XAVIER BECERRA
Attorney General of California
PETER A. MESHOT
Supervising Deputy Attorney General
OLIVER R. LEWIS, State Bar No. 133557
Deputy Attorney General
   1300 I Street, Suite 125
   P.O. Box 944255
   Sacramento, CA 94244-2550
   Telephone: (916) 210-7508
   Fax: (916) 322-8288
   E-mail: Oliver.Lewis@doj.ca.gov
*Attorneys for Defendants Jackie Clark,*
*Francis Ko, M.D., Michele Ditomas, M.D.,*
*Teresa Zink, R.N., and Wendy Harris*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **DERRICK OWENS,**<br><br>                                     Plaintiff,<br><br>          v.<br><br>**JACKIE CLARK, et al.,**<br><br><br><br>                                     Defendants. | 2:15-cv-00982 TLN KJN<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**<br><br><br><br>Date: NO HEARING DATE<br>**Time: LOCAL RULE 230(*l*)**<br><br>Action Filed:   October 8, 2015 |

TO DERRICK OWENS, PLAINTIFF PRO SE:

PLEASE TAKE NOTICE that, under Federal Rule of Civil Procedure (FRCP) 56 and Local Rule 230(l), Defendants Jackie Clark, Francis Ko, M.D., Michele Ditomas, M.D., Teresa Zink, R.N., and Wendy Harris ("Defendants"), move for summary judgment on the grounds that no genuine issue of material fact exists and, therefore, they are entitled to judgment as a matter of law.  FRCP 56(c).

1

1     Under Local Rule 230(l), no hearing will be held and the failure to file an opposition may

2  result in the granting of the motion and the dismissal of the action.

3     Plaintiff is advised to read the separate Rand Notice pursuant to *Rand v. Rowland*, 154 F.

4  3d 962-63 (9th Cir. 1998) (en banc), filed in conjunction herewith as a separate document.

5     The grounds for this motion are as follows:

6     1.   Defendants were not deliberately indifferent to Plaintiff's medical needs, and

7     2.   There are no disputed material facts to be adjudicated.

8     This motion is based on this notice of motion and motion, the accompanying

9  Memorandum of Points and Authorities, Defendant's Separate Statement of Undisputed Facts, the

10  Declaration of Oliver R. Lewis and the Declarations of Defendants Francis Ko, M.D., Michele

11  Ditomas, M.D., Teresa Zink, R.N., and Wendy Harris, the pleadings, records, and files in this

12  action, and such other matters as may properly come before the Court.

14  Dated:  December 1, 2017          Respectfully submitted,

15                     XAVIER BECERRA
                     Attorney General of California

16                     PETER A. MESHOT
                     Supervising Deputy Attorney General

17

                     ***/s/ Oliver R. Lewis***

18

                     OLIVER R. LEWIS

19                     Deputy Attorney General
                     *Attorneys for Defendants Jackie Clark,*

20                     *Francis Ko, M.D., Michele Ditomas, M.D.,*
                     *Teresa Zink, R.N., and Wendy Harris*

27  SA2016302529
    32971826.doc

28

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Derrick Owens v. Jackie Clark, et al.**
No.:         **2:15-cv-00982 TLN KJN**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On December 1, 2017, I served the attached DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES; SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS; SUPPORTING DECLARATIONS OF FRANCIS KO, M.D., MICHELE DITOMAS, M.D., TERESA ZINK, R.N., WENDY HARRIS, AND OLIVER R. LEWIS; RAND NOTICE, AND NOTICE OF LODGING by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550, addressed as follows:

Derrick Owens, V-49527
California Medical Facility
P.O. Box 2000
Vacaville, CA  95696-2000

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 1, 2017, at Sacramento, California.

| Lois M. Buzbee-Osby | */s/ Lois M. Buzbee-Osby* |
|:---:|:---:|
| Declarant | Signature |

SA2016302529
33156851.doc

1  XAVIER BECERRA
   Attorney General of California
2  PETER A. MESHOT
   Supervising Deputy Attorney General
3  OLIVER R. LEWIS, State Bar No. 133557
   Deputy Attorney General
4   1300 I Street, Suite 125
    P.O. Box 944255
5   Sacramento, CA 94244-2550
    Telephone: (916) 210-7508
6   Fax: (916) 322-8288
    E-mail:  Oliver.Lewis@doj.ca.gov
7  *Attorneys for Defendants Jackie Clark,*
   *Francis Ko, M.D., Michele DiTomas, M.D.,*
8  *Teresa Zink, R.N., and Wendy Harris*

9           IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11                   SACRAMENTO DIVISION

12

13 | **DERRICK OWENS,** | 2:15-cv-00982 TLN KJN |
14 |                    Plaintiff, | **DEFENDANTS' MEMORANDUM OF** |
15 |                                | **POINTS AND AUTHORITIES IN** |
   |                                | **SUPPORT OF MOTION FOR SUMMARY** |
16 |              v.                | **JUDGMENT OR, IN THE** |
   |                                | **ALTERNATIVE, SUMMARY** |
17 | **JACKIE CLARK, et al.,**      | **ADJUDICATION OF ISSUES** |
18 |                                |                        |
   |                                | Date: NO HEARING DATE  |
19 |                    Defendants. | **Time: LOCAL RULE 230(I)** |
20 |                                | Action Filed:  October 8, 2013 |
21

22                     **I.  INTRODUCTION**

23     Plaintiff Derrick Owens ("Plaintiff") is an inmate incarcerated within the California

24 Department of Corrections and Rehabilitation ("CDCR.") At all times alleged in his First

25 Amended Complaint ("FAC"), Plaintiff was an inmate at the California Medical Facility

26 ("CMF"), in Vacaville, California. Plaintiff alleges that Defendants violated his constitutional

27 rights under the Eighth Amendment.  Specifically, Plaintiff alleges Dr. Ko was deliberately

28 indifferent to his serious medical needs because he discontinued his morphine after it was found

                                   1

1    that Plaintiff breached his pain management contract with CDCR when he tested positive for

2    methamphetamines.

3         Plaintiff also alleges that Teresa Zink, R.N. was deliberately indifferent to his serious

4    medical needs because she collected a urine sample from him without wearing gloves and she

5    was of a different gender, in violation of CDCR policy.  Plaintiff further alleges that Michele

6    DiTomas, M.D. was also deliberately indifferent to his serious medical needs because she was a

7    supervising physician and she had the authority to overturn Dr. Ko's order discontinuing

8    Plaintiff's morphine.  With respect to Jackie Clark and Wendy Harris, Plaintiff's complaints are

9    that Ms. Clark denied his appeal and that Ms. Harris processed his appeal as a "routine" appeal

10   rather than an "emergency" appeal.

11        Plaintiff has no valid claims for deliberate indifference against any of the Defendants

12   because they did not disregard, ignore, or fail to respond to Plaintiff's medical needs. Plaintiff's

13   complaints against Defendants are not actionable under 42 U.S.C. § 1983.  Defendants are also

14   entitled to qualified immunity because their actions were objectively reasonable under the

15   circumstances.

**II.**

**STATEMENT OF FACTS**

18        At all relevant times, Plaintiff was an inmate incarcerated at CMF, in Vacaville, California.

19   (Separate Statement of Undisputed Material Facts "SSUMF" No. 1, 19, 30, 38 and 42.)  At all

20   relevant times, Defendant Ko was a physician and surgeon, employed by CDCR, at CMF,

21   Vacaville, California.  (SSUMF No. 2.)  At all relevant times, Teresa Zink, R.N. was employed

22   by CDCR as a registered nurse at CMF in Vacaville, California.  (SSUMF No. 20.)  At all relevant

23   times, Michele DiTomas, M.D. was the Chief Physician and Surgeon at CMF. (SSUMF No. 31.)

24   At all relevant times, Jackie Clark was the Chief Executive Officer at CMF.  (SSUMF No. 39.)

25   At all relevant times, Wendy Harris was a medical appeals coordinator employed by CDCR at

26   CMF in Vacaville, California. (SSUMF No. 43.)

27        On April 22, 2013, Plaintiff entered into a Pain Management Agreement ("Agreement")

28   with CDCR in order to receive morphine for his alleged chronic pain condition.  (SSUMF No. 5.)

2

1    Two of the conditions agreed to by Plaintiff in the Agreement were not to "cheek" the morphine

2    tablets and to submit to urine tests, as ordered by the health care provider, to detect improper use

3    of medications not prescribed. (SSUMF No. 6.)  On March 12, 2014, nursing staff noticed and

4    suspected that Plaintiff was not swallowing and was cheeking his morphine tablets. (SSUMF No.

5    7.)  After being notified by nursing staff that Plaintiff was suspected of cheeking his morphine

6    tablets, Dr. Ko ordered a urine test for Plaintiff. (SSUMF No. 8.)  Plaintiff submitted to a urine

7    test on April 11, 2014 and the results of the test showed a significant level of amphetamine in his

8    system, in violation of the pain management agreement. (SSUMF No. 9.)

9        **Defendant Francis Ko, M.D.**

10        As a result of Plaintiff violating his pain management agreement with CDCR, Dr. Ko

11    ordered that Plaintiff's morphine be discontinued and, on April 24, 2014, the order was placed to

12    reduce Plaintiff's daily morphine dose by 25% each week until completely off on May 24, 2014.

13    (SSUMF No. 10.)  When Plaintiff's morphine was completely discontinued, Dr. Ko did not

14    initially substitute his morphine with another pain medication because he wanted the morphine to

15    "wash out of his system" and get a baseline pain level.  Once the morphine was tapered off

16    completely, and only thereafter, could Plaintiff's baseline pain be assessed (including location on

17    his body, intensity, character, and how it impacted his activities of daily life [ADL's]).  There was

18    no way for Dr. Ko to predict what kind and how much of alternative treatment Plaintiff would

19    need.  It is possible Plaintiff's pain would be minimal or nonexistent when completely off the

20    morphine and, as a result, he would not need alternate pain medications. (SSUMF No. 11.)

21        Plaintiff knew how to seek immediate medical attention or to communicate with Dr. Ko if

22    his pain became unbearable at any time.  Plaintiff knew he could submit a Form 7362 (Health

23    Care Services Request) or present to California Medical Facility's Treatment and Triage Area 24

24    hours a day/7 days a week for immediate medical assistance.  He never exercised either option.

25    (SSUMF No. 12.)  After Plaintiff's morphine was completely cut off, Dr. Ko saw Plaintiff three

26    times: June 16, 2014, June 22, 2014, and July 24, 2014.  During the first two visits, Plaintiff did

27    not request any alternate pain medication. (SSUMF No. 13.)  On July 24, 2014, Plaintiff

28    requested alternate pain medication and Dr. Ko immediately prescribed him Ibuprofen 400 mg

3

1  and Nortriptyline 25 mg. (SSUMF No. 14.)  The only reason Dr. Ko discontinued Plaintiff's

2  morphine was because he had violated the Agreement.  Dr. Ko's action to discontinue the

3  morphine was authorized and justified by the terms of the pain management agreement.  Plaintiff

4  was well aware of that possibility when he entered into that agreement. (SSUMF No. 15.)

5      All of the medical care and treatment rendered to Plaintiff by Dr. Ko was appropriate and

6  consistent with Plaintiff's symptoms, medical condition and history, and, at all times, within the

7  community standard of care and consistent with the degree of knowledge and skill ordinarily

8  possessed and exercised by members of my profession under similar circumstances.  Dr. Ko have

9  never refused or denied Plaintiff appropriate medical treatment or evaluation.  (SSUMF No. 16.)

10  Plaintiff received all reasonable and necessary care to address his condition, at CMF, and the

11  treatment provided was consistent with the community standard of care and CDCR policies and

12  procedures.  (SSUMF No. 17.)  At all times, Dr. Ko treated Plaintiff with dignity and respect in

13  an honest effort to treat his condition.  At no time did he refuse to provide Plaintiff with medical

14  care or treatment. At no time did he intentionally or knowingly cause Plaintiff any injury or harm.

15  (SSUMF No. 18.)

16  **Defendant Teresa Zink, R.N.**

17      Plaintiff's allegations against Nurse Zink are that, in April 2014, she collected a urine

18  sample from him in violation of Title 15, section 52010.17, which requires that staff observing

19  the collection of a urine sample be of the same gender as the inmate being tested. (SSUMF No.

20  21.)  However, Title 15, Section 52010.17 applies only to "custody" situations, not to medically-

21  related issues.  (SSUMF No. 22.)  There are no CDCR regulations or policies preventing same-

22  gender nursing staff from collecting urine samples from inmates for medical reason. (SSUMF No.

23  23.)

24      In this case, in April, 2014, Dr. Ko had issued an order to collect a urine sample from

25  Plaintiff because nursing staff suspected that Plaintiff was cheeking his morphine tablets.

26  (SSUMF No. 24.)  The purpose of Dr. Ko's order was to determine the level of morphine in

27  Plaintiff's system to ensure that he was, in fact, ingesting his morphine.  (SSUMF Nos. 8 and 25.)

28

4

1  However, the result of the urine collection showed levels of both morphine and

2  methamphetamine. (SSUMF No. 26.)

3      Plaintiff also complains that Nurse Zink did not use gloves when she handed him the

4  receptacle for his urine sample. Nurse Zink's practice is to always wear gloves during the course

5  of urine collections. Therefore, it is extremely unlikely that she was not wearing gloves in this

6  case. (SSUMF No. 27.) Even if Nurse Zink had not worn gloves during Plaintiff's urine sample

7  collection, it would have been irrelevant because any physical contact with methamphetamine

8  would not have caused Plaintiff to test positive for methamphetamine. Levels of

9  methamphetamine can only be found in a urine sample when someone has used

10  methamphetamine within a few days prior to the test. (SSUMF No. 28.) Other than collecting a

11  urine sample from Plaintiff, Nurse Zink did not have any other personal interaction with Plaintiff.

12  (SSUMF No. 29.)

13      **Defendant Michele DiTomas, M.D.**

14      Plaintiff's only complaint against Dr. DiTomas is that she was a supervising physician and

15  she had the authority to overturn the order terminating Plaintiff's morphine. (SSUMF No. 32.)

16  As the Chief Physician and Surgeon at CMF, Dr. DiTomas' only involvement in this case was

17  that she denied Plaintiff's appeal at the first level of review because he had violated the terms of

18  his pain management agreement. (SSUMF No. 33.) On April 11, 2014, a urine toxicology test

19  showed that Plaintiff had methamphetamines in his body, in violation of the pain management

20  agreement entered into between Plaintiff and the California Department of Corrections and

21  Rehabilitation, in 2013. (SSUMF No. 34.) Federal and State regulations recommend prescribing

22  doctors to stop prescribed narcotics where the risks to the patient outweigh the benefits. (SSUMF

23  No. 35.) In this case, because Plaintiff was being prescribed morphine, the finding of

24  methamphetamines in his body was not only a violation of his pain management agreement, but

25  also a serious risk to his health. That is why Plaintiff's primary care physician, Dr. Francis Ko,

26  discontinued Plaintiff's morphine and Dr. DiTomas denied his appeal. (SSUMF No. 36.)

27  ////

28  ////

5

1   At no time was Dr. DiTomas ever deliberately indifferent to Plaintiff's serious medical

2   needs.  On the contrary, Dr. DiTomas' denial of his first level of review was to ensure that

3   Plaintiff's health would not be jeopardized. (SSUMF No. 37.)

4   **Defendant Jackie Clark**

5   Plaintiff's only complaint against Jackie Clark is the same as that against Dr. DiTomas--

6   she was a supervisor (Chief Executive Officer) and she denied his appeal at the second level of

7   review.  (SSUMF No. 40.)  Jackie Clark denied Plaintiff's appeal at the second level of review

8   because Plaintiff violated the terms of his pain management agreement entered into on April 22,

9   2013. (SSUMF No. 41.)

10   **Defendant Wendy Harris**

11   Plaintiff's complaint against Wendy Harris is that she processed his appeal as a "routine"

12   rather than "emergency" appeal. (SSUMF No. 44.)  On June 19, 2014, Plaintiff submitted a 602

13   medical appeal (Number 14039699) and Wendy Harris received it on June 27, 2014. (SSUMF

14   No. 45.)  Upon receipt of Plaintiff's appeal, Wendy Harris assigned a due date of August 8, 2014

15   for Appeal No. 14039699. (SSUMF No. 46.)  Plaintiff's Appeal No. 14039699 was not

16   designated as an "emergency" appeal by his health care provider, Dr. Ko or any other health care

17   provider. (SSUMF No. 47.)  As a medical appeals coordinator, Wendy Harris did not have the

18   authority to designate an appeal as either "routine" or "emergency." (SSUMF No. 48.)  An appeal

19   can only be designated as "routine" or "emergency" by a clinician (R.N. or higher licensing level)

20   and Wendy Harris is not a clinician. (SSUMF Nos. 49 and 50.)

21   **III.**

22   **ARGUMENT**

23   **A.   THE SUMMARY JUDGMENT STANDARD**

24   Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be

25   granted when there is no genuine issue as to any material fact and the moving party is entitled to

26   judgment as a matter of law.  In *Celotex Corporation v. Katrett*, 477 U.S. 317 (1986), the United

27   States Supreme Court stated that:

28

6

> "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. (Id., 477 U.S. at 322-323.) The failure of a nonmoving party to prove an essential element of its claim renders all other facts immaterial."

(*Id.*, 477 U.S. at 332.)

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242-248 (1986), the Supreme Court made it clear that a party opposing a motion for summary judgment must affirmatively show that a dispute about a material fact is genuine, such that a reasonable jury could return a verdict for the nonmoving party. *Id.*, 477 U.S. at 248. This standard requires that this Court grant this motion if the evidence proved against the defendants' motion is "merely colorable" or "not significantly probative." (*Id.*, 477 U.S. at 429; *Isenberg v. Insurance Company of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987). Thus, Plaintiff may not rest on his complaint in opposition to Defendants' motion for summary judgment. *First National Bank of Arizona v. City Service Co.*, 391 U.S. 253, 289 (1968).

**B.   STANDARD FOR DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**

Prison inmates have a constitutional right to medical care. However, prison authorities are not required to provide inmates with optimum medical care. Inmates are entitled to that care necessary to treat serious medical conditions. Stated another way, state prison authorities do not violate the constitution by providing poor or no medical care unless they are proven to have been deliberately indifferent to the serious medical needs of inmates. *Estelle v. Gamble*, 429 U.S. 97, 104 (1975); *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1987); *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980). To establish a constitutional claim, the inmate must show more than mere negligence or indifference. *Id.*

With respect to his contention that he was deprived medical care, Plaintiff attempts to create a cause of action under *Estelle v. Gamble, supra*. Under *Estelle* a prisoner states a cause of

7

1  action pursuant to section 1983 if he alleges: "[a] deliberate indifference to serious medical needs

2  of prisoners. . . This is true whether the indifference is manifested by prison doctors in their

3  response to the prisoners needs or by prison guards intentionally denying or delaying access to

4  medical care or intentionally interfering with the treatment prescribed." *Id.* at 104-105. The

5  alleged denial of adequate medical care must involve facts "repugnant to the conscience of

6  mankind'" under "'evolving standards of decency'" to amount to a violation of the Eighth

7  Amendment. *Id.* at 105-106. "Thus, a complaint that a physician has been negligent in

8  diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

9  under the Eighth Amendment.  Medical malpractice does not become a constitutional violation

10 merely because the victim is a prisoner." *Id.* at 106.  Rather the indifference to medical needs

11 must be "substantial" and "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not

12 support this cause of action." *Broughton v. Cutler Laboratories*, 622 F.2d 458, 460 (9th Cir.

13 1980), quoting *Estelle, supra*, 429 U.S. at 105-106.

14 

15 

16       The Ninth Circuit has acknowledged that "deliberate indifference" is a higher standard than

17 gross negligence. *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989; see also *Archie v. City of*

18 *Racine*, 847 F.2d 1211, 1218-20 (7th Cir. 1988).)  In order to establish deliberate indifference,

19 there must be evidence of a purposeful act or failure to act on the part of the defendant and

20 resulting harm. *Farmer v. Brennan*, 511 U.S. 825, 837-839 (1994); *Shapely v. Nevada*, 766 F.2d

21 404, 407 (9th Cir. 1985).  As expressed by the Supreme Court in *Whitley v. Albers*, 475 U.S. 312,

22 318 (1985), "a prison physician's negligence in diagnosing or treating a medical condition [does]

23 not suffice to make out a claim of cruel and unusual punishment.  It is obduracy and wantonness,

24 not inadvertence or error in good faith, that characterizes the conduct prohibited by the [Eighth

25 Amendment]."

26 

27 / / / /

28 

8

In cases involving complex medical issues expert medical opinion testimony is necessary to establish deliberate indifference. *See Hutchinson v. United States*, 838 F.2d 390 (9th Cir. 1988). Expert testimony is also necessary to show that actual harm was caused by the alleged failure to provide care or treatment.

A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation or deliberate indifference under the Eighth Amendment. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). Inadequate treatment due to malpractice or even gross negligence does not constitute an Eight Amendment violation. *Wood*, 900 F.2d at 1334; *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980). A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992).[1] It is also relevant to consider whether the plaintiff can establish more than one isolated instance of neglect. *Wood*, 900 F.2d at p. 1334.

In short, isolated occurrences of neglect do not establish a constitutional violation. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). Mere delay in the receipt of treatment, without more, does not establish deliberate indifference. (*Shapley, supra*, 766 F.2d at 407; *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989).) To establish a violation, it must be shown that the delay caused substantial harm. (*Wood, supra*, 900 F.2d at 1335.) Where only a difference of opinion as to diagnosis and treatment is shown, no violation is established. *Shields v. Kunkle*, 442 F.2d 409, 410 (9th Cir. 1971); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

/ / / /

---

[1]/ Overruled on other grounds by *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

9

## C.    DEFENDANT KO DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS

In this case, Plaintiff essentially complains of Defendant Ko only to the extent that he discontinued his morphine and did not provide him with alternate medications. As testified by Dr. Ko in his declaration filed in conjunction herewith, the only reason Plaintiff's morphine was discontinued was because Plaintiff violated of his pain management contract with CDCR, when levels of methamphetamines were found in his urine. As such, Dr. Ko was justified in terminating Plaintiff's morphine. Furthermore, as also testified by Dr. Ko, Plaintiff was not immediately provided with an alternate pain medication because Dr. Ko wanted the morphine to wash out of Plaintiff's system and get a baseline pain level. Additionally, even though Plaintiff saw Dr. Ko twice on June 16 and 24, 2014, he did not request any alternate pain medication until July 24, 2014, at which time Dr. Ko immediately prescribed Ibuprofen 400 mg and Nortriptyline 25 mg.

Plaintiff's pain management agreement (Ex. A to Dr. Ko's declaration) made it clear, at paragraph 13, that Dr. Ko could discontinue Plaintiff's morphine if other unprescribed medications were found in his system. More importantly, as testified by Dr. Ko in his declaration, the combination of morphine and methamphetamine in Plaintiff's system could cause a serious medical risk to his health. Therefore, Dr. Ko was justified in discontinuing Plaintiff's morphine and he was not deliberately indifferent to his serious medical needs.

## D.    DEFENDANT ZINK DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS

Plaintiff complains of Defendant Zink because she collected his urine sample, allegedly in violation of Title 15, section 52010.17, which requires that staff observing the collection of a urine sample be of the same gender as the inmate being tested. He further complains that Nurse Zink was not wearing gloves when she handed him the urine receptacle, thereby implying that the container may have been contaminated by her.

10

1  Plaintiff's first argument must fail because Title 15 Section 52010.17 is a part of Chapter 5

2  which only applies to "Custody and Security Operations." It does not apply to medical staff.

3  Therefore, Nurse Zink was justified in implementing Dr. Ko's order to collect a urine sample

4
5  from Plaintiff. Plaintiff's second argument must also fail because levels of methamphetamine can

6  only be found in a urine sample when someone has used methamphetamine within a few days

7  prior to the test. (SSUMF No. 28.)

8  **E.  DEFENDANT DITOMAS DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT**
      **RIGHTS**
9
10  Plaintiff complains of Michele DiTomas, M.D. because she was a supervising physician

11  and she had the authority to overturn Dr. Ko's order terminating Plaintiff's morphine, and she

12  failed to do so when she denied his appeal at the first level. Generally, denying a prisoner's

13  appeal does not cause or contribute to the underlying action. *George v. Smith*, 507 F.3d 605, 609

14  (7th Cir. 2007.) The review assessment of a correctional medical official may constitute

15  deliberate indifference only if the official was aware that the underlying challenged medical

16
17  decision caused plaintiff "further significant injury or the unnecessary and wanton infliction of

18  pain," and the official purposefully failed to pursue an appropriate medical remedy. *Jett v.*

19  *Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006.)

20  Here, Dr. DiTomas had a right to rely upon the judgment of examining physicians, such as

21  Dr. Ko, that Plaintiff's morphine should be discontinued under the circumstances. Plaintiff's

22  urine sample test result clearly showed that he had used methamphetamine. In addition to this

23  fact being a violation of Plaintiff's pain management agreement, Dr. Ko and Dr. DiTomas further
24
25  opined that the combination of morphine and methamphetamine in Plaintiff's body could

26  potentially cause a serious health risk. Therefore, Dr. DiTomas was justified in denying Plaintiff's

27  appeal.

28  Plaintiff's appeal is also based on his claim that he should have been provided some

11

alternate pain relief.  However, Plaintiff never requested any pain medication from anyone until

he met with Dr. Ko, on July 24, 2014, at which time Dr. Ko prescribed Ibuprofen 400 mg and

Nortriptyline 25 mg.  Dr. Ko and Dr. DiTomas cannot be faulted for failing to prescribe alternate

pain medication for Plaintiff when it was not requested.

As a reviewer of Plaintiff's appeal at the first level, given the circumstances, Dr. DiTomas

was justified in denying Plaintiff's appeal and Plaintiff's claim of deliberate indifference against

her must fail.

**F.    DEFENDANT CLARK DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS**

Plaintiff's complaint against Defendant Jackie Clark is similar to that of Dr. DiTomas.  He

alleges that, as the Chief Executive Officer, Ms. Clark was a supervisor and, as such she could

have overturned Dr. Ko's order to discontinue the morphine.  Plaintiff's argument against Ms.

Clark fails for the same reasons as those discussed above in Section E.

**G.    DEFENDANT HARRIS DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS**

Plaintiff's complaint against Defendant Harris is that, as the appeals coordinator, she

processed his appeal No. 14039699 as "routine" rather than "emergency."  However, as testified

to by Ms. Harris in her declaration filed herewith, Plaintiff's appeal was not designated as an

"emergency" appeal by his health care provided, when she received it on June 27, 2014.  As a

medical appeals coordinator, Ms. Harris did not have the authority to designate an appeal as either

"routine" or "emergency," since only a clinician at the registered nurse, or higher, licensing level

can make such designation, and she is not a clinician.  (SSUMF Nos. 48-50.)  Therefore,

Plaintiff's claim of deliberate indifference against Ms. Harris must fail.

////

////

12

# IV.

## DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

> Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." [Citation] The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Ibid. As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

*Saucier v. Katz*, 533 U.S. 194, 200-201 (2001).

To determine whether qualified immunity exists, the court must determine whether the right is "clearly established". *Pearson v. Callahan*, 129 S. Ct. 808, 818, 821-822 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable person that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-202. The plaintiff carries the burden of showing that a right was "clearly established" under the circumstances at the time the alleged misconduct occurred. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

For a public employee to be denied qualified immunity, the circumstances must have been such that it would be obvious to a reasonable employee, similarly situated, that his behavior was unconstitutional. *KRL v. Estate of Moore*, 512 F.3d 1184, 1191 (9th Cir. 2008). If reasonable minds could differ, under the circumstances, as to whether the behavior was constitutionally permissible, then qualified immunity is appropriate. *Id.*

In the present case, Dr. Ko's actions were objectively reasonable. Dr. Ko used his professional judgment and decided to discontinue Plaintiff's morphine because Plaintiff had violated the terms of his pain management agreement by using methamphetamine and because the combination of morphine and methamphetamine in Plaintiff's body created a potential serious

13

risk to his health.  Under such circumstances, Plaintiff cannot carry his burden of showing that it would have been clear that Dr. Ko's treatment of him was constitutionally impermissible.  If his treatment was arguably within the standard of care, and, thus, arguably reasonable under the circumstances, then he is entitled to qualified immunity.  This Court should, therefore, grant summary judgment to Dr. Ko because he has qualified immunity.  Doctors should not be forced to stand trial for an Eighth Amendment violation where they could have believed that they were acting within the standard of care and when they never refused to treat a patient.

Defendant Zink's action was also objectively reasonable.  Her only involvement, in this case, is that she implemented Dr. Ko's order to collect a urine sample from Plaintiff.  Plaintiff's claim that she violated CDCR regulations, when she collected the urine sample, because she is not of his same gender is without merit since Title 15 section 52010.17 is only applicable to custody operations, not to medically-related issues.

Defendants DiTomas' and Clark's actions were also objectively reasonable under the circumstances.  As appeals reviewers, they were both entitled to rely on Dr. Ko's action to discontinue Plaintiff's morphine because of the health risk involved in having both morphine and methamphetamine in Plaintiff's body.

With respect to Defendant Harris, her action to process Plaintiff's appeal as a routine appeal was also objectively reasonable.  She was not authorized to designate Plaintiff's appeal as an "emergency" appeal.  Only Plaintiff's health care providers could do so, and Plaintiff's appeal was not designated as such.

This Court should, therefore, grant summary judgment in favor of Defendants because they have qualified immunity.

////

////

14

1

## V.

## CONCLUSION

Defendants are entitled to judgment as a matter of law because they did not violate Plaintiff's Eighth Amendment rights. Therefore, Defendants respectfully request that their motion for summary judgment be granted and that judgment be entered in their favor.

Dated:  December 1, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
PETER A. MESHOT
Supervising Deputy Attorney General

*/s/ Oliver R. Lewis*

OLIVER R. LEWIS
Deputy Attorney General
*Attorneys for Defendants Jackie Clark,
Francis Ko, M.D., Michele Ditomas, M.D.,
Teresa Zink, R.N., and Wendy Harris*

SA2016302529
32971810.doc

15

XAVIER BECERRA
Attorney General of California
PETER A. MESHOT
Supervising Deputy Attorney General
OLIVER R. LEWIS, State Bar No. 133557
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7508
 Fax: (916) 322-8288
 E-mail: Oliver.Lewis@doj.ca.gov
*Attorneys for Defendants Jackie Clark,*
*Francis Ko, M.D., Michele Ditomas, M.D.,*
*Teresa Zink, R.N., and Wendy Harris*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **DERRICK OWENS,**<br><br>Plaintiff,<br><br>v.<br><br>**JACKIE CLARK, et al.,**<br><br>Defendant. | 2:15-cv-00982 TLN KJN<br><br>**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**<br><br>Date: NO HEARING DATE<br>**Time: LOCAL RULE 230(*l*)**<br><br>Action Filed:  October 8, 2015 |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

**AS TO DEFENDANT FRANCIS KO, M.D.**

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 1. At all relevant times Plaintiff was a state prisoner incarcerated within the California Department of Corrections and Rehabilitation ("CDCR") at the California Medical Facility ("CMF") in Vacaville, California. | 1.  First Amended Verified Complaint. ("FAC") |

1

| | |
|---|---|
| 2. At all relevant times, Defendant Francis Ko, M.D. was a physician and surgeon employed by CDCR at CMF in Vacaville, California. | 2. Ko Decl., ¶ 1 . |
| 3. Plaintiff's complaint against Dr. Ko only involves events that took place in April and May, 2014. | 3. Owens Depo., 17:11-23. |
| 4. Plaintiff alleges in his FAC that Dr. Ko violated his Eighth Amendment rights when he tapered his morphine, on April 24, 2014, and did not immediately provide him with alternate medications. | 4. FAC, ¶ IV, et seq.; Ko Decl., ¶ 5. |
| 5. On April 22, 2013, Plaintiff entered into a Pain Management Agreement ("Agreement") with CDCR in order to receive morphine for his alleged chronic pain condition. | 5. Ko Decl., ¶ 6. |
| 6. Two of the conditions agreed to by Plaintiff in the Agreement were not to "cheek" the morphine tablets and to submit to urine tests, as ordered by the provider, to detect improper use of medications not prescribed. | 6. Ko Decl., ¶ 6. |
| 7. On March 12, 2014, nursing staff noticed and suspected that Plaintiff was not swallowing and was cheeking his morphine tablets. | 7. Ko Decl., ¶ 7. |
| 8. After being notified by nursing staff that Plaintiff was suspected of cheeking his morphine tablets, Dr. Ko ordered a urine test for Plaintiff. | 8. Ko Decl., ¶ 7. |
| 9. Plaintiff submitted to a urine test on April 11, 2014 and the results of the test showed a significant level of amphetamine in his system. | 9. Ko Decl., ¶ 8. |
| 10. Pursuant to the terms of Agreement, I then ordered that Plaintiff's morphine be discontinued and, on April 24, 2014, the order was placed to reduce Plaintiff's daily morphine dose by 25% each week until completely off on May 24, 2014. This was required due to Plaintiff's violation of the Agreement. | 10. Ko Decl., ¶ 8. |

2

| | |
|---|---|
| 11.  When Plaintiff's morphine was completely discontinued, Dr. Ko did not initially substitute his morphine with another pain medication because he wanted the morphine to "wash out of his system" and get a baseline pain level. Once the morphine was tapered off completely, and only thereafter, could Plaintiff's baseline pain be assessed (including location on his body, intensity, character, and how it impacted his activities of daily life [ADL's]).  There was no way for Dr. Ko to predict what kind and how much of alternative treatment Plaintiff would need.   It is possible Plaintiff's pain would be minimal or nonexistent when completely off the morphine and, as a result, he would not need alternate pain medications. | 11.  Ko Decl., ¶ 9. |
| 12.  Plaintiff knew how to seek immediate medical attention or to communicate with Dr. Ko if his pain became unbearable at any time. Plaintiff knew he could submit a Form 7362 (Health Care Services Request) or present to California Medical Facility's Treatment and Triage Area 24 hours a day/7 days a week for immediate medical assistance.  He never exercised either option. | 12.  Ko Decl., ¶ 10. |
| 13.  After Plaintiff's morphine was completely cut off, Dr. Ko saw Plaintiff three times: June 16, 2014, June 22, 2014, and July 24, 2014. During the first two visits, Plaintiff did not request any alternate pain medication. | 13.  Ko Decl., ¶ 11. |
| 14.  On July 24, 2014, Plaintiff requested alternate pain medication and I immediately prescribed him Ibuprofen 400 mg and Nortriptyline 25 mg. | 14.  Ko Decl., ¶ 12. |
| 15.  The only reason Dr. Ko discontinued Plaintiff's morphine was because he had violated the Agreement.  Dr. Ko's action to discontinue the morphine was authorized and justified by the terms of the Agreement, especially due to the potential health risk Plaintiff having both morphine and methamphetamine in his system. Plaintiff was well aware of that possibility when he entered into the Agreement in question. | 15.  Ko Decl., ¶ 13. |

| | |
|---|---|
| 16.  All of the medical care and treatment rendered to Plaintiff by Dr. Ko was appropriate and consistent with Plaintiff's symptoms, medical condition and history, and, at all times, within the community standard of care and consistent with the degree of knowledge and skill ordinarily possessed and exercised by members of my profession under similar circumstances.  Dr. Ko has never refused or denied Plaintiff appropriate medical treatment or evaluation. | 16.  Ko Decl., ¶ 14. |
| 17.  Plaintiff received all reasonable and necessary care to address his condition, at CMF, and the treatment provided was consistent with the community standard of care and CDCR policies and procedures. | 17.  Ko Decl., ¶15. |
| 18.  At all times, Dr. Ko treated Plaintiff with dignity and respect in an honest effort to treat his condition.  At no time did he refuse to provide Plaintiff with medical care or treatment. At no time did he intentionally or knowingly cause Plaintiff any injury or harm. | 18.  Ko Decl., ¶ 16. |

## AS TO DEFENDANT TERESA ZINK, R,N,

| **UNDISPUTED MATERIAL FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 19.  At all relevant times Plaintiff was a state prisoner incarcerated within the California Department of Corrections and Rehabilitation ("CDCR") at the California Medical Facility ("CMF") in Vacaville, California. | 19.  FAC. |
| 20.  At all relevant times, Teresa Zink, R.N. was employed by CDCR as a registered nurse at CMF in Vacaville, California. | 20.  Zink Decl., ¶¶ 1 and 2. |
| 21.  In his First Amended Complaint ("FAC"), Plaintiff alleges that, in April 2014, Nurse Zink collected a urine sample from him in violation of Title 15, section 52010.17, which requires that staff observing the collection of a urine sample be of the same gender as the inmate being tested. | 21.  FAC; Zink Decl. ¶ 5. |
| 22.  Title 15, Section 52010.17 applies only to "custody" situations, not to medically-related issues. | 22.  Zink Decl. ¶ 6. |

4

| | |
|---|---|
| 23. There are no CDCR regulations or policies preventing same-gender nursing staff from collecting urine samples from inmates for medical reason. | 23. Zink Decl. ¶ 6. |
| 24. In this case, in April, 2014, Dr. Ko issued an order to collect a urine sample from Plaintiff because nursing staff suspected that Plaintiff was cheeking his morphine tablets. | 24. Zink Decl. ¶ 7. |
| 25. The purpose of Dr. Ko's order was to determine the level of morphine in Plaintiff's system to ensure that he was, in fact, ingesting his morphine. | 25. Zink Decl. ¶ 7. |
| 26. The result of the urine collection showed levels of both morphine and methamphetamine. | 26. Zink Decl., ¶7. |
| 27. Plaintiff also complains that Nurse Zink did not use gloves when she handed him the receptacle for his urine sample. Nurse Zink's practice is to always wear gloves during the course of urine collections. Therefore, it is extremely unlikely that she was not wearing gloves in this case. | 27. Zink Decl., ¶8. |
| 28. Even if Nurse Zink had not worn gloves during Plaintiff's urine sample collection, it would have been irrelevant because any physical contact with methamphetamine would not have caused Plaintiff to test positive for methamphetamine. Levels of methamphetamine can only be found in a urine sample when someone has used methamphetamine within a few days prior to the test. | 28. Zink Decl., ¶9. |
| 29. Other than collecting a urine sample from Plaintiff, Nurse Zink did not have any other personal interaction with Plaintiff. | 29. Zink Decl., ¶10. |

## AS TO DEFENDANT MICHELE DITOMAS, M.D.

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 30. At all relevant times Plaintiff was a state prisoner incarcerated within the California Department of Corrections and Rehabilitation ("CDCR") at the California Medical Facility ("CMF") in Vacaville, California. | 30. FAC. |

5

| | |
|---|---|
| 31.  At all relevant times, Michele DiTomas, M.D. was the Chief Physician and Surgeon at CMF. | 31.  DiTomas Decl.,¶ 2. |
| 32.  Plaintiff's only complaint against Dr. DiTomas is that she was a supervising physician and she had the authority to overturn Dr. Ko's order terminating Plaintiff's morphine. | 32.  FAC,  p. 16 of 150. |
| 33.  Dr. DiTomas' only involvement in this case is that she denied Plaintiff's appeal at the first level of review. | 33.  DiTomas Decl.,¶ 3. |
| 34.  On April 11, 2014, a urine toxicology test showed that Plaintiff had methamphetamines in his body, in violation of the pain management agreement entered into between Plaintiff and the California Department of Corrections and Rehabilitation, in 2013. | 34.  DiTomas Decl.,¶ 4. |
| 35.  Federal and State regulations recommend prescribing doctors to stop prescribed narcotics where the risks to the patient outweigh the benefits. | 35.  DiTomas Decl.,¶ 5. |
| 36.  In this case, because Plaintiff was being prescribed morphine, the finding of methamphetamines in his body was not only a violation of his pain management agreement, but also a serious risk to his health.  That is why Plaintiff's primary care physician, Dr. Francis Ko, discontinued Plaintiff's morphine and Dr. DiTomas denied his appeal. | 36.  DiTomas Decl.,¶ 6. |
| 37.  At no time was Dr. DiTomas ever deliberately indifferent to Plaintiff's serious medical needs.  On the contrary, Dr. DiTomas' denial of his first level of review was to ensure that Plaintiff's health would not be jeopardized. | 37.  DiTomas Decl.,¶ 7. |

## AS TO DEFENDANT JACKIE CLARK

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 38.  At all relevant times Plaintiff was a state prisoner incarcerated within the California Department of Corrections and Rehabilitation ("CDCR") at the California Medical Facility ("CMF") in Vacaville, California. | 38.  FAC (DOC. 24). |
| 39.  At all relevant times, Jackie Clark was the Chief Executive Officer at CMF. | 39.  FAC (DOC. 24), Ex. 18, p. 85 of 150. |

6

| | |
|---|---|
| 40.  Plaintiff's only complaint against Jackie Clark is the same as that against Dr. DiTomas- she was a supervisor and she denied his appeal at the second level of review. | 40.  FAC (DOC. 24), p. 8 of 150; Owens Depo., 43:7-24. |
| 41.  Jackie Clark denied Plaintiff's appeal at the second level of review because Plaintiff violated the terms of his pain management agreement entered into on April 22, 2013. | 41.  FAC (DOC. 24), Ex. 18, p. 85 of 150. |

### AS TO DEFENDANT WENDY HARRIS

| | |
|---|---|
| 42.  At all relevant times Plaintiff was a state prisoner incarcerated within the California Department of Corrections and Rehabilitation ("CDCR") at the California Medical Facility ("CMF") in Vacaville, California. | 42.  FAC (DOC. 24). |
| 43.  At all relevant times, Wendy Harris was a medical appeals coordinator employed by CDCR at CMF in Vacaville, California. | 43.  Harris Decl.,¶ 2. |
| 44.  Plaintiff's complaint against Wendy Harris is that she processed his appeal as a "routine" rather than "emergency" appeal. | 44.  FAC (DOC. 24), p. 12 of 150. |
| 45.  On June 19, 2014, Plaintiff submitted a 602 medical appeal (Number 14039699) and Wendy Harris received it on June 27, 2014. | 45.  Harris Decl.,¶ 4. |
| 46.  Wendy Harris assigned a due date of August 8, 2014 for Appeal No. 14039699. | 46.  Harris Decl.,¶ 4. |
| 47.  Plaintiff's Appeal No. 14039699 was not designated as an "emergency" appeal by his health care provider, Dr. Ko or any other health care provider. | 47.  Harris Decl.,¶ 5. |
| 48.  As a medical appeals coordinator, Wendy Harris did not have the authority to designate an appeal as either "routine" or "emergency." | 48.  Harris Decl.,¶ 6. |

| 49. An appeal is designated as "routine" or "emergency" only by a clinician (R.N. or higher licensing level.) | 49. Harris Decl.,¶ 7. |
|---|---|
| 50. Wendy Harris is not a clinician. | 50. Harris Decl.,¶ 6. |

Dated:  December 1, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
PETER A. MESHOT
Supervising Deputy Attorney General

*/s/ Oliver R. Lewis*

OLIVER R. LEWIS
Deputy Attorney General
*Attorneys for Defendants Jackie Clark,
Francis Ko, M.D., Michele Ditomas, M.D.,
Teresa Zink, R.N., and Wendy Harris*

SA2016302529
32971848.doc

8

1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  PETER A. MESHOT, State Bar No. 117061
   Supervising Deputy Attorney General
3  OLIVER R. LEWIS, State Bar No. 133557
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone: (916) 210-7508
6    Fax: (916) 322-8288
     E-mail: Oliver.Lewis@doj.ca.gov
7  *Attorneys for Defendants Jackie Clark,*
   *Francis Ko, M.D., Michele Ditomas, M.D.,*
8  *Teresa Zink, R.N., and Wendy Harris*

9

                IN THE UNITED STATES DISTRICT COURT
10
              FOR THE EASTERN DISTRICT OF CALIFORNIA
11
                        SACRAMENTO DIVISION
12

13

14 | **DERRICK OWENS,** | 2:15-cv-00982 TLN KJN |
|---|---|
15 | Plaintiff, | **DECLARATION OF FRANCIS KO, M.D.** |
| | **IN SUPPORT OF DEFENDANTS'** |
16 | v. | **MOTION FOR SUMMARY JUDGMENT** |
| | **OR, IN THE ALTERNATIVE,** |
17 | **JACKIE CLARK, et al.,** | **SUMMARY ADJUDICATION OF** |
| | **ISSUES** |
18 | Defendants. | |
19 | | |

20       I, Francis Ko, M.D. hereby declare as follows:

21       All of the following information is based on my own personal knowledge and, if called to

22  testify, I could do so competently.

23       1.     I am a physician and surgeon licensed by the Medical Board of California since May

24  9, 1997. At all times relevant to Plaintiff's First Amended Complaint ("FAC") I was employed as

25  such by the California Department of Corrections & Rehabilitation ("CDCR") at the California

26  Medial Facility ("CMF") in Vacaville, California.

27       2.     I graduated from an accredited medical school in the United States in 1994, and I am

28  board certified by the American Board of Medical Specialties® (ABMS®).

1

3.    As a physician and surgeon, my responsibilities include examination of patients and diagnosing their illness, prescribing medication, and administrating medical treatment.  In addition, my duties involve running of the clinics, providing comprehensive examination, evaluation and treatment to patients/inmate.  Interpreting labs and imaging results, prescribing medications, performing minor surgical procedures, taking part in the institutional pain management committee, diagnosis, and referral to other specialists for higher level of care treatment.  I also provide treatment for comprehensive management/assessment of pain.

4.    I am a Defendant in this case.  This declaration is based on my professional training, and experience and knowledge, review of the FAC and of Plaintiff's medical records.

5.    Plaintiff alleges in his FAC that I violated his Eighth Amendment rights when I tapered his morphine, on April 24, 2014, and did not immediately provide him with alternate medications.

6.    On April 22, 2013, Plaintiff entered into a Pain Management Agreement ("Agreement") with CDCR in order to receive morphine for his alleged chronic pain condition. (See **Exhibit A**, attached hereto and incorporated herein by reference).  Two of the conditions agreed to by Plaintiff in the Agreement were not to "cheek" the morphine tablets and to submit to urine tests, as ordered by the provider, to detect improper use of medications not prescribed.

7.    On March 12, 2014, nursing staff noticed and suspected that Plaintiff was not swallowing and was cheeking his morphine tablets.  After being notified of this suspicion, I ordered a urine test for Plaintiff.

8.    Plaintiff submitted to a urine test on April 11, 2014 and the results of the test showed a significant level of methamphetamine in his system.  Although Plaintiff alleges that the urine sample may have been contaminated by Nurse Zink because she allegedly did not wear gloves when she handed him the urine receptacle, it is an unrealistic scenario.  Detectable levels of methamphetamine can only be found in a urine sample when someone has used methamphetamine within a few days prior to the test.  Pursuant to the terms of Agreement, I then ordered that Plaintiff's morphine be discontinued and, on April 24, 2014, the order was placed to reduce Plaintiff's daily morphine dose by 25% each week until completely off on May 24, 2014.

2

1   This was required due to Plaintiff's violation of the Agreement and, more importantly, because

2   the combination of morphine and methamphetamine could cause a serious medical risk to

3   Plaintiff's health.

4       9.      When Plaintiff's morphine was completely discontinued, I did not initially substitute

5   his morphine with another pain medication because I wanted the morphine to "wash out of his

6   system" and get a baseline pain level.   Once he tapered off the morphine completely, and only

7   thereafter, can his baseline pain be assessed (including location on his body, intensity, character,

8   and how it impacts his activities of daily life [ADL's]).   There was no way ahead of time I could

9   predict what kind and how much of alternative pain treatment Plaintiff would need.   It is possible

10  his pain would be minimal (or nonexistent) when completely off the morphine and, as a result, he

11  would not need alternate pain medications.   Non-medication, pain treatments could be prescribed

12  & sufficient depending on the nature of his pain (e.g. physical therapy, TENS units, assistive

13  devices, etc).

14      10.     Plaintiff knew how to seek immediate medical attention or to communicate with me if

15  his pain became unbearable at any time.   Plaintiff knew he could submit a Form 7362 (Health

16  Care Services Request) or present to California Medical Facility's Treatment and Triage Area 24

17  hours a day/7 days a week for immediate medical assistance.   He never exercised either option.

18      11.     After his morphine was completely cut off, I saw Plaintiff three times: June 16, 2014,

19  June 22, 2014, and July 24, 2014.   During the first two visits, Plaintiff did not request any

20  alternate pain medication.

21      12.     On July 24, 2014, Plaintiff requested alternate pain medication and I immediately

22  prescribed him Ibuprofen 400 mg and Nortriptyline 25 mg.

23      13.     There are two main reasons I discontinued Plaintiff's morphine:  Firstly, he had

24  violated the Pain Agreement.   My action to discontinue the morphine was authorized and justified

25  by the terms of the Agreement, and in these circumstances, is supported by the California Medical

26  Board, and CDCR Medical Department Management, and customary best practices.   Plaintiff was

27  well aware of that possibility when he entered into the Agreement in question.   The purpose of

28  Pain Agreements is to prevent misuse, diversion, or abuse of opiate pain medications of which the

3

1   Plaintiff was prescribed (morphine).  Secondly, I discontinued Plaintiff's morphine due to his

2   chosen methamphetamine use with the prescribed morphine, the combination of which is/was

3   greatly hazardous to his health and potentially deadly.  Again, in these circumstances, my action

4   to discontinue the morphine is supported by the California Medical Board, and CDCR Medical

5   Department Management, customary best practices, and common-sense responsibility.

6         14.   All of the medical care and treatment rendered to Plaintiff by me was appropriate and

7   consistent with Plaintiff's symptoms, medical condition and history, and, at all times, within the

8   community standard of care and consistent with the degree of knowledge and skill ordinarily

9   possessed and exercised by members of my profession under similar circumstances.  I have never

10  refused or denied Plaintiff appropriate medical treatment or evaluation.

11        15.   I provided Plaintiff with medical care and treatment every time I saw him and I was

12  never deliberately indifferent to any of his serious medical needs.  Plaintiff received all

13  reasonable and necessary care to address his condition, at CMF, and the treatment provided was

14  consistent with the community standard of care and CDCR policies and procedures.

15        16.   At all times, I treated Plaintiff with dignity and respect in an honest effort to treat his

16  condition.  At no time did I refuse to provide Plaintiff with medical care or treatment. At no time

17  did I intentionally or knowingly cause Plaintiff any injury or harm.

18        I declare under penalty of perjury, under the laws of the United States, that the foregoing is

19  true and correct.

20        Executed this 28 th day of November, 2017, in Vacaville, California.

21

22   _____

23   FRANCIS KO, M.D.

24

25

26

27

28

4

# EXHIBIT A

STATE OF CALIFORNIA
**CHRONIC PAIN PROVIDER-PATIENT AGREEMENT/**
**INFORMED CONSENT FOR OPIOID PAIN MEDICATION (English)**
CDCR 7474 (12/09)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

### Chronic Pain Provider-Patient Agreement/Informed Consent for Opioid Pain Medication

This is an agreement between ___Owens  V49527___ (the patient) and ___Dr. Ko / CMF___ (the provider) concerning the use of opioid medications for the treatment of a chronic pain problem.

1. I understand that opioid medications are used as one part of a chronic pain treatment program and that they have risks and side effects involved with taking them. I have been informed of these risks and discussed them with my provider.

2. I understand that the medication will probably not eliminate my pain, but will be used to attempt to reduce my pain enough that I may become more active. Most patients see about a 30% decrease in their pain.

3. Chronic pain is a difficult problem that requires a team approach. I must keep all appointments (physical therapy, specialist clinicians, pain groups and counselors) that my pain management provider recommends for my treatment, or my opioid medication may be stopped.

4. I understand that treatment with opioid pain medications is being started on a trial basis. Adjustment in medications will be made depending on the benefits I show and also the problems that may develop.

5. In particular, I understand that opioid medications can cause physical dependence. If I suddenly stop or decrease the medication, I could have withdrawal symptoms (flu-like syndrome such as nausea, vomiting, diarrhea, aches, sweats, chills) that may occur within 24-48 hours of the last dose. I understand that opioid withdrawal is quite uncomfortable, but not a life-threatening condition.

6. Overdose on this medication may cause death by stopping my breathing; this can possibly be reversed by emergency medical personnel if they know I have taken opioid medications.

7. If the medication causes drowsiness, sedation, or dizziness, I understand that if my job requires, I must not drive a motor vehicle or operate machinery that could put my life or someone else's life in jeopardy.

8. I understand it is my responsibility to inform the provider of any and all side effects I have from this medication.

9. I agree to take this medication as prescribed and not to self diagnose, or demand the provider change the amount or frequency of the medication without a medical reason. Running out early, needing early refills, or increasing doses or more frequent dosing may be signs of misuse of the medication and may be reasons for the provider to discontinue prescribing to me.

10. Seeking opioid medication from other providers may be a reason for my provider to discontinue the opioids.

11. I agree not to sell, lend, or in any way give my medication to any other person. If I am found to be cheeking my medicine, it will be stopped. If I am suspected of hoarding my medication, custody may be notified and a search of my housing may result.

12. I agree not to drink alcohol or take other non-prescribed mood-altering drugs while I am taking opioid medication.

13. My provider may request urine or blood drug screens from time to time to monitor my use of pain medications, and to detect improper use of medications not prescribed. I agree to submit to these tests and understand if I refuse the testing, my provider will need to stop my opioid medication. In the event that these tests indicate that my use of opioids or other medications presents a health risk to myself or to others, my provider may taper and stop the opioid medication. If my test results indicate a danger to myself or others, I authorize my medical provider to notify Custody. _D O_ (pt. initial)

14. I understand that there is a risk that opioid addiction could occur. This means that I might become psychologically dependent on the medication, using it to change my mood or get high, or be unable to control my use of it. People with past history of alcohol or drug abuse problems are more susceptible to addiction. If this occurs, the medication will be discontinued.

I have read the above, asked questions, and understand the agreement. If I violate the agreement, I know that the doctor may discontinue this form of treatment.

Patient Signature: ___Derick Owens___

Provider Signature: _____

Date/Time: ___4/22/13___

| CDCR Stamp: |
| --- |
| Patient Name: |
| CDCR #: |
| DOB: |

Distribution: Original - Patient-Inmate Chart; Canary - Patient-Inmate

Confidential Printed 2017.11.28 16:42:30 -08'00'

1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   PETER A. MESHOT, State Bar No. 117061
    Supervising Deputy Attorney General
3   OLIVER R. LEWIS, State Bar No. 133557
    Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone: (916) 210-7508
6    Fax: (916) 322-8288
     E-mail: Oliver.Lewis@doj.ca.gov
7   *Attorneys for Defendants Jackie Clark,*
    *Francis Ko, M.D., Michele DiTomas, M.D.,*
8   *Teresa Zink, R.N., and Wendy Harris*

9                 IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                        SACRAMENTO DIVISION

12

13

14   DERRICK OWENS,                          2:15-cv-00982 TLN KJN

15                           Plaintiff,      **DECLARATION OF MICHELE
                                             DITOMAS, M.D. IN SUPPORT OF**
16         v.                                **DEFENDANTS' MOTION FOR
                                             SUMMARY JUDGMENT OR, IN THE**
17                                           **ALTERNATIVE, SUMMARY**
     JACKIE CLARK, et al.,                   **ADJUDICATION OF ISSUES**
18
                            Defendants.
19

20         I, Michele DiTomas, M.D. hereby declare as follows:

21   1.    All of the following information is based on my own personal knowledge and, if called to

22   testify, I could do so competently.

23   2.    At all relevant times, I was the Chief Physician and Surgeon at the California Medical

24   Facility ("CMF") in Vacaville, California.

25   3.    I have no recollection of having met the Plaintiff. My only involvement in this case is that I

26   denied Plaintiff's appeal at the first level of review.

27   ////

28   ////

                                              1

1    4.    On April 11, 2014, a urine toxicology test showed that Plaintiff had methamphetamines in

2    his body, in violation of the pain management agreement entered into between Plaintiff and the

3    California Department of Corrections and Rehabilitation, in 2013.

4    5.    Federal and State regulations recommend prescribing doctors to stop prescribed narcotics

5    where the risks to the patient outweigh the benefits.

6    6.    In this case, because Plaintiff was being prescribed morphine, the finding of

7    methamphetamines in his body was not only a violation of his pain management agreement, but

8    also a serious risk to his health.  That is why Plaintiff's primary care physician, Dr. Francis Ko,

9    discontinued Plaintiff's morphine.

10   7.    At no time was I ever deliberately indifferent to Plaintiff's serious medical needs.  On the

11   contrary, my denial of his first level of review was to ensure that Plaintiff's health would not be

12   jeopardized.

13        I declare under penalty of perjury, under the laws of the United States, that the foregoing is

14   true and correct.

15        Executed on the ___21___ th day of November, 2017 in Vacaville, California.

16

17                                                MICHELE DITOMAS, M.D.

18

19

20

21

22

23

24

25

26

27   SA2016302529
     33142908.docx

28

                                           2

1  XAVIER BECERRA, State Bar No. 118517
Attorney General of California
2  PETER A. MESHOT, State Bar No. 117061
Supervising Deputy Attorney General
3  OLIVER R. LEWIS, State Bar No. 133557
Deputy Attorney General
4   1300 I Street, Suite 125
P.O. Box 944255
5   Sacramento, CA 94244-2550
Telephone: (916) 210-7508
6   Fax (916) 322-8288
E-mail:  Oliver.Lewis@doj.ca.gov
7  *Attorneys for Defendants Jackie Clark,*
*Francis Ko, M.D., Michele Ditomas, M.D.,*
8  *Teresa Zink, R.N., and Wendy Harris*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| 13  **DERRICK OWENS,** | 2:15-cv-00982 TLN KJN |
| 14                                    Plaintiff, | **DECLARATION OF TERESA ZINK,** |
| | **R.N. IN SUPPORT OF DEFENDANTS'** |
| 15           v. | **MOTION FOR SUMMARY JUDGMENT** |
| | **OR, IN THE ALTERNATIVE,** |
| 16 | **SUMMARY ADJUDICATION OF** |
| **JACKIE CLARK, et al.,** | **ISSUES** |
| 17 | |
| | |
|                                     Defendants. | |
| 18 | |

19          I, Teresa Zink, R.N. hereby declare as follows:

20          1.  I have been a licensed registered nurse since February 11, 2002 and I am currently

21  employed in that capacity by the California Department of Corrections and Rehabilitation

22  ("CDCR".)

23          2.  At all relevant times, I was employed as a registered nurse at the California Medical

24  Facility ("CMF") in Vacaville, California.

25          3.  All of the following information is based on my own personal knowledge and, if called

26  to testify, I could do so competently.

27          4.  All of the following information is also based on my review of Plaintiff's pertinent

28  medical records.

1

---

5. In his First Amended Complaint ("FAC"), Plaintiff alleges that, in April 2014, I collected a urine sample from him in violation of Title 15, section 52010.17, which requires that staff observing the collection of a urine sample be of the same gender as the inmate being tested.

6. Plaintiff is misguided in that Section 52010.17 applies to "custody" situations only, not to medically-related issues. There are no CDCR regulations or policies preventing same-gender nursing staff from collecting urine samples from inmates for medical reason.

7. In this case, in April, 2014, Dr. Ko issued an order to collect a urine sample from Plaintiff because nursing staff suspected that Plaintiff was cheeking his morphine tablets. The purpose of Dr. Ko's order was to determine the level of morphine in Plaintiff's system to ensure that he was, in fact, ingesting his morphine. The result of the urine collection showed levels of both morphine and methamphetamine.

8. Plaintiff also complains that I did not use gloves when I handed him the receptacle for his urine sample. Although I do not have a specific recollection of this event, my practice is to always wear gloves during the course of urine collections. Therefore, it is extremely unlikely that I was not wearing gloves in this case.

9. Even if I had not worn gloves during Plaintiff's urine sample collection, it would have been irrelevant because any physical contact with methamphetamine would not have caused Plaintiff to test positive for methamphetamine. Levels of methamphetamine can only be found in a urine sample when someone has used methamphetamine within a few days prior to the test.

10. Other than collecting a urine sample from Plaintiff, I have not had any other personal interaction with Plaintiff.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Executed on this 20th day of November, 2017, in Corcoran, California.

Teresa Zink, R.N.

1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  PETER A. MESHOT, State Bar No. 117061
   Supervising Deputy Attorney General
3  OLIVER R. LEWIS, State Bar No. 133557
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone: (916) 210-7508
6    Fax: (916) 322-8288
     E-mail: Oliver.Lewis@doj.ca.gov
7  *Attorneys for Defendants Jackie Clark,
   Francis Ko, M.D., Michele Ditomas, M.D.,*
8  *Teresa Zink, R.N., and Wendy Harris*

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                     SACRAMENTO DIVISION

13

14
   | | |
   |---|---|
   | **DERRICK OWENS,** | 2:15-cv-00982 TLN KJN |
   | Plaintiff, | **DECLARATION OF WENDY HARRIS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES** |
   | v. | |
   | **JACKIE CLARK, et al.,** | |
   | Defendants. | |

15

16

17

18

19

20

21        I, Wendy Harris, hereby declare as follows:

22   1.    All of the following information is based on my own personal knowledge and, if called to

23   testify, I could do so competently.

24   2.    At all relevant times, I was employed by the California Department of Corrections and

25   Rehabilitation ("CDCR") as a medical appeals coordinator, at the California Medical Facility

26   ("CMF") in Vacaville, California.

27   ////

28   ////

                                    1
   ─────────────────────────────────────────────────────────────
   Declaration of Teresa Zink in Support of Motion for Summary Judgment  (2:15-cv-00982 TLN KJN)

3.     In his First Amended Complaint ("FAC"), Plaintiff alleges that I violated his Eighth Amendment rights because I processed his appeal as a routine appeal, rather than an emergency appeal (FAC, p. 12 of 150.)

4.     On June 14, 2014, Plaintiff submitted a 602 medical appeal (Number 14039699) and I received it on June 27, 2014.  Upon receipt of Appeal 14039699, I assigned a due date of August 8, 2014.

5.     Plaintiff's Appeal No. 14039699 was not designated as an "emergency" appeal by his health care provider, Dr. Ko or any other health care provider.  Therefore, I did not process it as an "emergency" appeal.

6.     As a medical appeals coordinator, I do not have the authority to assign a designation of either "routine" or "emergency" to an appeal, as I am not a clinician.

7.     An appeal can only be designated as "routine" or "emergency" by a clinician (R.N. or higher licensing level.)

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Executed on this 22 nd th day of November, 2017, in Vacaville, California.


_Wendy Harris_
WENDY HARRIS

SA2016302529
33142856.docx

2

1  XAVIER BECERRA
   Attorney General of California
2  PETER A. MESHOT
   Supervising Deputy Attorney General
3  OLIVER R. LEWIS, State Bar No. 133557
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone: (916) 210-7508
6    Fax: (916) 322-8288
     E-mail:  Oliver.Lewis@doj.ca.gov
7  *Attorneys for Defendants Jackie Clark,*
   *Francis Ko, M.D., Michele Ditomas, M.D.,*
8  *Teresa Zink, R.N., and Wendy Harris*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                     SACRAMENTO DIVISION

12

13

| | |
|---|---|
| **DERRICK OWENS,** | 2:15-cv-00982 TLN KJN |
| Plaintiff, | **DECLARATION OF OLIVER R. LEWIS AND EXHIBIT LIST IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES** |
| v. | |
| **JACKIE CLARK, et al.,** | |
| Defendants. | Date: NO HEARING DATE **Time: LOCAL RULE 230(*l*)** Action Filed:  April 13, 2016 |

21        I, Oliver R. Lewis, declare that:

22        1.    I am an attorney at law licensed to practice in all of the courts of the State of

23  California and the United States District Court, Eastern District of California.  I am a Deputy

24  Attorney General for the State of California, assigned to represent Defendants Jackie Clark,

25  Francis Ko, M.D., Michele Ditomas, M.D., Teresa Zink, R.N., and Wendy Harris in the present

26  matter.  I am familiar with the file of this matter and have personal knowledge of the facts set

27  forth herein.  If called upon to testify, I could competently testify thereto.

28

                                    1

1    2.    This declaration is made and submitted in support of Defendants' Motion for

2  Summary Judgment, or in the alternative, Summary Adjudication of Issues in the present case.

3    3.    Attached hereto as Exhibit C are true and correct copies of the pertinent portions of

4  the deposition transcript of Plaintiff Derrick Owens, referred to in Defendants' motion for

5  summary judgment.  The deposition was taken on April 24, 2017, before a certified court

6  reporter, California Medical Facility in Vacaville, California.

| **EXHIBIT** | **DOCUMENT/ITEM** |
| --- | --- |
| Exhibit A | Plaintiff's deposition transcript, dated April 24, 2017, page 17:11-23. |

I declare under penalty of perjury, under the laws of the United States, that the foregoing is
true and correct.

Executed this 1st day of December, 2017, in Sacramento, California.

OLIVER R. LEWIS

SA2016302529
32971842.doc

2

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3                  SACRAMENTO DIVISION

4

5   DERRICK OWENS,                    )

6                                     )

7          Plaintiff,                 )

8                                     )

9   vs.                               ) 2:15-cv-00982 TLN KJN

10                                    )

11  JACKIE CLARK, et al.,             )

12                                    )

13         Defendants.                )

14                                    )

15

16           DEPOSITION OF DERRICK OWENS

17             Vacaville, California

18            Monday, April 24, 2017

19                 11:03 a.m.

20

21  Reported By:

22  Danielle Reading

23  CSR No. 10826

24  Job No. CA 2578209

25  Pages 1 through 54

                                          Page 1

1    First Amended Complaint, correct?

2           THE WITNESS:  Yes.

3           MR. LEWIS:  Okay.  Great.  Let me have that back

4    for the court reporter, please.  Thank you.

5           (Exhibit 1 was marked.)

6    BY MR. LEWIS:

7      Q    Okay.  So let's go back to Dr. Ko.  Your

8    complaint with regards to Dr. Ko spans during what time

9    frame?

10     A    Say that again, please.

11     Q    Your complaint against Dr. Ko -- and I know

12   you've got a couple of complaints about him.  But what

13   time frame are we looking at?  Is that during the first

14   part -- or the first time you were here at CMF?

15     A    No.  It's dealing with the part of 2014.

16     Q    Okay.  So just the one year, 2014?

17     A    Yes.

18     Q    Can you be more specific as far as the months?

19     A    2014 April --

20     Q    Okay.

21     A    -- and May.

22     Q    April and May.  Okay.  That makes it a lot

23   easier.

24          Okay.  So why don't you tell me briefly -- and

25   once again, I've read the Complaint.  But I want you,

                                                    Page 17

1    XAVIER BECERRA
Attorney General of California
2    PETER A. MESHOT
Supervising Deputy Attorney General
3    OLIVER R. LEWIS, State Bar No. 133557
Deputy Attorney General
4      1300 I Street, Suite 125
P.O. Box 944255
5      Sacramento, CA 94244-2550
Telephone: (916) 210-7508
6      Fax: (916) 322-8288
E-mail: Oliver.Lewis@doj.ca.gov
7    *Attorneys for Defendants Jackie Clark,*
*Francis Ko, M.D., Michele Ditomas, M.D.,*
8    *Teresa Zink, R.N., and Wendy Harris*

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11                 SACRAMENTO DIVISION

12

13

14    **DERRICK OWENS,**             2:15-cv-00982 TLN KJN

15                Plaintiff,    **NOTICE TO PLAINTIFF DERRICK OWENS, PROCEEDING IN PROPRIA PERSONA, REGARDING FILING OF MOTIONS FOR SUMMARY JUDGMENT**

16        v.

17    **JACKIE CLARK, et al.,**

18                   [Notice as Per *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) and *Wyatt v. Terhune,* 315 F.3d 1108 (9th Cir. 2003)]

19               Defendants.

20                   Date: NO HEARING DATE
**Time: LOCAL RULE 230(***l***)**

21                   Action Filed: October 8, 2015

22

23       TO DERRICK OWENS, PLAINTIFF PRO SE:

24          Defendants Jackie Clark, Francis Ko, M.D., Michele Ditomas, M.D., Teresa Zink, R.N.,

25    and Wendy Harris have filed a Motion for Summary Judgment pursuant to Federal Rule Civil

26    Procedure 56 on October 19, 2016. Pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir.

27    1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), Plaintiff is advised of the following

28    requirements for opposing a motion for summary judgment made by Defendant(s) pursuant to

1

1   Rule 56 of the Federal Rules of Civil Procedure. Such a motion is a request for an order for

2   judgment on some or all of Plaintiff's claims in favor of Defendant(s)

3   without trial. See Rule 56(b).  Defendants' motion will set forth the facts which Defendant(s)

4   contend are not reasonably subject to dispute and that entitle Defendant(s) to judgment as a matter

5   of law. See Rule 56(c).

### NOTICE—WARNING TO PLAINTIFF

7        The Defendant's Motion for Summary Judgment seeks to have your case dismissed as

8   against ***.  A motion for summary judgment under Federal Rules of Civil Procedure, Rule 56

9   will, if granted, end your case against said Defendants.

10        Rule 56 tells you what you must do in order to oppose a Motion for Summary

11   Judgment.  Generally, summary judgment must be granted when there is no genuine issue of

12   material fact—that is, if there is no real dispute about any fact that would affect the result of

13   your case, the party who asked for summary judgment is entitled to judgment as a matter of

14   law, which will end your case.  When a party you are suing makes a motion for summary

15   judgment that is properly supported by declarations (or other sworn testimony), you cannot

16   simply rely on what your Complaint says.  Instead, you must set out specific facts in

17   declarations, depositions, answers to interrogatories, or authenticated documents, as provided in

18   Rule 56(e), that contradict the facts shown in the Defendant's declarations and documents and

19   show that there is a genuine issue of material fact for trial.  If you do not submit your own

20   evidence in opposition, summary judgment, if appropriate, may be entered against you.

21        If summary judgment is granted, your case against Defendants will be dismissed and

22   there will be no trial.  Local Rule of Civil Procedure 260(b) also requires that you include with

23   your response to the Motion for Summary Judgment a separate statement of facts in opposition

24   to the Motion for Summary Judgment.  Your separate statement of facts must include

25   numbered paragraphs corresponding to each Defendant's ("moving party's") separate statement

26   of facts:

27        Any party opposing a motion for summary judgment or summary
     adjudication shall reproduce the itemized facts in the Statement of
28        Undisputed Facts and admit those facts that are undisputed and deny those

2

that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial. The

opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication. The opposing party shall be responsible for the filing of all evidentiary documents cited in the opposing papers. See L.R. 133(j). If a need for discovery is asserted as a basis for denial of the motion, the party opposing the motion shall provide a specification of the particular facts on which discovery is to be had or the issues on which discovery is necessary.

Local Rule 260(b) further requires that you must also cite to the specific paragraph in your statement of facts that supports any factual claims you make in your memorandum of law.

Local Rule 152(a)(3) requires that if any affidavit is introduced in support of the opposition, you are required to:

identify, authenticate, and attach documents and exhibits offered in support of or in opposition to the motion, unless such documents and exhibits are already in the record and specifically referred to in the motion or opposition.

Local Rule 230(l) additionally provides that:

All motions, except motions to dismiss for lack of prosecution, filed in actions wherein one party is incarcerated and proceeding *in propria persona,* shall be submitted upon the record without oral argument unless otherwise ordered by the Court. Such motions need not be noticed on the motion calendar. Opposition, if any, to the granting of the motion shall be served and filed by the responding party not more than twenty-one (21), days after the date of service of the motion. A responding party who has no opposition to the granting of the motion shall serve and file a statement to that effect, specifically designating the motion in question. Failure of the responding party to file an opposition or to file a statement of no opposition may be deemed a waiver of any opposition to the granting of the motion and may result in the imposition of sanctions. The moving party may, not more than seven (7) days after the opposition has been filed in CM/ECF, serve and file a reply to the opposition. All such motions will be deemed submitted when the time to reply has expired.

You must timely respond to all motions. The Court may, in its discretion, treat your failure to respond to Defendants' Motion for Summary Judgment as a waiver of any opposition to the granting of the motion, and judgment may be entered dismissing this action with prejudice pursuant to Local Rule 230(l). *See Brydges v. Lewis,* 18 F.3d 651 (9th Cir. 1994) *(per curiam).*

///

3

1       **EASTERN DISTRICT OF CALIFORNIA LOCAL RULE REQUIREMENTS**

2       In accordance with Local Rule 260(a), Defendant has filed a Statement of Undisputed

3 Material Facts that contains discrete, specific material facts to support his entitlement to summary

4 judgment.  In response to this Statement, Local Rule 260(b) requires you to "reproduce the

5 itemized facts in the Statement of Undisputed Material Facts and admit those facts that are

6 undisputed and deny those that are disputed, including with each denial a citation to the particular

7 portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other

8 document relied upon in support of that denial."  You may also "file a concise Statement of

9 Disputed Facts, and the source thereof in the record, of all additional material facts as to which

10 there is a genuine issue precluding summary judgment or adjudication."  *Id*.  You are responsible

11 for filing all evidentiary documents cited in the opposing papers.  *Id*.  If additional discovery is

12 needed to oppose summary judgment, Local Rule 260(b) requires you to "provide a specification

13 of the particular facts on which discovery is to be had or the issues on which discovery is

14 necessary.

15

16 Dated:  December 1, 2017                Respectfully submitted,

17                                       XAVIER BECERRA
                                      Attorney General of California

18                                       PETER A. MESHOT
                                      Supervising Deputy Attorney General

19

20                                       */s/ Oliver R. Lewis*

21                                       OLIVER R. LEWIS
                                      Deputy Attorney General

22                                       *Attorneys for Defendants Jackie Clark,*
                                      *Francis Ko, M.D., Michele Ditomas, M.D.,*
                                      *Teresa Zink, R.N., and Wendy Harris*

23

24

25

26

27 SA2016302529
32971822.doc

28

XAVIER BECERRA
Attorney General of California
PETER A. MESHOT
Supervising Deputy Attorney General
OLIVER R. LEWIS, State Bar No. 133557
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7508
  Fax: (916) 322-8288
  E-mail: Oliver.Lewis@doj.ca.gov
*Attorneys for Defendants Jackie Clark,
Francis Ko, M.D., Michele Ditomas, M.D.,
Teresa Zink, R.N., and Wendy Harris*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ZACHARIAH DANIELS,** | 2:15-cv-00982 TLN KJN |
| Plaintiff, | **NOTICE OF LODGING OF DEPOSITION TRANSCRIPT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES** |
| v. | |
| **DR. DENIS FIALLOS-MONTERO, et al.,** | |
| Defendant. | Date: NO HEARING DATE **Time: LOCAL RULE 230(*l*)** Action Filed: October 8, 2015 |

TO: COURT AND PLAINTIFF DERRICK OWENS, IN PRO SE:

PLEASE TAKE NOTICE that the deposition transcript of Plaintiff, Derrick Owens, deposed in the discovery proceeding herein, relied upon by Defendant in support of his Motion for Summary Judgment, is hereby lodged as follows:

///

///

///

///

///

1

1.  1.  April 24, 2017 Deposition Transcript of Derrick Owens.

2

3  Dated:  December 1, 2017                          Respectfully submitted,

4                                                    XAVIER BECERRA
                                                     Attorney General of California
5                                                    PETER A. MESHOT
                                                     Supervising Deputy Attorney General
6
                                                     */s/ Oliver R. Lewis*
7
                                                     OLIVER R. LEWIS
8                                                    Deputy Attorney General
                                                     *Attorneys for Defendants Jackie Clark,*
9                                                    *Francis Ko, M.D., Michele Ditomas, M.D.,*
                                                     *Teresa Zink, R.N., and Wendy Harris*
10

11

12

13

14  SA2016302529
    32971836.doc
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                             2

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3                 SACRAMENTO DIVISION

4

5    DERRICK OWENS,                    )

6                                      )

7           Plaintiff,                 )

8                                      )

9    vs.                               ) 2:15-cv-00982 TLN KJN

10                                     )

11   JACKIE CLARK, et al.,             )

12                                     )

13          Defendants.                )

14                                     )

15

16            DEPOSITION OF DERRICK OWENS

17               Vacaville, California

18              Monday, April 24, 2017

19                   11:03 a.m.

20

21   Reported By:

22   Danielle Reading

23   CSR No. 10826

24   Job No. CA 2578209

25   Pages 1 through 54

                                          Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                      SACRAMENTO DIVISION

 4

 5

 6   DERRICK OWENS,                    )

 7                                     )

 8           Plaintiff,                )

 9                                     )

10   vs.                              ) 2:15-cv-00982 TLN KJN

11                                     )

12   JACKIE CLARK, et al.,            )

13                                     )

14           Defendants.               )

15                                     )

16

17

18

19           Deposition of DERRICK OWENS, taken on behalf of

20   the Defendants, at the California Medical Facility, 1600

21   California Drive, Vacaville, California, beginning at

22   11:03 a.m. and ending at 12:09 p.m. on Monday, April 24,

23   2017, before Danielle Reading, Certified Shorthand

24   Reporter No. 10826.

25
```

Page 2

```
 1    A P P E A R A N C E S:

 2

 3    For the Defendants:

 4              STATE OF CALIFORNIA

 5              OFFICE OF THE ATTORNEY GENERAL

 6              BY:   OLIVER R. LEWIS,

 7                 Deputy Attorney General

 8              1300 I Street

 9              P.O. Box 944255

10              Sacramento, California   94244-2550

11              916-324-5495

12

13

14

15                       --oOo--

16

17

18

19

20

21

22

23

24

25

                                        Page 3
```

1                           I N D E X

2     WITNESS                                    EXAMINATION

3     DERRICK OWENS

4            By Mr. Lewis                              4

5

6

7

8                         --oOo--

9

10

11

12                      E X H I B I T S

13    Defendants'                                  Page

14    Exhibit 1     Second Amended Notice of        17

15                  Taking Deposition of

16                  Plaintiff Derrick Owens and

17                  Notice to Produce Documents

18                  Pursuant to Code of Civil

19                  Procedure Section 2025.010

20                  et seq.

21

22

23

24

25                        --oOo--

                                           Page 4

```
 1              Vacaville, California, Monday, April 24, 2017

 2                   11:03 a.m. - 12:09 p.m.

 3

 4                      DERRICK OWENS,

 5      having been administered an oath, was examined and

 6      testified as follows:

 7

 8                      EXAMINATION

 9      BY MR. LEWIS:

10          Q    Good morning, Mr. Owens.

11          A    Good morning.

12          Q    My name is Oliver Lewis.  And we've spoken on the

13      telephone before.

14          A    Okay.

15          Q    I'm here to take your deposition today.

16               For the record, can you please state your full

17      name and spell the name as well?

18          A    Derrick Owens.

19          Q    Can you spell your name, please.

20          A    D-e-r-r-i-c-k.

21          Q    And then last name?

22          A    Owens, O-w-e-n-s.

23          Q    Okay.  Do you have a middle initial?

24          A    D.

25          Q    D.
```

1              And what does that stand for?

2    A    Dasaun.

3    Q    Okay.  Mr. Owens, have you ever had your

4    deposition taken before?

5    A    No.

6    Q    Okay.  Let me kind of explain what the process is

7    like.

8              Basically, the purpose of the deposition today is

9    for me to kind of get a better understanding of what your

10   lawsuit is about.

11   A    Okay.

12   Q    So, basically, to assess the merits of your case.

13   A    Okay.

14   Q    There are certain ground rules that we need to

15   follow, and mostly for the court reporter's benefit.

16             Number one, wait until I finish my question

17   before you give me your answer.  Okay?

18   A    Okay.

19   Q    So that we don't both speak at the same time --

20   A    Okay.

21   Q    -- because it's very difficult for the court

22   reporter to take that down.

23   A    Okay.

24   Q    I also do not want you to guess at any of my

25   questions.  So if you are not sure about something I'm

Page 6

1    asking you, make sure that you ask me to rephrase it.  If

2    you don't understand it, that's fine.  There's nothing

3    wrong with that.  Or if you don't recall, there's nothing

4    wrong with that.

5         A    Okay.

6         Q    Just tell me.

7         A    Okay.

8         Q    I may ask you for a specific time or date.

9    That's where the guessing comes in.  I don't want you to

10   guess.  For example, if I ask you:  What time did this

11   occur?

12             And you say, Well, I'm not sure but I'm going to

13   guess. . .

14             Okay?  I don't want you to do that.  But I am

15   entitled to an estimate.

16        A    Okay.

17        Q    Your best estimate.

18        A    Okay.

19        Q    The example I like to use is:  For example, if I

20   were to ask you the size of the table in my office in

21   Sacramento, that would be a complete guess because you've

22   never been there.

23        A    Right.

24        Q    But if I asked you for the size of this table,

25   based on your experience, you could look at it and say,

```
 1   Well, I think it's approximately such and such.  Okay?
 2   That's an estimate, and I am entitled to that.
 3        Do you understand the difference between the two?
 4   A    Yes.
 5   Q    Okay.  As you can see, the court reporter is
 6   taking everything down that you and I are going to be
 7   saying today.  And within a few weeks there will be a
 8   transcript that will be generated.
 9   A    Okay.
10   Q    You will have an opportunity to review that
11   transcript.
12   A    Okay.
13   Q    Okay?  And you will have an opportunity to make
14   any changes to your answers that you wish.  But I should
15   forewarn you to try to give us today your best testimony
16   because if you make changes later, it might affect your
17   credibility.
18   A    Okay.
19   Q    And, you know, the obvious example is if this
20   were a car accident.  And, you know, I ask you today,
21   Well, was the light green or red?
22        And you say, The light was red.  And then you
23   read your transcript later on and you look at your
24   response and you change it to green, obviously, that
25   would affect your credibility.  Okay?
```

Veritext Legal Solutions
866 299-5127

1          Do you understand that?

2     A    Yes.

3     Q    Okay.  Is there any reason why this deposition

4  shouldn't go forward, such as you are not feeling well?

5          And I should ask you:  Have you taken any

6  medication today?

7     A    Yes.

8     Q    Okay.  What kind of medication have you taken

9  this morning?

10    A    Gabapentin.

11    Q    Gabapentin.

12         That's Neurontin, is it not?

13    A    Yeah.  I take it for pain.

14    Q    Okay.  Anything else?

15    A    No.  Just a heartburn medication.

16    Q    Okay.  Does the Gabapentin -- if you know, does

17  the Gabapentin affect your ability to remember or recall

18  events?

19    A    Not -- not -- not really, no.

20    Q    Okay.  And what dosage of Gabapentin did you take

21  this morning, if you know?

22    A    1600 milligrams.

23    Q    1600.  Okay.

24         Is it helping for the pain?

25    A    Yeah, so-so.

                                              Page 9

1      Q      So-so.   Okay.

2      A      Yeah.

3      Q      You have filed a lawsuit back -- well, actually,

4   it was while ago.   But then you filed a First Amended

5   Complaint on October 8th, 2015.

6      A      Yes.

7      Q      So that's the operative Complaint now.   That's

8   the one we're dealing with.   You've sued five defendants,

9   to my understanding.   You've sued Dr. Ko, K-o?

10     A      Yes.

11     Q      You've sued Jackie Clark?

12     A      Yes.

13     Q      You've sued Michele Ditomas?   She's a doctor.

14     A      Yes.

15     Q      You've sued a nurse by the last name of Zink?

16     A      Yes.

17     Q      And also the healthcare appeals coordinator by

18   the name of W. Harris; is that correct?

19     A      That is correct.

20     Q      Okay.   And so I'm going to be asking you

21   questions about each of those five individuals.

22     A      Okay.

23     Q      And I've read your Complaint, by the way.

24     A      Okay.

25     Q      And I've looked at the exhibits, but I kind of

1   want you to explain a few things about them.

2          Let's start with Dr. Ko -- and, actually, before

3   we do this.  Let me backtrack.

4          I know you have filed a motion to compel

5   responses.

6      A   Yes.

7      Q   And having reviewed that, I do think you are

8   entitled to the first item on your Request for Production

9   of Documents.  So I have provided you here, and I'm going

10  to serve you with this on the record, with Defendant

11  Francis Ko's Supplemental Responses to Plaintiff's

12  Request for Production of Documents, Set One.  Okay?  And

13  that is -- you wanted a copy of the duty statement, I

14  believe, of Dr. Ko.  So I'm serving you with these two

15  documents.  Those are for you.  They are for your

16  records.

17     A   Okay.

18     Q   Okay.  So going back to Dr. Ko.  Now, obviously,

19  you've met with Dr. Ko several times, have you not?

20     A   What's that?

21     Q   You've met with him several times?

22     A   Yes.

23     Q   Okay.  Can you give me an approximate number of

24  times you've seen Dr. Ko for your pain?

25     A   God.

Page 11

1    Q   Again, this is where the estimate comes in.  I'm

2  not going to hold you to it.

3    A   It's been on numerous occasions.

4    Q   Okay.  Is it less than ten?

5    A   I was his patient back in 2011.  I left this

6  facility 2012.  I came back to this facility 2013.  He

7  was my provider from '13 all the way until about '16, if

8  I'm correct.

9    Q   Okay.  So from 2011 to 2012 when you were here

10  the first time, Dr. Ko was not your primary care

11  physician?

12    A   What's that?

13    Q   The first time you were here, 2011 to 2012,

14  Dr. Ko --

15    A   He was my --

16    Q   He was?

17    A   Yes, he was.

18    Q   And then you left for a year; is that correct?

19    A   Yes.

20    Q   And where did you go?

21    A   I went to another facility.

22    Q   Which one?

23    A   If I'm correct, Kern Valley, Lancaster, one of

24  those.

25    Q   Okay.

Page 12

1      A     It's been a while.

2      Q     Yeah.  Okay.  And so he was -- Dr. Ko was your

3   primary care physician from 2011 to 2012 and then again

4   from 2013 to 2016, correct?

5      A     Correct.

6      Q     And he's not currently your provider, is he?

7      A     He's no longer at this facility.

8      Q     Oh, okay.  Okay.  Now, what is the nature of the

9   pain that you suffer from?

10      A     Well. . .

11      Q     I mean, how did the pain first occur?

12      A     Well, back in 2007 I had an MRI done.

13      Q     Okay.

14      A     Because of neck pain reported by myself.

15      Q     Okay.

16      A     And after that MRI was taken, it was determined

17   that I had major protruding, bulging disks in my cervical

18   spine.

19      Q     Okay.

20      A     And the neurosurgeon then recommended that I have

21   surgery to give myself the best possible chance to

22   recover.

23      Q     Okay.  Did you have the surgery?

24      A     Yes.

25      Q     Okay.  And when did you have the surgery?

Page 13

1     A     December 19, 2007.

2     Q     Okay.  And was it -- do you know what kind of

3  surgery?  Was it a fusion or did they remove the disk?

4     A     They removed it.

5     Q     Okay.

6     A     And they also fused it.

7     Q     Okay.

8     A     Copies of that report and surgery are attached to

9  the Complaint.

10     Q     Okay.  Thank you.

11          MR. LEWIS:  By the way, I'll show you what's

12  going to be marked Exhibit 1 to your deposition.  If you

13  could take a look at this.

14  BY MR. LEWIS:

15     Q     Have you seen that document before?  That's

16  basically your Notice of Deposition for today.

17     A     Yes.

18     Q     Okay.  Can you look -- can you flip over to, I

19  believe it's Page 3 -- actually, it's Page 2.  I

20  apologize.  Page 2.

21          Do you see there's a list of documents that I've

22  requested that you produce?  There should be five or six

23  items there.  Do you see those?

24     A     Um-hum.

25     Q     Okay.  Is that a "yes"?

Page 14

1     A     Um-hum.

2     Q     I forgot to mention that.

3     A     Yes.

4     Q     For the court reporter, it's important that you

5   verbalize your responses because she can't take down a

6   nod of the head or an "um-hum" or "hum-um."  So make sure

7   you give me verbal responses.

8     A     Okay.

9     Q     Have you brought with you today any documents

10   that are responsive to this request in the Notice of

11   Deposition?

12     A     I don't understand.  Can you. . .

13     Q     Yeah.  If you look at the list of documents that

14   I've asked you to produce, do you see the different

15   categories?

16     A     Yes.

17     Q     Okay.  Have you brought with you any documents

18   that fit in those categories?

19     A     Well, the documents that I brought are the

20   exhibits attached to the Complaint.

21     Q     That was going to be my next question.

22     A     Right.

23     Q     So they are already -- and you filed that when

24   you filed your Complaint, correct?

25     A     Yes.

Page 15

1      Q      Okay.  Good.

2      A      With the x-rays.  There's a few of those attached

3  to the Complaint, I believe.

4      Q      Okay.  Do you have any other documents that have

5  to do with this case that are responsive to this request?

6      A      Responsive?  What do you mean?

7      Q      I mean, that fit in those categories.

8      A      All I have now is the exhibits that are attached

9  to this Complaint.

10     Q      Okay.  So there are no other documents that you

11  know of, correct?

12     A      There are.

13     Q      Okay.

14     A      I'm currently in the process of receiving the

15  additional medical records to get those authenticated.  I

16  could send them -- I can mail those to you.

17     Q      That would be great.  Why don't we put that on

18  the record.

19            MR. LEWIS:  So Mr. Owens just stated that the

20  documents that he has are in the process of being

21  authenticated, and that he would mail them to my office.

22            THE WITNESS:  The additional documents.

23            MR. LEWIS:  The additional documents.

24            THE WITNESS:  Right.

25            MR. LEWIS:  Additional to the exhibits to the

Page 16

1    First Amended Complaint, correct?

2            THE WITNESS:  Yes.

3            MR. LEWIS:  Okay.  Great.  Let me have that back

4    for the court reporter, please.  Thank you.

5            (Exhibit 1 was marked.)

6    BY MR. LEWIS:

7      Q     Okay.  So let's go back to Dr. Ko.  Your

8    complaint with regards to Dr. Ko spans during what time

9    frame?

10     A     Say that again, please.

11     Q     Your complaint against Dr. Ko -- and I know

12   you've got a couple of complaints about him.  But what

13   time frame are we looking at?  Is that during the first

14   part -- or the first time you were here at CMF?

15     A     No.  It's dealing with the part of 2014.

16     Q     Okay.  So just the one year, 2014?

17     A     Yes.

18     Q     Can you be more specific as far as the months?

19     A     2014 April --

20     Q     Okay.

21     A     -- and May.

22     Q     April and May.  Okay.  That makes it a lot

23   easier.

24            Okay.  So why don't you tell me briefly -- and

25   once again, I've read the Complaint.  But I want you,

                                        Page 17

1   from your own recollection, to tell me what your

2   complaint against Dr. Ko was during April and May of

3   2014.

4        A  . Well, during April 2014 --

5        Q     Okay.

6        A     -- I was tested for a controlled substance --

7        Q     Right.

8        A     -- by a -- one of the defendants.

9        Q     Was that R.N. Zink?

10       A     Zink, yes.

11       Q     Okay.

12       A     Where she came out and told me that I had to do

13   this test, and that the doctor had ordered it.  And at

14   first I refused.  But then she told me that if I don't do

15   the test, the doctor would cut me off my pain medication.

16       Q     Okay.  Which was what at the time?  What was the

17   pain medication?

18       A  .  Morphine.  I was taking 60 milligrams a day.

19       Q     Okay.  Go ahead.  I didn't mean to cut you off.

20       A     So, yeah, the test came back positive for

21   morphine and methamphetamine.

22       Q     Had you taken the morphine that morning -- well,

23   strike that.  That was a bad question.

24             About what time of day was the test; do you

25   remember?  Was it morning?  Was it afternoon?

                                                    Page 18

1      A     I don't remember.  I'm not sure.

2      Q     That's fine.  That's fine.

3            Had you taken morphine shortly before --

4      A     Yeah, I was taking morphine 60 milligrams every

5   day.  Once in the morning and once at night.

6      Q     Okay.

7      A     I was taking 30 milligrams in the morning and 30

8   milligrams at night.

9      Q     Had you ingested any methamphetamines?

10     A     No, not that I know of.

11     Q     Right.  Okay.

12           Then what happened?  Okay.  So you are tested --

13     A     Um --

14     Q     Let me finish my question for the court reporter.

15           You are tested by R.N. Zink.  Was it a urine

16   test?

17     A     It was a urine test, yes.

18     Q     So you are tested by R.N. Zink.  And the results

19   come back showing morphine and methamphetamines in your

20   system?

21     A     Yes.

22     Q     Okay.  Then what happens, if anything?

23     A     So I saw Dr. Ko.

24     Q     How long after that?  Do you recall?

25     A     I'm not sure how long after the test I saw

Page 19

```
 1    Dr. Ko.  But I remember the date I saw Dr. Ko.  I saw him
 2    on April 24th, 2014.
 3       Q    Okay.  Let me write this down.  Dr. Ko. . .
 4       A    His --
 5       Q    Okay.  Go ahead.
 6       A    His, I think, primary update for that date is
 7    attached to the exhibits as Exhibit 14 to the Complaint.
 8       Q    Okay.  And what does that say -- well, let me ask
 9    you -- it says what it says.  I can look at it later.
10            But what did Dr. Ko tell you on the day he saw
11    you, on April 14 [sic], 2014?
12       A    Well, Dr. Ko explained that the test showed
13    methamphetamine.  It was a pain contract violation.  And,
14    initially, I had to sign this contract to receive opioid
15    medication.  So he told me that he was going to have to
16    taper me off the morphine --
17       Q    Okay.
18       A    -- at that time.  You know?
19       Q    Was that because of the methamphetamines?
20       A    Yes.
21       Q    Okay.
22       A    At that time I explained to him that -- give me
23    one second.
24       Q    Yeah, yeah.  Go ahead.
25       A    Okay.  At that time I explained to Dr. Ko that I
```

Page 20

1    did not do methamphetamine.  I explained to him that the

2    way the test was conducted was a clear violation of the

3    policy of the institution.

4        Q    Okay.

5        A    He replied and said, well, he still had to cut me

6    off that medication, morphine, due to whatever policy at

7    the institution.

8        Q    Okay.

9        A    I then requested an alternative, you know,

10   something that wasn't narcotic.  He refused.  And he just

11   started to taper me off the medication morphine.

12            May 14th, 2014 -- 2014 the morphine was

13   completely cut.

14       Q    Okay.  What date was that, I'm sorry, again?

15       A    May 14th, 2014.

16       Q    Okay.  So about a month later?

17       A    Let me back up.  April 24th Dr. Ko started

18   cutting the morphine.

19       Q    Okay.  So it wasn't on April 14th.  It was

20   April 24th?

21       A    April 24th he started cutting the morphine.

22       Q    Okay.

23       A    May 14th, 2014, the morphine --

24       Q    Was cut off?

25       A    -- completely was cut off.

```
 1       Q    Okay.  During that time period from April 24th,
 2    2014, to May 14, 2014, when the morphine was completely
 3    cut off, did you take any other pain medication?
 4       A    No.  He wouldn't give me anything at that time.
 5       Q    Not even over-the-counter Ibuprofen?  Anything?
 6       A    No, sir.  No, sir.
 7       Q    Okay.
 8       A    As a matter of fact, on April 24th, 2014, because
 9    I knew that he was going to start to taper me off the
10    morphine, I requested, you know, the alternative.  Hey,
11    will you give me something else?
12       Q    Right.
13       A    I don't want to just be left in pain.  A simple
14    Tylenol would have been better than to just go without
15    anything.  And he refused me, man.
16       Q    Did he tell you why?
17       A    No.  He just seemed a little upset.  Like that.
18    You know, because I had been taking morphine for quite a
19    while.  For several years, depending on his medication.
20    And he just seemed upset.  He became kind of cruel even.
21       Q    In what way?
22       A    Just hurrying me out of his office.  Saying that
23    I shouldn't have violated the pain contract.  And that I
24    could just get up and go, basically.
25       Q    Okay.
```

Page 22

1        A    So, yes, again, on May 14, 2014, the medication

2    morphine was completely stopped.  And I was basically

3    just left, you know, with nothing.

4        Q    Okay.

5        A    And I didn't realize, you know, that he was

6    violating my rights by, you know, not giving me nothing.

7             So I then put in a request to see him again, a

8    sick call for him.

9        Q    And do you remember the date of that,

10   approximate?

11       A    It's attached to the Complaint.

12       Q    Okay.

13       A    I think it's at exhibit -- give me one second,

14   sir.

15       Q    Sure.

16       A    Exhibit 20 attached to the Complaint.

17       Q    Okay.  So you then requested to see him again?

18       A    I needed to see him.  I wrote specifically on

19   the --

20       Q    Was it a healthcare request?

21       A    It's a 7362 medical request.

22       Q    Right.

23       A    Which was on June 2nd, 2014.

24       Q    Okay.

25       A    I put, "I need to see my primary care provider

                                                    Page 23

1    concerning medications."

2        Q    Okay.  Let me stop you right there.  From

3    May 14th of 2014, when the morphine was completely cut

4    off, until you put in the request on June 2nd, 2014, were

5    you taking any kind of pain medication?

6        A    I wasn't taking anything.

7        Q    Okay.

8        A    Actually, I spoke to a few of the medication

9    nurses that work on the housing unit and I told them,

10   like, Hey, I'm not getting anything.  The doctor weaned

11   me off morphine that I was taking for chronic back pain,

12   neck pain, sciatic nerve pain in my leg.

13            And they told me to, you know, give them a

14   chance.  They'll go refer what I'm saying to the doctor.

15       Q    Right.

16       A    And, you know, several times they never got back

17   to me.  And I was furious.  And I was in my cell in pain.

18   And I put the sick call slip in on June. . .

19       Q    Did you actually see Dr. Ko again after you put

20   in the request on the June 2nd?

21       A    Yes.

22       Q    Okay.  How long after the June 2nd request do you

23   recall?  And, again, you don't have to give me the exact

24   date.  Just approximate number of days.

25       A    I put the request in on June 2nd, 2014.  And I

                                                    Page 24

1    saw Dr. Ko, I believe, on June 16th, 2014.  So it took 16

2    days.

3        Q    Two weeks?

4        A    Yes.

5        Q    And do you recall that visit with Dr. Ko?

6        A    What's that?

7        Q    Do you recall that visit with Dr. Ko on

8    June 16th?

9        A    Clearly.

10       Q    Okay.  And what happened during that visit?

11       A    I spoke to Dr. Ko about my medications.  Told him

12   I was, you know, going through pain.  And, you know,

13   that's something that he knew.  I believe he diagnosed

14   me.  He knew that I had past surgery, chronic neck pain.

15   And I told him that I needed something.

16            And this guy he just was really, like, mad.  He

17   seemed like he was upset with me.  I don't know if that

18   was because this pain contract was violated, maybe that

19   made him look bad to his supervisors.  But he refused me.

20   And he rushed me out of his office.

21       Q    Just like the previous time?

22       A    Just like the previous time.

23       Q    Okay.

24       A    I got his copy of his progress notes, which I

25   believe is attached to this Complaint.

Page 25

1     Q     Okay.  I can take a look at that later.  Okay.

2           So, basically, you tell him that you need some

3   kind of alternative pain medication.  He doesn't

4   prescribe anything, and kind of rushes you out of his

5   office?

6     A     Rushed me out of his office.

7     Q     Okay.  Did you ever see Dr. Ko again after that

8   visit for the same thing?

9     A     Yes.

10    Q     Okay.  How long after that, approximately?

11    A     Well, after that I put in a grievance.

12    Q     Okay.

13    A     A 602.

14    Q     A 602.  Okay.

15    A     Requesting emergency processing.

16    Q     Okay.

17    A     Well, let me back up.  Let me back up.

18          I put in a -- okay.  Correct.  I put in a 602

19   grievance.  And this was on June 19th, 2014.  It was

20   maybe two or three days after I had saw Dr. Ko.

21    Q     You said June 18th or 19th?

22    A     June 19th.

23    Q     Okay.  Go ahead.  Actually, let me ask you one

24   question before we go on.

25          Had you filed a 602 prior to June 19th of 2014?

Page 26

1    A    No, because I wanted to see him first.

2    Q    Right.   That makes sense.   Okay.   Okay.   So go

3    ahead.   So you file a 602 on June 19th.

4         Then what happens, if anything?

5    A    Well, let me say this.

6    Q    Yeah.

7    A    I didn't file the 602 grievance before the

8    June 16th -- the June 16, 2014, meeting with Dr. Ko

9    because I wanted to see him and give him an opportunity

10   to maybe give me something.   You know?

11        So when he didn't give me anything, that's when I

12   filed the 602, sir.

13   Q    Okay.   And so what happened after you filed the

14   602?

15   A    After I filed the 602 requesting emergency

16   processing from our appeals coordinator for medical, the

17   602 was processed as a routine.

18        I requested the emergency processing because I

19   was in a lot of pain.   I was going through it.   My

20   neck -- when it gets cold at night, I have crooks in my

21   neck.   It's hard to lay on one side.

22        That appeal was processed as a routine.

23   Q    How do you know that?   I'm just curious.

24   A    Well. . .

25   Q    Well, first of all, let me ask you this.

                                                    Page 27

1     Do you have a copy of your 602 attached to your

2   Complaint?

3     A    Yes.

4     Q    Okay.  And so how do you know that it was

5   processed as a routine 602?

6     A    Give me one second.

7     Q    Sure.

8     A    Can you repeat your question?

9     Q    Sure.

10     How do you know that the 602 that you filed on

11   June 19th, 2014, was processed as a routine 602 as

12   opposed to the emergency process that you requested?

13     A    Well, California Code of Regulations, they

14   require a 602 medical grievance to be processed within

15   five days, I believe, if the inmate states the proper

16   standards for emergency processing.  I wish I would have

17   brought a Title 15 with me.

18     Q    Oh, that's fine.  I can look it up.

19     A    If the inmate is in, like, chronic pain --

20     Q    Okay.

21     A    -- or something is, like, threatening his life.

22     Q    So are you saying that you are supposed to be

23   seen within five days after that?

24     A    Within five days.

25     Q    And you were not?

1    A    I was seen -- I want to give you exact dates.

2    Okay.  I have it here.

3         Can you repeat the question, please?

4    Q    Sure.

5         My question was:  How do you know that your 602

6    was processed as a routine 602 as opposed to the

7    emergency process that you requested?

8         And I think you mentioned something about you

9    were supposed to be seen within five days.

10   A    Right.  Five, seven days.  It's pretty quick, if

11   you have, like, a chronic illness.

12   Q    Right.  And so when were you seen after that?

13   A    I was -- I wasn't seen until, I believe -- for

14   the 602?

15   Q    Yes.

16   A    July 24th, 2014.  So it was over a month.

17   Q    During that month were you seen by any other

18   healthcare providers?

19   A    No.

20   Q    Okay.

21   A    Only nurses.

22   Q    Okay.  And, of course, the nurses were not

23   allowed to prescribe anything?

24   A    They weren't allowed to prescribe.

25   Q    Okay.  So you still -- as of July 24th, 2014, you

Page 29

1    still don't have any pain medication, correct?

2        A    As of when?

3        Q    July 24th, '14, when you were seen for the 602 --

4        A    Right.

5        Q    -- you still hadn't been taking anything?

6        A    I still hadn't been taking anything.

7        Q    Okay.  And I believe, if I remember correctly,

8    the 602 was denied at the first level; is that correct?

9        A    No, it was granted at the first level.

10       Q    It was granted?

11       A    Yes.

12       Q    Okay.  And do you know who did that?

13       A    I believe it was the Defendant Michele Ditomas.

14       Q    Okay.  And was she a chief physician at the time?

15       A    I believe a copy of the first-level response is

16   attached --

17       Q    Okay.

18       A    -- at exhibit -- no, let me back up.

19            I believe my medication was granted at the first

20   and second level.

21       Q    Okay.

22       A    The Defendant Jackie Clark granted me medication

23   also at the second level.  And that's attached here to

24   the First Amended Complaint as Exhibit 26.

25       Q    Okay.  So let me make sure I understand this.

Page 30

1          Your 602 was granted at the first level --

2     A    Um-hum.

3     Q    -- by Michele Ditomas.

4     A    I appealed to the second level also.

5     Q    Why did you appeal, if it was granted?

6     A    The doctor -- well, the Defendant Francis Ko had

7     violated the 8th Amendment right to medical care, refused

8     me medication on several occasions.

9          I also didn't feel that my morphine should have

10    ever been taken due to the violation of the procedures --

11    Q    Okay.

12    A    -- of the. . .

13    Q    Let me ask you this.  After your 602 was granted

14    at the first level by Dr. Ditomas, how soon after that

15    did you start receiving any kind of pain medication?

16    A    After what now?

17    Q    After the first level was granted, how soon after

18    that did you receive pain medication?

19    A    I believe I received medication either that

20    night, on July 24, 2014, or the next morning.

21    Q    Okay.  And what kind of medication?

22    A    I believe he prescribed Ibuprofen 400 milligrams.

23    Q    This was Dr. Ko?

24    A    Yes.

25    Q    Okay.

Page 31

1    A    And Nortriptyline 25 milligrams.

2    Q    What was the other one?

3    A    I can spell it.

4    Q    Sure.

5    A    N-o-r-t-r-i-p-t-y-l-i-n-e.   Twenty-five

6   milligrams.

7    Q    And both of those medications were for the pain,

8   correct?

9    A    Yes.

10    Q    Okay.   Did those two medications help with the

11   pain?

12    A    Very, very slight.

13    Q    Okay.   Okay.   So then you appealed it to the

14   second level.

15    A    Yes.

16    Q    And that's where Jackie Clark comes in.   And it's

17   also granted, correct?

18    A    The medication, yes.

19    Q    The same medication?

20    A    Yes.   Yes.

21    Q    Okay.   So during that time frame you are

22   continuing to receive the Ibuprofen and the

23   Nortriptyline?

24    A    Yes.

25    Q    Twenty-five milligrams.   Okay.

Page 32

```
 1              And what happened after the second level?   You
 2    appealed it to the third level?
 3         A    I appealed it to the third level.
 4         Q    And what happened there?
 5         A    I have that third-level response attached hereto.
 6         Q    Okay.   What's the exhibit number?
 7         A    I need a second to go through it and find it.
 8         Q    Sure.
 9              Do you recall if it was granted?
10         A    Yes.   I have that exhibit attached to the
11    Complaint, I believe, at Exhibit 30.
12         Q    Okay.   Let me take a quick look at that.   Okay.
13    So it says that the appeal is denied, correct?
14         A    Where are you reading?
15         Q    Where it says, "Director's-level decision."
16         A    Yes.
17         Q    It says, "Appeal is denied.   This decision
18    exhausts your administrative remedies."
19         A    Right.
20         Q    Okay.   Okay.   Anything else about Dr. Ko other
21    than what you've told me, as far as your Complaints
22    against him, which is, essentially, that he did not give
23    you -- strike that.
24              Essentially, I think what you've stated, both in
25    your Complaint and today in your testimony, is that
```

                                                        Page 33

1    because there was a finding that there was a violation of

2    your pain contract with CCR, that he started tapering you

3    off the morphine without giving you any alternate

4    medications for pain; is that correct?

5        A    Right.

6        Q    Anything else about Dr. Ko that you complain of?

7        A    Yes.  Give me one second.  There's something else

8    I wanted to tell you.

9        Q    Sure.

10       A    Yes.  The 602 that was filed against Dr. Ko for

11   his failure to provide me with some pain medication --

12       Q    Is that the one that was filed on June 19, 2014?

13       A    Yes.

14       Q    Okay.

15       A    -- this appeal was accepted at the first-level

16   review, assigned to Dr. Ko, which he received --

17       Q    Okay.

18       A    -- on June 27th, 2014.

19            Now, down to the bottom of Exhibit 21 --

20       Q    Okay.  What is the complaint there?

21       A    Well, I received his, I believe it was,

22   admissions.  I don't have that on hand right now, but I

23   do have it back in my room.

24       Q    Okay.

25       A    Dr. Ko, I believe, in his admissions stated that

Page 34

1    he didn't know that I was in pain or that I didn't

2    know -- that he didn't know that I wanted anything.  And

3    he received this 602 on June 27th, 2014.  I saw Dr. Ko on

4    July 22nd, 2014.

5        Q    So about a month after?

6        A    Yes.

7        Q    Okay.

8        A    And I think he was aware -- well, I believe he

9    was aware due to the fact that he signed off on this 602.

10       Q    Okay.

11       A    And this is the same 602 appeal that I requested

12   emergency processing because I was in chronic pain.

13       Q    Right.  Okay.

14            So you think, basically, Dr. Ko was aware of the

15   pain you were going through --

16       A    Absolutely.

17       Q    -- and still didn't give you any medications?

18       A    Absolutely.

19       Q    Okay.  Do you think -- and this is probably

20   speculation on both of our parts.  But do you think it's

21   possible that his hands were tied and that he could not

22   prescribe anything else because of the pain contract

23   violation?

24       A    Not at all.  I believe there's always an

25   alternative.

                                              Page 35

1    Q   Okay.

2    A   Especially when you are dealing with people that

3  are in pain, chronic pain, or people with cancer.

4    Q   Okay.  Anything else about Dr. Ko?  I want to

5  move on to the other defendants very briefly.

6    A   No, not right now.

7    Q   Okay.  Let's move on to R.N. Zink.  And I'm going

8  to tell you what I think is your complaint.  And you

9  correct me if I'm wrong.

10       I believe I saw in your Complaint that your

11  complaint against R.N. Zink was that she was the nurse --

12  by the way, was it a he or a she?

13    A   A she.

14    Q   You don't happen to know her first name, do you?

15    A   Teresa Zink.

16    Q   Teresa.  Okay.  Okay.

17       So your complaint about nurse Teresa Zink is that

18  she was the one who administered the urine test, correct?

19    A   Yes, she collected the urine sample.

20    Q   She collected the urine sample.  Okay.  And I

21  believe your complaint was twofold.  Number one, that she

22  was not -- you were not supposed to have a female collect

23  the urine sample; is that correct?

24    A   Yes.

25    Q   Okay.  And then, number two, that she was not

Page 36

1    wearing gloves when she --

2        A    Yes.

3        Q    Let me finish my question, for the record.

4             That she was not wearing gloves when she

5    collected the urine sample; is that correct?

6        A    Yes.

7        Q    Can you describe for me how that event went

8    about?  So, in other words, she approaches you --

9        A    Yes.

10       Q    -- and says I need a urine sample from you?

11       A    Yes.

12       Q    Okay.  And so then what?  You go into the

13   restroom?

14       A    Well, can I back up for a second?

15       Q    Sure.

16       A    I was called to B-1 medical clinic.

17       Q    Okay.

18       A    That's where the inmates go when we are waiting

19   for our appointments to see the doctor for that day.

20       Q    Okay.

21       A    She came out and she told me that she needed to

22   collect a urine sample from me, random.

23       Q    Okay.

24       A    She said if I didn't provide a urine sample, the

25   doctor would cut me off my medication for pain.

Page 37

1    Q    Okay.  Did she say who ordered her to do that?

2    A    Dr. Ko.

3    Q    Dr. Ko did?

4    A    Yes.

5    Q    Okay.  Go ahead.

6    A    So she -- she told me that I had to go into this

7  restroom.  You know, it's an inmate restroom --

8    Q    Right.

9    A    -- where we all use, and provide this urine

10 sample for her.

11       I wasn't provided any gloves.  She wasn't wearing

12 any gloves.

13       I go into the restroom and I'm trying to shield

14 myself, and she is watching me.  And she -- it was a

15 total disaster.

16   Q    Okay.  So I want to make sure I understand this,

17 without going into too much detail.

18       But you had your back to her at that point?

19   A    No.

20   Q    You don't?  Okay.

21   A    I tried to shield myself.

22   Q    Okay.

23   A    But she told me that she had to watch the urine

24 going into the bottle.

25   Q    Okay.  Okay.  So then that happens, I assume?

Page 38

1      A      Yes.

2      Q      How far away from you is she at that point?

3      A      She's about two feet --

4      Q      Okay.

5      A      -- two and a half feet.

6      Q      Okay.  So you do your thing.  You put the urine

7   in a cup, I assume, correct?

8      A      A little container.

9      Q      Okay.  And then there is a lid to that?

10     A      I'm not even sure.

11     Q      Okay.  So you didn't put a lid back on?

12     A      No.

13     Q      Okay.  And so when you're done, do you hand it to

14  her?

15     A      I hand it to her, yes.

16     Q      Okay.  Do you recall if she put a lid on it?

17     A      You know, it's been so long ago. . .

18     Q      I know.

19     A      This was 2014.

20     Q      I know.

21     A      I know she's supposed to put a lid.

22     Q      That's why I told you earlier, I don't want you

23  to guess.  If you don't know, you don't know.  That's

24  fine.

25     A      Okay.

Page 39

1      Q     But in any event, you give her the urine sample

2    in the cup.  And then what happens?

3          Does she leave at that point?

4      A     Yes.

5      Q     Okay.  So other than what we've discussed about

6    R.N. Zink, is there anything else in your complaints

7    against her?

8      A     Yes.

9      Q     Okay.

10     A     You know, for the record, you know, they have a

11   policy here per DOM Section 52010.17/52010.18.  "Staff

12   Requirements/Urine Sample Collection."  And one of the

13   requirements are that "Staff observing the collection of

14   the urine sample shall be of the same gender as the

15   inmate being tested."

16     Q     Right.  I saw that in your Complaint.  Did you

17   tell her that at the time?

18     A     I -- I think I mentioned it.  I didn't have the

19   DOM on me that day.  So I don't know if I gave that to

20   her or said it in these exact words.

21     Q     Right.

22     A     I'm reading directly from Exhibit 33 of the

23   Complaint.

24     Q     Okay.

25     A     But I did tell her that, you know, Aren't

Page 40

 1    males -- isn't this a custody issue?  Male R.N.s.

 2          And she just kind of smirked and said, If you

 3    don't do this, you know, the doctor is going to cut you

 4    off your medication for pain.  So I was kind of forced to

 5    do this.

 6    Q    Okay.  Okay.

 7          So the no gloves is your complaint?

 8    A    No gloves.

 9    Q    And then also the gender problem, that it should

10    have been a male nurse actually collecting --

11    A    A male staff member, custody.

12    Q    Or a male staff member, correct.

13    A    Another thing was the environment, the restroom

14    environment, was very, you know, not clean.  A little

15    dirty.  It's an inmate restroom where we run in and out

16    of.

17    Q    Yeah.

18    A    And one of the requirements when you are

19    collecting the urine sample for drug testing -- give me

20    one second.  It specifically states, "Staff will adhere

21    to the following during the collection of the urine

22    sample:  The sample collection shall be conducted in a

23    sanitary setting and with the necessary universal

24    precautions.  The inmate shall be provided disposable

25    gloves for use during the collection and access to clean

                                                    Page 41

1   running water after the collection is completed."

2          None of this was done during that time.

3      Q    Is it -- is it your belief that that's -- that's

4   a bad question.  Strike that.

5          Do you believe that the fact that, as you said,

6   none of this was done, that that contributed to your

7   having methamphetamines in your system?

8      A    Well, I remember her hands being inside the

9   bottle before she handed it to me.

10     Q    Okay.

11     A    I don't know if she put a lid on it after.  I

12  don't remember exactly what happened.  But I do remember,

13  you know, she wasn't wearing gloves.  I was not provided

14  gloves.  Her hands was touching the inside of the

15  container when she handed it to me.

16     Q    Okay.  And you think that might have contributed

17  to it -- contributed to the finding of methamphetamines

18  in your system?

19     A    Again, the area which I was put to provide it was

20  dirty.  It's a hot spot for drug use.  Inmates. . .

21     Q    Right.

22     A    So I don't know if I may have touched something.

23  I'm just not sure.

24     Q    I understand.  I understand.

25     A    I've given several tests since then and they've

                                                Page 42

1    all been clean.  But I've been in a lab setting.  They

2    won't send me back to the B-1 medical clinic.  I think

3    they changed that.

4       Q    Okay.  Okay.  Good.

5            Let's move on to Jackie Clark.

6       A    Okay.

7       Q    Now, tell me again who Jackie Clark was at the

8    time.

9       A    Jackie Clark is the -- then she was the chief

10   executive officer.

11      Q    Okay.  And what is your complaint against Jackie

12   Clark?

13      A    Well, Jackie Clark, she knew that the urine

14   collection procedure was violated by the Defendant Teresa

15   Zink.  I appealed to her and requested that my medication

16   be reinstated for those reasons, and maybe that a repeat

17   test could be done properly.

18           That was never done and the appeal was denied.

19      Q    Okay.

20      A    I feel that Jackie Clark was, you know, the

21   supervisor that knew of this, and that's why she was

22   added to this suit.

23      Q    Okay.  Anything else about Jackie Clark?

24      A    Not at this time.

25      Q    Okay.  What about W. Harris?  I don't know what

Page 43

1   the first name is.  Oh, she was the healthcare --

2        A    When --

3        Q    Excuse me.

4             She was the healthcare appeals coordinator?

5        A    Yes.

6        Q    So what is the complaint against her?

7        A    Give me one second.

8        Q    Sure.

9        A    In the Complaint, yes, I filed a 602 medical

10   appeal to Jackie Clark who was the healthcare appeals

11   coordinator.

12       Q    No.  I'm sorry.  Let me correct you.  You just

13   stated that Jackie Clark was the chief executive officer.

14            Are you talking about W. Harris?

15       A    Excuse me.  Yes.

16       Q    Okay.  W. Harris.

17       A    I filed the medical healthcare appeal --

18       Q    Is that still the same one that we talked about

19   earlier, the one that was filed in June of 2014, or is

20   that a different one?

21       A    That's the same one.

22       Q    Okay.

23       A    The Defendant Wendy Harris was the medical

24   appeals coordinator.

25       Q    Okay.

Page 44

1     A    And I requested emergency processing due to pain

2   issues again.

3     Q    So that goes back to your complaint that it was

4   processed as a routine?

5     A    It was processed as a routine.  And I

6   specifically stated that I had consulted with my primary

7   care provider about pain, and he refused me anything.

8     Q    Okay.

9     A    Could somebody please provide some treatment for

10  me?

11     Q    Okay.

12     A    This appeal was processed as a routine, which

13  delayed me, like, over a month to receive some treatment

14  for my chronic pain.

15     Q    Okay.  Anything else about Wendy Harris?

16     A    Well, yeah.  The California Code of Regulations

17  Title 15, Section 3084.9 [sic] (A)(1), (B) and (2),

18  requires medical appeals to be processed as an emergency

19  if there is a serious and imminent danger to the inmate's

20  health.

21     Q    Okay.

22     A    I did submit the appeal, which I gave a clear

23  description of the circumstances warranting emergency

24  processing, and that is attached to this Complaint as

25  Exhibit 21.

Page 45

1            I explained that I was in chronic pain.  And that

2     the Defendant Francis Ko refused and failed to provide me

3     any medical care.

4        Q    Okay.  Did you -- did you ever receive a response

5     from Wendy Harris after you filed your 602?  Did she

6     personally ever respond to you?

7        A    No.

8        Q    Okay.

9        A    The first thing I got was a due date for, like,

10    sometime in July.

11       Q    To see Dr. Ko?

12       A    Yes.

13       Q    Okay.  Let's go to Dr. Michele Ditomas.  She's

14    the fifth one.  What is your complaint against her?

15       A    Similar to the complaint against the Defendant

16    Jackie Clark.

17       Q    Okay.

18       A    Her supervisor liability.

19            The Defendant Michele Ditomas knew of the lack of

20    treatment that I was getting, as far as medication for

21    pain and the violation of the urine sample collection.

22            I requested morphine reinstated due to the urine

23    sample collection violation --

24       Q    Okay.

25       A    -- which was denied.

Page 46

```
 1      Q     Did you ever receive morphine after that for your
 2   pain?
 3      A     No.
 4      Q     You never did?
 5      A     No.
 6      Q     Okay.  After you -- you told me that at some
 7   point, which I believe it was July of 2014, you started
 8   receiving Ibuprofen and Nortriptyline.
 9      A     Wait a second.  What did you say?
10      Q     After you began receiving medication on
11   July 24th, 2014, which you said you were receiving
12   Ibuprofen 400 milligrams and then Nortriptyline 25
13   milligrams --
14      A     Right.
15      Q     -- did you continue receiving medication up to
16   the present?
17      A     Yes.
18      Q     Okay.
19      A     Yes.
20      Q     Did that medication change at any point?
21      A     Yes.
22      Q     Okay.  And was that to the Gabapentin?
23      A     Yes.
24      Q     Okay.  Did you receive any other types of
25   medication besides the Ibuprofen, the Nortriptyline, or
```

Page 47

1      the Gabapentin?

2          A     Yes.   I've been on quite a few medications since

3      then.

4          Q     Okay.

5          A     And I've been working -- my current provider has

6      been working with me to see what medications that will

7      work best for me.

8          Q     Okay.

9          A     He's also sent me to a pain committee twice in a

10     discussion to possibly get me cut back on the morphine.

11         Q     Who is your current provider?

12         A     Dr. Petras.

13         Q     Do you know how to spell that?

14         A     P-e-t-r-a-s.

15         Q     Petras.   Okay.   Great.

16               Now, out of those five defendants -- we talked

17     about Dr. Ko.   We talked about R.N. Zink.

18         A     Yes.

19         Q     We talked about Jackie Clark.   We talked about

20     Wendy Harris.   And we talked about Dr. Ditomas.

21               -- the only two you have ever met is Dr. Ko and

22     R.N. Zink; is that correct?

23         A     Yes.

24         Q     You never met Jackie Clark?

25         A     No.

                                                    Page 48

1    Q    Never met Wendy Harris?

2    A    No.

3    Q    And never went -- excuse me.

4         And never met Michele Ditomas?

5    A    No.

6    Q    Okay.  Let me just take a quick look here.

7         Do you have an expected release date?

8    A    Yes.

9    Q    Which is when?

10   A    Around 2022.

11   Q    Okay.  What was your current crime of commitment?

12   A    Do I have to answer that?

13   Q    Well, for purposes of a deposition, yeah.  You

14   may not think it's relevant, but you do have to answer

15   it.  It doesn't mean it comes in at trial or anything.

16   A    I had a robbery conviction.

17   Q    Okay.  What year was that in?

18   A    20- -- early 2000s.

19   Q    Okay.  Let me just make sure.  I think I'm almost

20   done.

21        When was the last time you saw Dr. Ko; do you

22   recall?  Approximately.  I know you mentioned earlier it

23   was 2016.

24   A    Yeah, maybe a year.  A little bit over a year

25   ago.

Page 49

1    Q    Okay.  Was it for the same problem?  For the

2    pain?  I mean, for the pain associated with your sciatic

3    nerve and neck?

4    A    Every time I saw Dr. Ko I've always spoken to him

5    about my pain, like, on every visit.

6    Q    Okay.

7    A    There hasn't ever been a visit where we didn't

8    speak about my pain issues.

9    Q    Okay.  After he prescribed those two medications,

10   the Ibuprofen and the Nortriptyline, did he always agree

11   to refill those?

12   A    Dr. Ko?

13   Q    Yeah.  In other words, he never denied a refill

14   for either one of those two medications that you know of,

15   do you?

16   A    I'm not -- I'm not -- I don't remember exactly.

17   It's been a while.

18   Q    Okay.

19   A    It's been a long time.

20   Q    Okay.  Okay.  Is there anything else you want to

21   tell me about any of these five defendants, and I'm

22   talking complaint-wise.

23   A    Just the fact that, you know, I was kind of

24   tortured by the doctor.  Like I say, I feel like, you

25   know, just because you may be mad at me or a little

Page 50

1    upset, it doesn't give a doctor the right to become

2    cruel.

3         And, you know, reading the law has taught me a

4    lot, you know, about my rights.

5    Q    Right.

6    A    And, you know, even if, you know -- if it was

7    true that a pain contract is violated, you know, there

8    has to be an alternative.  Especially when you know that

9    I'm in pain.

10   Q    Right.

11   A    If you know that I suffer.

12        If Dr. Ko never knew, I wouldn't say a word.

13   Because how could he be liable?

14   Q    Right.

15   A    But this guy, he knew the prognosis.  He knew

16   it's an ongoing thing.  I've been diagnosed with, like,

17   spinal stenosis and chronic pain.  I'm always in pain.

18   It never goes away.  I'm in pain right now.

19   Q    I was going to ask you that.  We've been sitting

20   here for about over an hour.

21   A    Yeah.  You know, the medication I'm receiving

22   right now, you know, it helps me somewhat.  It's better

23   than nothing.

24   Q    Right.  Right.  Okay.

25        MR. LEWIS:  That's all I've got.

Page 51

1           So, once again, if you don't mind sending me

2    those records once you have them, after they are

3    authenticated.

4           THE WITNESS:  Okay.  And what are all the records

5    that you need?

6           MR. LEWIS:  Whatever is responsive to the notice.

7           THE WITNESS:  Okay.

8           MR. LEWIS:  And you should have the notice

9    because you received a copy of it.

10          THE WITNESS:  Okay.  Okay.

11          MR. LEWIS:  So whatever is responsive to that, if

12   you think there's anything else, other than what is

13   attached to your Complaint.

14          THE WITNESS:  Okay.

15          MR. LEWIS:  Okay.  Great.  I think we're done.

16   Thank you.  Thank you, Mr. Owens.

17          THE WITNESS:  Thank you, sir.

18          (The deposition concluded at 12:09 p.m.)

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

1          I, DERRICK OWENS, do hereby declare under penalty

2    of perjury that I have read the foregoing transcript;

3    that I have made any corrections as appear noted, in ink,

4    initialed by me, or attached hereto; that my testimony as

5    contained herein, as corrected, is true and correct.

6          EXECUTED this      day of              ,

7    20   , at                        ,                .

8                    (City)              (State)

9

10

11

12

13                              DERRICK OWENS

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 53

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken before

4  me at the time and place herein set forth; that any

5  witnesses in the foregoing proceedings; prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand which

8  was thereafter transcribed under my direction; that the

9  foregoing transcript is a true record of the testimony

10  given.

11    Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [  ] was [  ] was not requested.

15    I further certify I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or party to this action.

18    IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20  Dated:   May 4, 2017

21

22

23

24

25    DANIELLE READING CSR NO. 10826

Page 54

[00982 - approximately]

**0**

**00982** 1:9 2:10

**1**

**1** 1:25 4:14 14:12
17:5 37:16 43:2
45:17
**10826** 1:23 2:24
54:25
**11:03** 1:19 2:22
5:2
**12:09** 2:22 5:2
52:18
**13** 12:7
**1300** 3:8
**14** 20:7,11 22:2
23:1 30:3
**14th** 21:12,15,19
21:23 24:3
**15** 28:17 45:17
**16** 12:7 25:1 27:8
**1600** 2:20 9:22,23
**16th** 25:1,8 27:8
**17** 4:14
**18th** 26:21
**19** 14:1 34:12
**19th** 26:19,21,22
26:25 27:3 28:11

**2**

**2** 14:19,20 45:17
**20** 23:16 49:18
53:7
**2000s** 49:18
**2007** 13:12 14:1
**2011** 12:5,9,13
13:3
**2012** 12:6,9,13
13:3
**2013** 12:6 13:4
**2014** 17:15,16,19
18:3,4 20:2,11

21:12,12,15,23
22:2,2,8 23:1,23
24:3,4,25 25:1
26:19,25 27:8
28:11 29:16,25
31:20 34:12,18
35:3,4 39:19
44:19 47:7,11
**2015** 10:5
**2016** 13:4 49:23
**2017** 1:18 2:23 5:1
54:20
**2022** 49:10
**2025.010** 4:19
**21** 34:19 45:25
**22nd** 35:4
**24** 1:18 2:22 5:1
31:20
**24th** 20:2 21:17,20
21:21 22:1,8
29:16,25 30:3
47:11
**25** 32:1 47:12
**2578209** 1:24
**26** 30:24
**27th** 34:18 35:3
**2:15** 1:9 2:10
**2nd** 23:23 24:4,20
24:22,25

**3**

**3** 14:19
**30** 19:7,7 33:11
**3084.9** 45:17
**33** 40:22

**4**

**4** 4:4 54:20
**400** 31:22 47:12

**5**

**52010.17/52010...**
40:11
**54** 1:25

**6**

**60** 18:18 19:4
**602** 26:13,14,18,25
27:3,7,12,14,15,17
28:1,5,10,11,14
29:5,6,14 30:3,8
31:1,13 34:10
35:3,9,11 44:9
46:5

**7**

**7362** 23:21

**8**

**8th** 10:5 31:7

**9**

**916-324-5495** 3:11
**94244-2550** 3:10
**944255** 3:9

**a**

**a.m.** 1:19 2:22 5:2
**ability** 9:17
**absolutely** 35:16
35:18
**accepted** 34:15
**access** 41:25
**accident** 8:20
**action** 54:16,17
**added** 43:22
**additional** 16:15
16:22,23,25
**adhere** 41:20
**administered** 5:5
36:18
**administrative**
33:18

**admissions** 34:22
34:25
**affect** 8:16,25 9:17
**afternoon** 18:25
**ago** 10:4 39:17
49:25
**agree** 50:10
**ahead** 18:19 20:5
20:24 26:23 27:3
38:5
**al** 1:11 2:12
**allowed** 29:23,24
**alternate** 34:3
**alternative** 21:9
22:10 26:3 35:25
51:8
**amended** 4:14
10:4 17:1 30:24
**amendment** 31:7
**answer** 6:17 49:12
49:14
**answers** 8:14
**apologize** 14:20
**appeal** 27:22 31:5
33:13,17 34:15
35:11 43:18 44:10
44:17 45:12,22
**appealed** 31:4
32:13 33:2,3
43:15
**appeals** 10:17
27:16 44:4,10,24
45:18
**appear** 53:3
**appointments**
37:19
**approaches** 37:8
**approximate**
11:23 23:10 24:24
**approximately** 8:1
26:10 49:22

Veritext Legal Solutions
866 299-5127

[april - contained]

**april** 1:18 2:22 5:1
  17:19,22 18:2,4
  20:2,11 21:17,19
  21:20,21 22:1,8
**area** 42:19
**asked** 7:24 15:14
**asking** 7:1 10:20
**assess** 6:12
**assigned** 34:16
**associated** 50:2
**assume** 38:25 39:7
**attached** 14:8
  15:20 16:2,8 20:7
  23:11,16 25:25
  28:1 30:16,23
  33:5,10 45:24
  52:13 53:4
**attorney** 3:5,7
  54:17
**authenticated**
  16:15,21 52:3
**aware** 35:8,9,14

**b**

**b** 4:12 37:16 43:2
  45:17
**back** 10:3 11:18
  12:5,6 13:12 17:3
  17:7 18:20 19:19
  21:17 24:11,16
  26:17,17 30:18
  34:23 37:14 38:18
  39:11 43:2 45:3
  48:10
**backtrack** 11:3
**bad** 18:23 25:19
  42:4
**based** 7:25
**basically** 6:8,12
  14:16 22:24 23:2
  26:2 35:14

**began** 47:10
**beginning** 2:21
**behalf** 2:19
**belief** 42:3
**believe** 11:14
  14:19 16:3 25:1
  25:13,25 28:15
  29:13 30:7,13,15
  30:19 31:19,22
  33:11 34:21,25
  35:8,24 36:10,21
  42:5 47:7
**benefit** 6:15
**best** 7:17 8:15
  13:21 48:7
**better** 6:9 22:14
  51:22
**bit** 49:24
**bottle** 38:24 42:9
**bottom** 34:19
**box** 3:9
**briefly** 17:24 36:5
**brought** 15:9,17
  15:19 28:17
**bulging** 13:17

**c**

**c** 3:1 5:20
**ca** 1:24
**california** 1:2,17
  2:2,20,21,21 3:4
  3:10 5:1 28:13
  45:16 54:2
**call** 23:8 24:18
**called** 37:16
**cancer** 36:3
**car** 8:20
**care** 12:10 13:3
  23:25 31:7 45:7
  46:3
**case** 6:12 16:5
  54:12

**categories** 15:15
  15:18 16:7
**ccr** 34:2
**cell** 24:17
**certain** 6:14
**certified** 2:23 54:1
**certify** 54:2,15
**cervical** 13:17
**chance** 13:21
  24:14
**change** 8:24 47:20
**changed** 43:3
**changes** 8:14,16
**chief** 30:14 43:9
  44:13
**chronic** 24:11
  25:14 28:19 29:11
  35:12 36:3 45:14
  46:1 51:17
**circumstances**
  45:23
**city** 53:8
**civil** 4:18
**clark** 1:11 2:12
  10:11 30:22 32:16
  43:5,7,9,12,13,20
  43:23 44:10,13
  46:16 48:19,24
**clean** 41:14,25
  43:1
**clear** 21:2 45:22
**clearly** 25:9
**clinic** 37:16 43:2
**cmf** 17:14
**code** 4:18 28:13
  45:16
**cold** 27:20
**collect** 36:22 37:22
**collected** 36:19,20
  37:5

**collecting** 41:10
  41:19
**collection** 40:12
  40:13 41:21,22,25
  42:1 43:14 46:21
  46:23
**come** 19:19
**comes** 7:9 12:1
  32:16 49:15
**commitment**
  49:11
**committee** 48:9
**compel** 11:4
**complain** 34:6
**complaint** 10:5,7
  10:23 14:9 15:20
  15:24 16:3,9 17:1
  17:8,11,25 18:2
  20:7 23:11,16
  25:25 28:2 30:24
  33:11,25 34:20
  36:8,10,11,17,21
  40:16,23 41:7
  43:11 44:6,9 45:3
  45:24 46:14,15
  50:22 52:13
**complaints** 17:12
  33:21 40:6
**complete** 7:21
**completed** 42:1
**completely** 21:13
  21:25 22:2 23:2
  24:3
**completion** 54:13
**concerning** 24:1
**concluded** 52:18
**conducted** 21:2
  41:22
**consulted** 45:6
**contained** 53:5

Veritext Legal Solutions
866 299-5127

[container - either]

| | | | |
|---|---|---|---|
| **container** 39:8 42:15 | **current** 48:5,11 49:11 | **delayed** 45:13 | **doctor** 10:13 18:13,15 24:10,14 |
| **continue** 47:15 | **currently** 13:6 16:14 | **denied** 30:8 33:13 33:17 43:18 46:25 50:13 | 31:6 37:19,25 41:3 50:24 51:1 |
| **continuing** 32:22 | **custody** 41:1,11 | **depending** 22:19 | **document** 14:15 |
| **contract** 20:13,14 22:23 25:18 34:2 35:22 51:7 | **cut** 18:15,19 21:5 21:13,24,25 22:3 24:3 37:25 41:3 | **deposition** 1:16 2:19 4:15 5:15 6:4 6:8 9:3 14:12,16 | **documents** 4:17 11:9,12,15 14:21 15:9,13,17,19 16:4 16:10,20,22,23 |
| **contributed** 42:6 42:16,17 | 48:10 | 15:11 49:13 52:18 54:12 | **dom** 40:11,19 |
| **controlled** 18:6 | **cutting** 21:18,21 | **deputy** 3:7 | **dosage** 9:20 |
| **conviction** 49:16 | **cv** 1:9 2:10 | **derrick** 1:5,16 2:6 2:19 4:3,16 5:4,18 | **dr** 10:9 11:2,14,18 11:19,24 12:10,14 |
| **coordinator** 10:17 27:16 44:4,11,24 | **d** | 53:1,13 | 13:2 17:7,8,11 18:2 19:23 20:1,1 |
| **copies** 14:8 | **d** 4:1 5:20,24,25 | **describe** 37:7 | 20:3,10,12,25 21:17 24:19 25:1 |
| **copy** 11:13 25:24 28:1 30:15 52:9 | **danger** 45:19 | **description** 45:23 | 25:5,7,11 26:7,20 27:8 31:14,23 |
| **correct** 10:18,19 12:8,18,23 13:4,5 | **danielle** 1:22 2:23 54:25 | **detail** 38:17 | 33:20 34:6,10,16 34:25 35:3,14 |
| 15:24 16:11 17:1 26:18 30:1,8 32:8 | **dasaun** 6:2 | **determined** 13:16 | 36:4 38:2,3 46:11 46:13 48:12,17,20 |
| 32:17 33:13 34:4 36:9,18,23 37:5 | **date** 7:8 20:1,6 21:14 23:9 24:24 | **diagnosed** 25:13 51:16 | 48:21 49:21 50:4 50:12 51:12 |
| 39:7 41:12 44:12 48:22 53:5 | 46:9 49:7 54:18 | **difference** 8:3 | **drive** 2:21 |
| **corrected** 53:5 | **dated** 54:20 | **different** 15:14 44:20 | **drug** 41:19 42:20 |
| **corrections** 53:3 | **dates** 29:1 | **difficult** 6:21 | **due** 21:6 31:10 35:9 45:1 46:9,22 |
| **correctly** 30:7 | **day** 18:18,24 19:5 20:10 37:19 40:19 | **direction** 54:8 | **duly** 54:6 |
| **counter** 22:5 | 53:6 | **directly** 40:22 | **duty** 11:13 |
| **couple** 17:12 | **days** 24:24 25:2 26:20 28:15,23,24 | **director's** 33:15 | **e** |
| **course** 29:22 | 29:9,10 | **dirty** 41:15 42:20 | **e** 3:1,1 4:1,12 5:20 5:22 32:5 48:14 |
| **court** 1:1 2:1 6:15 6:21 8:5 15:4 17:4 | **dealing** 10:8 17:15 36:2 | **disaster** 38:15 | **earlier** 39:22 44:19 49:22 |
| 19:14 | **december** 14:1 | **discussed** 40:5 | **early** 49:18 |
| **credibility** 8:17,25 | **decision** 33:15,17 | **discussion** 48:10 | **easier** 17:23 |
| **crime** 49:11 | **declare** 53:1 | **disk** 14:3 | **eastern** 1:2 2:2 |
| **crooks** 27:20 | **defendant** 11:10 30:13,22 31:6 | **disks** 13:17 | **either** 31:19 50:14 |
| **cruel** 22:20 51:2 | 43:14 44:23 46:2 | **disposable** 41:24 | |
| **csr** 1:23 54:25 | 46:15,19 | **district** 1:1,2 2:1,2 | |
| **cup** 39:7 40:2 | **defendants** 1:13 2:14,20 3:3 4:13 | **ditomas** 10:13 30:13 31:3,14 | |
| **curious** 27:23 | 10:8 18:8 36:5 48:16 50:21 | 46:13,19 48:20 49:4 | |
| | | **division** 1:3 2:3 | |

[emergency - half]

**emergency**  26:15
  27:15,18 28:12,16
  29:7 35:12 45:1
  45:18,23
**employee**  54:16
**entitled**  7:15 8:2
  11:8
**environment**
  41:13,14
**especially**  36:2
  51:8
**essentially**  33:22
  33:24
**estimate**  7:15,17
  8:2 12:1
**et**  1:11 2:12 4:20
**event**  37:7 40:1
**events**  9:18
**exact**  24:23 29:1
  40:20
**exactly**  42:12
  50:16
**examination**  4:2
  5:8
**examined**  5:5
**example**  7:10,19
  7:19 8:19
**excuse**  44:3,15
  49:3
**executed**  53:6
**executive**  43:10
  44:13
**exhausts**  33:18
**exhibit**  4:14 14:12
  17:5 20:7 23:13
  23:16 30:18,24
  33:6,10,11 34:19
  40:22 45:25
**exhibits**  10:25
  15:20 16:8,25
  20:7

**expected**  49:7
**experience**  7:25
**explain**  6:6 11:1
**explained**  20:12
  20:22,25 21:1
  46:1

**f**

**facility**  2:20 12:6,6
  12:21 13:7
**fact**  22:8 35:9 42:5
  50:23
**failed**  46:2
**failure**  34:11
**far**  17:18 33:21
  39:2 46:20
**federal**  54:12
**feel**  31:9 43:20
  50:24
**feeling**  9:4
**feet**  39:3,5
**female**  36:22
**fifth**  46:14
**file**  27:3,7
**filed**  10:3,4 11:4
  15:23,24 26:25
  27:12,13,15 28:10
  34:10,12 44:9,17
  44:19 46:5
**financially**  54:15
**find**  33:7
**finding**  34:1 42:17
**fine**  7:2 19:2,2
  28:18 39:24
**finish**  6:16 19:14
  37:3
**first**  10:4 11:8
  12:10,13 13:11
  17:1,13,14 18:14
  27:1,25 30:8,9,15
  30:19,24 31:1,14
  31:17 34:15 36:14

44:1 46:9
**fit**  15:18 16:7
**five**  10:8,21 14:22
  28:15,23,24 29:9
  29:10 32:5,25
  48:16 50:21
**flip**  14:18
**follow**  6:15
**following**  41:21
**follows**  5:6
**forced**  41:4
**foregoing**  53:2
  54:3,5,9,11
**forewarn**  8:15
**forgot**  15:2
**forth**  54:4
**forward**  9:4
**frame**  17:9,13
  32:21
**francis**  11:11 31:6
  46:2
**full**  5:16
**furious**  24:17
**further**  54:11,15
**fused**  14:6
**fusion**  14:3

**g**

**gabapentin**  9:10
  9:11,16,17,20
  47:22 48:1
**gender**  40:14 41:9
**general**  3:5,7
**generated**  8:8
**getting**  24:10
  46:20
**give**  6:17 8:15
  11:23 13:21 15:7
  20:22 22:4,11
  23:13 24:13,23
  27:9,10,11 28:6
  29:1 33:22 34:7

35:17 40:1 41:19
  44:7 51:1
**given**  42:25 54:10
**giving**  23:6 34:3
**gloves**  37:1,4
  38:11,12 41:7,8,25
  42:13,14
**go**  9:4 12:20 17:7
  18:19 20:5,24
  22:14,24 24:14
  26:23,24 27:2
  33:7 37:12,18
  38:5,6,13 46:13
**god**  11:25
**goes**  45:3 51:18
**going**  7:12 8:6
  10:20 11:9,18
  12:2 14:12 15:21
  20:15 22:9 25:12
  27:19 35:15 36:7
  38:17,24 41:3
  51:19
**good**  5:10,11 16:1
  43:4
**granted**  30:9,10
  30:19,22 31:1,5,13
  31:17 32:17 33:9
**great**  16:17 17:3
  48:15 52:15
**green**  8:21,24
**grievance**  26:11
  26:19 27:7 28:14
**ground**  6:14
**guess**  6:24 7:10,13
  7:21 39:23
**guessing**  7:9
**guy**  25:16 51:15

**h**

**h**  4:12
**half**  39:5

[hand - lot]

| | | | |
|---|---|---|---|
| **hand** 34:22 39:13 39:15 | **individuals** 10:21 | 24:5 26:3,4 31:15 31:21 41:2,4 | **l** |
| **handed** 42:9,15 | **ingested** 19:9 | 50:23 | **l** 32:5 |
| **hands** 35:21 42:8 42:14 | **initial** 5:23 | **kjn** 1:9 2:10 | **lab** 43:1 |
| **happen** 36:14 | **initialed** 53:4 | **knew** 22:9 25:13 | **lack** 46:19 |
| **happened** 19:12 25:10 27:13 33:1 33:4 42:12 | **initially** 20:14 | 25:14 43:13,21 | **lancaster** 12:23 |
| | **ink** 53:3 | 46:19 51:12,15,15 | **law** 51:3 |
| | **inmate** 28:15,19 38:7 40:15 41:15 41:24 | **know** 8:19,20 9:16 9:21 11:4 14:2 | **lawsuit** 6:10 10:3 |
| **happens** 19:22 27:4 38:25 40:2 | | 16:11 17:11 19:10 | **lay** 27:21 |
| **hard** 27:21 | **inmate's** 45:19 | 20:18 21:9 22:10 | **leave** 40:3 |
| **harris** 10:18 43:25 44:14,16,23 45:15 46:5 48:20 49:1 | **inmates** 37:18 42:20 | 22:18 23:3,5,6 24:13,16 25:12,12 | **left** 12:5,18 22:13 23:3 |
| | **inside** 42:8,14 | 25:17 27:10,23 | **leg** 24:12 |
| | **institution** 21:3,7 | 28:4,10 29:5 | **level** 30:8,9,15,20 30:23 31:1,4,14,17 32:14 33:1,2,3,5 33:15 34:15 |
| **head** 15:6 | **interested** 54:16 | 30:12 35:1,2,2 | |
| **health** 45:20 | **issue** 41:1 | 36:14 38:7 39:17 | |
| **healthcare** 10:17 23:20 29:18 44:1 44:4,10,17 | **issues** 45:2 50:8 | 39:18,20,21,23,23 | |
| | **item** 11:8 | 40:10,10,19,25 | |
| | **items** 14:23 | 41:3,14 42:11,13 | **lewis** 3:6 4:4 5:9 5:12 14:11,14 16:19,23,25 17:3,6 51:25 52:6,8,11,15 |
| **heartburn** 9:15 | | 42:22 43:20,25 | |
| **help** 32:10 | **j** | 48:13 49:22 50:14 | |
| **helping** 9:24 | **jackie** 1:11 2:12 10:11 30:22 32:16 43:5,7,9,11,13,20 43:23 44:10,13 46:16 48:19,24 | 50:23,25 51:3,4,6 51:6,7,8,11,21,22 | |
| **helps** 51:22 | | **ko** 10:9 11:2,14,18 11:19,24 12:10,14 13:2 17:7,8,11 18:2 19:23 20:1,1 20:3,10,12,25 21:17 24:19 25:1 25:5,7,11 26:7,20 27:8 31:6,23 33:20 34:6,10,16 34:25 35:3,14 36:4 38:2,3 46:2 46:11 48:17,21 49:21 50:4,12 51:12 | **liability** 46:18 |
| **hereto** 33:5 53:4 | | | **liable** 51:13 |
| **hey** 22:10 24:10 | | | **lid** 39:9,11,16,21 42:11 |
| **hold** 12:2 | **job** 1:24 | | **life** 28:21 |
| **hot** 42:20 | **july** 29:16,25 30:3 31:20 35:4 46:10 47:7,11 | | **light** 8:21,22 |
| **hour** 51:20 | | | **list** 14:21 15:13 |
| **housing** 24:9 | | | **little** 22:17 39:8 41:14 49:24 50:25 |
| **hum** 14:24 15:1,6 15:6 31:2 | **june** 23:23 24:4,18 24:20,22,25 25:1,8 26:19,21,22,25 27:3,8,8 28:11 34:12,18 35:3 44:19 | | **long** 19:24,25 24:22 26:10 39:17 50:19 |
| **hurrying** 22:22 | | | |
| | | | **longer** 13:7 |
| **i** | | | **look** 7:25 8:23 14:13,18 15:13 20:9 25:19 26:1 28:18 33:12 49:6 |
| **ibuprofen** 22:5 31:22 32:22 47:8 47:12,25 50:10 | **k** | | |
| | **k** 5:20 10:9 | **ko's** 11:11 | |
| **illness** 29:11 | **kern** 12:23 | | **looked** 10:25 |
| **imminent** 45:19 | **kind** 6:6,9 9:8 10:25 14:2 22:20 | | **looking** 17:13 |
| **important** 15:4 | | | **lot** 17:22 27:19 51:4 |

[machine - okay]

| m | methamphetamine | nature 13:8 | o |
|---|---|---|---|

**m**

machine 54:7
mad 25:16 50:25
mail 16:16,21
major 13:17
male 41:1,10,11
    41:12
males 41:1
man 22:15
marked 14:12
    17:5
matter 22:8
mean 13:11 16:6,7
    18:19 49:15 50:2
medical 2:20
    16:15 23:21 27:16
    28:14 31:7 37:16
    43:2 44:9,17,23
    45:18 46:3
medication 9:6,8
    9:15 18:15,17
    20:15 21:6,11
    22:3,19 23:1 24:5
    24:8 26:3 30:1,19
    30:22 31:8,15,18
    31:19,21 32:18,19
    34:11 37:25 41:4
    43:15 46:20 47:10
    47:15,20,25 51:21
medications 24:1
    25:11 32:7,10
    34:4 35:17 48:2,6
    50:9,14
meeting 27:8
member 41:11,12
mention 15:2
mentioned 29:8
    40:18 49:22
merits 6:12
met 11:19,21
    48:21,24 49:1,4

**methamphetamine**

methamphetamine
    18:21 20:13 21:1
methamphetami...
    19:9,19 20:19
    42:7,17
michele 10:13
    30:13 31:3 46:13
    46:19 49:4
middle 5:23
milligrams 9:22
    18:18 19:4,7,8
    31:22 32:1,6,25
    47:12,13
mind 52:1
monday 1:18 2:22
    5:1
month 21:16
    29:16,17 35:5
    45:13
months 17:18
morning 5:10,11
    9:9,21 18:22,25
    19:5,7 31:20
morphine 18:18
    18:21,22 19:3,4,19
    20:16 21:6,11,12
    21:18,21,23 22:2
    22:10,18 23:2
    24:3,11 31:9 34:3
    46:22 47:1 48:10
motion 11:4
move 36:5,7 43:5
mri 13:12,16

**n**

n 3:1 4:1 5:22 32:5
    32:5
name 5:12,17,17
    5:19,21 10:15,18
    36:14 44:1 54:19
narcotic 21:10

**nature**

nature 13:8
necessary 41:23
neck 13:14 24:12
    25:14 27:20,21
    50:3
need 6:14 23:25
    26:2 33:7 37:10
    52:5
needed 23:18
    25:15 37:21
neither 54:15
nerve 24:12 50:3
neurontin 9:12
neurosurgeon
    13:20
never 7:22 24:16
    43:18 47:4 48:24
    49:1,3,4 50:13
    51:12,18
night 19:5,8 27:20
    31:20
nod 15:6
nortriptyline 32:1
    32:23 47:8,12,25
    50:10
noted 53:3
notes 25:24
notice 4:14,17
    14:16 15:10 52:6
    52:8
number 6:16
    11:23 24:24 33:6
    36:21,25
numerous 12:3
nurse 10:15 36:11
    36:17 41:10
nurses 24:9 29:21
    29:22

**o**

o 5:22 10:9 32:5
oath 5:5
observing 40:13
obvious 8:19
obviously 8:24
    11:18
occasions 12:3
    31:8
occur 7:11 13:11
october 10:5
office 3:5 7:20
    16:21 22:22 25:20
    26:5,6
officer 43:10
    44:13
oh 13:8 28:18 44:1
okay 5:14,23 6:3,6
    6:11,13,17,18,20
    6:23 7:5,7,14,16
    7:18 8:1,5,9,12,13
    8:18,25 9:3,8,14
    9:16,20,23 10:1,20
    10:22,24 11:12,17
    11:18,23 12:4,9,25
    13:2,8,8,13,15,19
    13:23,25 14:2,5,7
    14:10,18,25 15:8
    15:17 16:1,4,10,13
    17:3,7,16,20,22,24
    18:5,11,16,19 19:6
    19:11,12,22 20:3,5
    20:8,17,21,25 21:4
    21:8,14,16,19,22
    22:1,7,25 23:4,12
    23:17,24 24:2,7,22
    25:10,23 26:1,1,7
    26:10,12,14,16,18
    26:23 27:2,2,13
    28:4,20 29:2,20,22
    29:25 30:7,12,14

[okay - r.n.s.]

30:17,21,25 31:11
31:21,25 32:10,13
32:13,21,25 33:6
33:12,12,20,20
34:14,17,20,24
35:7,10,13,19 36:1
36:4,7,16,16,20,25
37:12,17,20,23
38:1,5,16,20,22,25
38:25 39:4,6,9,11
39:13,16,25 40:5,9
40:24 41:6,6
42:10,16 43:4,4,6
43:11,19,23,25
44:16,22,25 45:8
45:11,15,21 46:4,8
46:13,17,24 47:6
47:18,22,24 48:4,8
48:15 49:6,11,17
49:19 50:1,6,9,18
50:20,20 51:24
52:4,7,10,10,14,15
**oliver**  3:6 5:12
**once**  17:25 19:5,5
52:1,2
**ongoing**  51:16
**ooo**  3:15 4:8,25
**operative**  10:7
**opioid**  20:14
**opportunity**  8:10
8:13 27:9
**opposed**  28:12
29:6
**ordered**  18:13
38:1
**original**  54:12
**owens**  1:5,16 2:6
2:19 4:3,16 5:4,10
5:18,22 6:3 16:19
52:16 53:1,13

## p

**p**  3:1,1 32:5 48:14
**p.m.**  2:22 5:2
52:18
**p.o.**  3:9
**page**  4:13 14:19,19
14:20
**pages**  1:25
**pain**  9:13,24 11:24
13:9,11,14 18:15
18:17 20:13 22:3
22:13,23 24:5,11
24:12,12,17 25:12
25:14,18 26:3
27:19 28:19 30:1
31:15,18 32:7,11
34:2,4,11 35:1,12
35:15,22 36:3,3
37:25 41:4 45:1,7
45:14 46:1,21
47:2 48:9 50:2,2,5
50:8 51:7,9,17,17
51:18
**part**  17:14,15
**parts**  35:20
**party**  54:17
**patient**  12:5
**penalty**  53:1
**people**  36:2,3
**period**  22:1
**perjury**  53:2
**personally**  46:6
**pertains**  54:11
**petras**  48:12,15
**physician**  12:11
13:3 30:14
**place**  54:4
**plaintiff**  1:7 2:8
4:16
**plaintiff's**  11:11

**please**  5:16,19
17:4,10 29:3 45:9
**point**  38:18 39:2
40:3 47:7,20
**policy**  21:3,6
40:11
**positive**  18:20
**possible**  13:21
35:21
**possibly**  48:10
**precautions**  41:24
**prescribe**  26:4
29:23,24 35:22
**prescribed**  31:22
50:9
**present**  47:16
**pretty**  29:10
**previous**  25:21,22
**primary**  12:10
13:3 20:6 23:25
45:6
**prior**  26:25 54:5
**probably**  35:19
**problem**  41:9 50:1
**procedure**  4:19
43:14
**procedures**  31:10
**proceedings**  54:3
54:5,7,13
**process**  6:6 16:14
16:20 28:12 29:7
**processed**  27:17
27:22 28:5,11,14
29:6 45:4,5,12,18
**processing**  26:15
27:16,18 28:16
35:12 45:1,24
**produce**  4:17
14:22 15:14
**production**  11:8
11:12

**prognosis**  51:15
**progress**  25:24
**proper**  28:15
**properly**  43:17
**protruding**  13:17
**provide**  34:11
37:24 38:9 42:19
45:9 46:2
**provided**  11:9
38:11 41:24 42:13
**provider**  12:7 13:6
23:25 45:7 48:5
48:11
**providers**  29:18
**purpose**  6:8
**purposes**  49:13
**pursuant**  4:18
**put**  16:17 23:7,25
24:4,18,19,25
26:11,18,18 39:6
39:11,16,21 42:11
42:19

## q

**question**  6:16
15:21 18:23 19:14
26:24 28:8 29:3,5
37:3 42:4
**questions**  6:25
10:21
**quick**  29:10 33:12
49:6
**quite**  22:18 48:2

## r

**r**  3:1,6 5:20,20
32:5,5 48:14
**r.n.**  18:9 19:15,18
36:7,11 40:6
48:17,22
**r.n.s.**  41:1

Page 7

[random - shield]

**random**  37:22
**rays**  16:2
**read**  8:23 10:23
  17:25 53:2
**reading**  1:22 2:23
  33:14 40:22 51:3
  54:25
**realize**  23:5
**really**  9:19 25:16
**reason**  9:3
**reasons**  43:16
**recall**  7:3 9:17
  19:24 24:23 25:5
  25:7 33:9 39:16
  49:22
**receive**  20:14
  31:18 32:22 45:13
  46:4 47:1,24
**received**  31:19
  34:16,21 35:3
  52:9
**receiving**  16:14
  31:15 47:8,10,11
  47:15 51:21
**recollection**  18:1
**recommended**
  13:20
**record**  5:16 11:10
  16:18 37:3 40:10
  54:6,9
**records**  11:16
  16:15 52:2,4
**recover**  13:22
**red**  8:21,22
**refer**  24:14
**refill**  50:11,13
**refused**  18:14
  21:10 22:15 25:19
  31:7 45:7 46:2
**regards**  17:8

**regulations**  28:13
  45:16
**reinstated**  43:16
  46:22
**relative**  54:16
**release**  49:7
**relevant**  49:14
**remedies**  33:18
**remember**  9:17
  18:25 19:1 20:1
  23:9 30:7 42:8,12
  42:12 50:16
**remove**  14:3
**removed**  14:4
**repeat**  28:8 29:3
  43:16
**rephrase**  7:1
**replied**  21:5
**report**  14:8
**reported**  1:21
  13:14
**reporter**  2:24 6:22
  8:5 15:4 17:4
  19:14 54:2
**reporter's**  6:15
**request**  11:8,12
  15:10 16:5 23:7
  23:20,21 24:4,20
  24:22,25
**requested**  14:22
  21:9 22:10 23:17
  27:18 28:12 29:7
  35:11 43:15 45:1
  46:22 54:14
**requesting**  26:15
  27:15
**require**  28:14
**requirements**
  40:12,13 41:18
**requires**  45:18

**respond**  46:6
**response**  8:24
  30:15 33:5 46:4
**responses**  11:5,11
  15:5,7
**responsive**  15:10
  16:5,6 52:6,11
**restroom**  37:13
  38:7,7,13 41:13,15
**results**  19:18
**review**  8:10 34:16
  54:13
**reviewed**  11:7
**right**  7:23 15:22
  16:24 18:7 19:11
  22:12 23:22 24:2
  24:15 27:2 29:10
  29:12 30:4 31:7
  33:19 34:5,22
  35:13 36:6 38:8
  40:16,21 42:21
  47:14 51:1,5,10,14
  51:18,22,24,24
**rights**  23:6 51:4
**robbery**  49:16
**room**  34:23
**routine**  27:17,22
  28:5,11 29:6 45:4
  45:5,12
**rules**  6:14
**run**  41:15
**running**  42:1
**rushed**  25:20 26:6
**rushes**  26:4

**s**

**s**  3:1 4:12 5:22
  48:14
**sacramento**  1:3
  2:3 3:10 7:21
**sample**  36:19,20
  36:23 37:5,10,22

37:24 38:10 40:1
  40:12,14 41:19,22
  41:22 46:21,23
**sanitary**  41:23
**saw**  19:23,25 20:1
  20:1,10 25:1
  26:20 35:3 36:10
  40:16 49:21 50:4
**saying**  8:7 22:22
  24:14 28:22
**says**  20:9,9 33:13
  33:15,17 37:10
**sciatic**  24:12 50:2
**second**  4:14 20:23
  23:13 28:6 30:20
  30:23 31:4 32:14
  33:1,7 34:7 37:14
  41:20 44:7 47:9
**section**  4:19 40:11
  45:17
**see**  8:5 14:21,23
  15:14 23:7,17,18
  23:25 24:19 26:7
  27:1,9 37:19
  46:11 48:6
**seen**  11:24 14:15
  28:23 29:1,9,12,13
  29:17 30:3
**send**  16:16 43:2
**sending**  52:1
**sense**  27:2
**sent**  48:9
**seq**  4:20
**serious**  45:19
**serve**  11:10
**serving**  11:14
**set**  11:12 54:4
**setting**  41:23 43:1
**seven**  29:10
**shield**  38:13,21

[shorthand - touched]

| | | | |
|---|---|---|---|
| shorthand 2:23 | stand 6:1 | surgery 13:21,23 | testing 41:19 |
| 54:1,7 | standards 28:16 | 13:25 14:3,8 | tests 42:25 |
| shortly 19:3 | start 11:2 22:9 | 25:14 | thank 14:10 17:4 |
| show 14:11 | 31:15 | sworn 54:6 | 52:16,16,17 |
| showed 20:12 | started 21:11,17 | system 19:20 42:7 | thing 26:8 39:6 |
| showing 19:19 | 21:21 34:2 47:7 | 42:18 | 41:13 46:9 51:16 |
| sic 20:11 45:17 | state 3:4 5:16 53:8 | | things 11:1 |
| sick 23:8 24:18 | 54:2 | **t** | think 8:1 11:7 |
| side 27:21 | stated 16:19 33:24 | t 4:12 32:5,5 48:14 | 20:6 23:13 29:8 |
| sign 20:14 | 34:25 44:13 45:6 | table 7:20,24 | 33:24 35:8,14,19 |
| signature 54:24 | statement 11:13 | take 5:15 6:22 | 35:20 36:8 40:18 |
| signed 35:9 | states 1:1 2:1 | 9:13,20 14:13 | 42:16 43:2 49:14 |
| similar 46:15 | 28:15 41:20 | 15:5 22:3 26:1 | 49:19 52:12,15 |
| simple 22:13 | stenosis 51:17 | 33:12 49:6 | third 33:2,3,5 |
| sir 22:6,6 23:14 | stop 24:2 | taken 2:19 6:4 9:5 | threatening 28:21 |
| 27:12 52:17 | stopped 23:2 | 9:8 13:16 18:22 | three 26:20 |
| sitting 51:19 | street 3:8 | 19:3 31:10 54:3 | tied 35:21 |
| six 14:22 | strike 18:23 33:23 | talked 44:18 48:16 | time 6:19 7:8,10 |
| size 7:20,24 | 42:4 | 48:17,19,19,20 | 12:10,13 17:8,13 |
| slight 32:12 | submit 45:22 | talking 44:14 | 17:14 18:16,24 |
| slip 24:18 | subscribed 54:19 | 50:22 | 20:18,22,25 22:1,4 |
| smirked 41:2 | substance 18:6 | taper 20:16 21:11 | 25:21,22 30:14 |
| somebody 45:9 | sued 10:8,9,11,13 | 22:9 | 32:21 40:17 42:2 |
| somewhat 51:22 | 10:15 | tapering 34:2 | 43:8,24 49:21 |
| soon 31:14,17 | suffer 13:9 51:11 | taught 51:3 | 50:4,19 54:4 |
| sorry 21:14 44:12 | suit 43:22 | telephone 5:13 | times 11:19,21,24 |
| spans 17:8 | supervisor 43:21 | tell 7:6 17:24 18:1 | 24:16 |
| speak 6:19 50:8 | 46:18 | 20:10 22:16 26:2 | title 28:17 45:17 |
| specific 7:8 17:18 | supervisors 25:19 | 34:8 36:8 40:17 | tln 1:9 2:10 |
| specifically 23:18 | supplemental | 40:25 43:7 50:21 | today 5:15 6:8 8:7 |
| 41:20 45:6 | 11:11 | ten 12:4 | 8:15,20 9:6 14:16 |
| speculation 35:20 | supposed 28:22 | teresa 36:15,16,17 | 15:9 33:25 |
| spell 5:17,19 32:3 | 29:9 36:22 39:21 | 43:14 | told 18:12,14 |
| 48:13 | sure 6:25 7:1,12 | test 18:13,15,20,24 | 20:15 24:9,13 |
| spinal 51:17 | 15:6 19:1,25 | 19:16,17,25 20:12 | 25:11,15 33:21 |
| spine 13:18 | 23:15 28:7,9 29:4 | 21:2 36:18 43:17 | 37:21 38:6,23 |
| spoke 24:8 25:11 | 30:25 32:4 33:8 | tested 18:6 19:12 | 39:22 47:6 |
| spoken 5:12 50:4 | 34:9 37:15 38:16 | 19:15,18 40:15 | tortured 50:24 |
| spot 42:20 | 39:10 42:23 44:8 | testified 5:6 | total 38:15 |
| staff 40:11,13 | 49:19 | testifying 54:6 | touched 42:22 |
| 41:11,12,20 | | testimony 8:15 | |
| | | 33:25 53:4 54:9 | |

Veritext Legal Solutions
866 299-5127

[touching - zink]

| | | | z |
|---|---|---|---|

touching 42:14
transcribed 54:8
transcript 8:8,11
8:23 53:2 54:9,12
54:14
treatment 45:9,13
46:20
trial 49:15
tried 38:21
true 51:7 53:5
54:9
try 8:15
trying 38:13
twenty 32:5,25
twice 48:9
two 8:3 11:14 25:3
26:20 32:10 36:25
39:3,5 48:21 50:9
50:14
twofold 36:21
tylenol 22:14
types 47:24

**u**

um 14:24 15:1,6,6
19:13 31:2
undersigned 54:1
understand 7:2
8:3 9:1 15:12
30:25 38:16 42:24
42:24
understanding 6:9
10:9
unit 24:9
united 1:1 2:1
universal 41:23
update 20:6
upset 22:17,20
25:17 51:1
urine 19:15,17
36:18,19,20,23
37:5,10,22,24 38:9

38:23 39:6 40:1
40:12,14 41:19,21
43:13 46:21,22
use 7:19 38:9
41:25 42:20

**v**

vacaville 1:17 2:21
5:1
valley 12:23
verbal 15:7
verbalize 15:5
violated 22:23
25:18 31:7 43:14
51:7
violating 23:6
violation 20:13
21:2 31:10 34:1
35:23 46:21,23
visit 25:5,7,10
26:8 50:5,7
vs 1:9 2:10

**w**

w 5:22 10:18
43:25 44:14,16
wait 6:16 47:9
waiting 37:18
want 6:24 7:9,14
11:1 17:25 22:13
29:1 36:4 38:16
39:22 50:20
wanted 11:13 27:1
27:9 34:8 35:2
warranting 45:23
watch 38:23
watching 38:14
water 42:1
way 10:23 12:7
14:11 21:2 22:21
36:12

we've 5:12 40:5
51:19
weaned 24:10
wearing 37:1,4
38:11 42:13
weeks 8:7 25:3
wendy 44:23
45:15 46:5 48:20
49:1
went 12:21 37:7
49:3
whereof 54:18
wise 50:22
wish 8:14 28:16
witness 4:2 16:22
16:24 17:2 52:4,7
52:10,14,17 54:18
witnesses 54:5
word 51:12
words 37:8 40:20
50:13
work 24:9 48:7
working 48:5,6
write 20:3
wrong 7:3,4 36:9
wrote 23:18

**x**

x 4:1,12 16:2

**y**

y 32:5
yeah 9:13,25 10:2
13:2 15:13 18:20
19:4 20:24,24
27:6 41:17 45:16
49:13,24 50:13
51:21
year 12:18 17:16
49:17,24,24
years 22:19

zink 10:15 18:9,10
19:15,18 36:7,11
36:15,17 40:6
43:15 48:17,22

Page 10

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT
1
Owens

1   XAVIER BECERRA
    Attorney General of California
2   PETER A. MESHOT
    Supervising Deputy Attorney General
3   OLIVER R. LEWIS, State Bar No. 133557
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone: (916) 324-5495
6     Fax: (916) 322-8288
      E-mail: Oliver.Lewis@doj.ca.gov
7   *Attorneys for Defendants Jackie Clark,*
    *Francis Ko, M.D., Michele Ditomas, M.D.,*
8   *Teresa Zink, R.N., and Wendy Harris*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                     SACRAMENTO DIVISION

12

13
    DERRICK OWENS,                        2:15-cv-00982 TLN KJN
14
                          Plaintiff,      **SECOND AMENDED NOTICE OF**
15                                        **TAKING OF DEPOSITION OF**
              v.                          **PLAINTIFF DERRICK OWENS AND**
16                                        **NOTICE TO PRODUCE DOCUMENTS**
                                          **PURSUANT TO CODE OF CIVIL**
17  JACKIE CLARK, et al.,                 **PROCEDURE SECTION 2025.010 et. seq.**

18                        Defendants.     Date:      Monday, April 24, 2017
                                          Time:      11:00 a.m.
19                                        Location:  (CMF) California Medical
                                                     Facility, Vacaville, CA
20                                        Reporter:  Veritext

21                                        Action Filed:  October 8, 2015

22
    **TO PLAINTIFF IN PRO PER:**
23
        **PLEASE TAKE NOTICE** that the deposition of **Plaintiff DERRICK OWENS** will be
24
    taken by Defendants **Jackie Clark, Francis Ko, M.D., Michele Ditomas, M.D., Teresa Zink,**
25
    **R.N., and Wendy Harris (Deputy Oliver R. Lewis), on April 24, 2017, at 11:00 a.m.,** at
26
    **California Medical Facility, Vacaville, CA (Veritext Deposition Reporters),** before a certified
27
    shorthand reporter. If for any reason the taking of the deposition is not completed on that date,
28

                                          1

1  the taking of the deposition will be continued, at the option of the noticing party, either from day

2  to day, excluding Saturdays, Sundays and holidays, or be continued until a date certain as

3  determined by the noticing party.  The deposition will be taken pursuant to Code of Civil

4  Procedure section 2025.010 et seq.

5       PLEASE TAKE FURTHER NOTICE that deponent is required to produce all of the

6  following items and/or documents related to the subject matter of this action:

7      1. Any and all statements, correspondence, e-mails and other writings, (as that term is

8  defined in Evidence Code §250) that relate to the subject matter of this litigation.

9      2. Any and all photographs and X-rays related to this action.

10      3. Any and all diagrams related to this action.

11      4. Any and all tape recordings related to this action.

12      5. Any other evidence relating to how or why the incident, which is the subject matter of

13  this action, occurred.

14      6. Any medical bills and reports not previously produced.

15

16  Dated:  April 6, 2017                             Respectfully submitted,

17                                        XAVIER BECERRA

18                                        Attorney General of California
                                      PETER A. MESHOT

19                                        Supervising Deputy Attorney General

20

21                                        OLIVER R. LEWIS

22                                        Deputy Attorney General
                                      *Attorneys for Defendants Jackie Clark,*

23                                        *Francis Ko, M.D., Michele Ditomas, M.D.,*
                                      *Teresa Zink, R.N., and Wendy Harris*

24  SA2016302529
    32832011.doc

25

26

27

28

                                2

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Derrick Owens v. Jackie Clark, et al.**
No.:             **2:15-cv-00982-TLN-KJN**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On <u>April 6, 2017</u>, I served the attached <u>**Second Amended**</u> **Notice of Deposition of Plaintiff Derrick Owens with Request for Production of Documents** by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550, addressed as follows:

Derrick Owens, V-49527
California Medical Facility
P.O. Box 2000
Vacaville, CA  95696-2000

In Pro Per

**Courtesy copies to:**
<u>cfitzer@veritext.com</u>
<u>mee.thao@cdcr.ca.gov</u>
<u>connie.vanenburg@cdcr.ca.gov</u>

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>April 6, 2017</u>, at Sacramento, California.

| Lois M. Buzbee-Osby | |
| --- | --- |
| Declarant | Signature |

SA2016302529
32832037.doc