UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DERRICK OWENS,<br><br>        Plaintiff,<br><br>   v.<br><br>JACKIE CLARK, et al.,<br><br>        Defendants. | No. 2:15-cv-0982 TLN KJN P<br><br><br>FINDINGS AND RECOMMENDATIONS |

I.  Introduction

Plaintiff is a state prisoner, proceeding pro se and in forma pauperis.  Defendants' motion for summary judgment is before the court.  As discussed below, defendants' motion for summary judgment should be granted in part and denied in part.

II.  Summary Judgment Standards

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

////

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

By contemporaneous notice provided on December 1, 2017 (ECF No. 67 at 43-46), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

III. Legal Standards

A. Eighth Amendment

While the Eighth Amendment of the United States Constitution entitles plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating

that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

To establish "deliberate indifference" to such a need, the prisoner must demonstrate: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Jett, 439 F.3d at 1096. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citations omitted); Hallett v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002). To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett, 439 F.3d at 1096; see also McGuckin, 974 F.2d at 1060. The defendant must have been subjectively aware of a serious risk of harm and must have consciously disregarded that risk. See Farmer v. Brennan, 511 U.S. 825, 845 (1994).

An "isolated exception" to the defendant's "overall treatment" of the prisoner does not state a deliberate indifference claim. Jett, 439 F.3d at 1096. Similarly, "mere malpractice, or even gross negligence" in the provision of medical care does not establish a constitutional violation. Wood, 900 F.2d at 1334; see also Farmer, 511 U.S. at 835 (deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety'") (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)); Wilhelm, 680 F.3d at 1123 (a "negligent misdiagnosis" does not state a claim for deliberate indifference).

4

In addition, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citation omitted); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

In order to prevail on a claim involving defendants' choices between alternative courses of treatment, a prisoner must show that the chosen treatment "was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332. In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. Id.

IV. Undisputed Facts[1] ("UDF")

*Undisputed Facts as to Defendant Dr. Ko*

1. At all times relevant to this action, plaintiff Derrick Owens was a state prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and housed at the California Medical Facility ("CMF") in Vacaville, California.

2. At all relevant times, defendant Dr. Francis Ko, M.D. was a physician and surgeon employed by CDCR at CMF.

3. Plaintiff's claims against Dr. Ko concern events from April of 2014, through July 24, 2014, when Dr. Ko prescribed alternative pain medications for plaintiff.[2]

---

[1] For purposes of summary judgment, the undersigned finds these facts are undisputed, unless otherwise indicated. On January 16, 2018, plaintiff filed an amended response to defendants' statement of undisputed facts. (ECF No. 73.) Although such filing is technically an unauthorized sur-reply, the undersigned has considered plaintiff's filing because his initial responses were often unclear, as noted in defendants' reply. Plaintiff did not provide any new evidence in his filing, but simply clarified what facts he disputes, and on what evidence his responses relied.

[2] Despite defendants' claim that plaintiff's complaint against Dr. Ko is limited to events that took place in April and May of 2014, plaintiff's verified pleading and complete deposition testimony

5

4.  Plaintiff alleges in his verified first amended complaint that Dr. Ko violated plaintiff's Eighth Amendment rights when the doctor tapered his morphine on April 24, 2014, and did not provide plaintiff with alternative medications.[3]  (ECF No. 24 at 3.)

5.  On April 22, 2013, plaintiff entered into a Pain Management Agreement ("Agreement") with CDCR in order to receive morphine for his alleged chronic pain condition. (ECF No. 67 at 32.)

6.  Two of the conditions agreed to by plaintiff in the Agreement were not to "cheek" the morphine tablets and to submit to urine tests, as ordered by the provider, to detect improper use of medication not prescribed.

7.  On March 12, 2014, nursing staff noticed and suspected that plaintiff was not swallowing and was cheeking his morphine tablets.[4]

8.  After being notified by nursing staff that plaintiff was suspected of cheeking his morphine tablets, Dr. Ko ordered a urine test for plaintiff.  (ECF No. 24 at 69.)

9.  Plaintiff submitted to a urine test on April 11, 2014, and the results of the test showed a significant level of methamphetamine in his system.[5]  (ECF Nos. 24 at 71; 67 at 28:22.)

_____

encompasses Dr. Ko's treatment for June and July of 2014 as well.  At his deposition, plaintiff initially testified that his complaint against Dr. Ko only involves events that took place in April and May of 2014.  (Pl.'s Dep. at 17:11-23.)  However, plaintiff further testified that he saw Dr. Ko on June 16, 2014, and July 22, 2014.  (Pl.'s Dep. at 22-25; 35.)  In his verified pleading, plaintiff states he saw Dr. Ko on June 16, 2014, and Dr. Ko would not provide treatment.  (ECF No. 24 at 12.)  Plaintiff was seen again by Dr. Ko on July 22, 2014, and by Dr. Ko's own admission, plaintiff walked with a slight limp; plaintiff states that he requested pain medication, but none was prescribed.  (ECF No. 24 at 12-13.)  It is undisputed that plaintiff's morphine prescription was cut off in May of 2014, and he was not provided alternative pain medications until July 24, 2014.

[3] Defendants assert that in his pleading, plaintiff claimed Dr. Ko did not <u>immediately</u> provide alternative pain medications.  However, the court finds that plaintiff's pleading it not limited to the discontinuation or immediate failure to prescribe alternative medications.  Rather, plaintiff also includes a claim for the delay in failing to prescribe alternative medications, by including incidents occurring after April 24, 2014, as well as arguing alleged harm caused by the delay, citing <u>Jett</u>, 439 F.3d 1091.  (ECF No. 24 at 23-24; *passim*.)

[4] Plaintiff denies this statement, citing his first amended complaint at 6.  (ECF No. 73 at 2, citing 24 at 6.)  But plaintiff's pleading and exhibit does not rebut the nursing staff's report.

[5] Plaintiff disputes this fact, arguing that the methamphetamine was in his urine, but not in his system.  Plaintiff adduces no competent evidence to support his theory.

10.  Under the terms of the Agreement, Dr. Ko ordered plaintiff's morphine to be discontinued, and on April 24, 2014, the order was placed to reduce plaintiff's daily morphine dose by 25% each week until completely tapered off.  This was required due to plaintiff's violation of the Agreement.  Dr. Ko declares that the morphine was completely off on May 24, 2014 (ECF No. 67 at 28), but plaintiff declares the morphine stopped on May 14, 2014 (ECF No. 68 at 38).  The April 24, 2014 medical record states that an order was written to reduce daily morphine 25% each week until off completely (3 wk taper).  (ECF No. 24 at 73.)

11.  When plaintiff's morphine was completely discontinued, Dr. Ko did not <u>initially</u> substitute the morphine with another pain medication because Dr. Ko wanted the morphine to "wash out of [plaintiff's] system" and get a baseline pain level.  Once the morphine was tapered off completely, and only thereafter, could plaintiff's baseline pain be assessed (including location on his body, intensity, character, and how it impacted his activities of daily life [ADL's]).  Dr. Ko declares there was no way to predict what kind and how much of alternative treatment plaintiff would need.  Dr. Ko also declares it is "possible" plaintiff's pain would be minimal or nonexistent when completely off the morphine and, as a result, plaintiff would not need alternate pain medications.  Although plaintiff did not submit an expert witness declaration rebutting Dr. Ko's declaration, plaintiff argues that due to plaintiff's medical conditions and prior history as a chronic pain patient of Dr. Ko, then Dr. Ko should have known plaintiff would require alternative pain medications.  Plaintiff can testify as to the pain he experienced, when he took the last morphine dose, and when he informed Dr. Ko of plaintiff's pain and need for requested alternative pain medications.

12.  Dr. Ko declares that plaintiff could submit a Form 7362 (Health Care Services Request) or present to CMF's Treatment and Triage Area 24 hours a day/7 days a week for immediate medical assistance.  Dr. Ko declares that plaintiff "never exercised either option." (ECF No. 67 at 29.)  However, plaintiff provided a copy of his Form 7362 signed on June 4, 2014, in which plaintiff sought to see Dr. Ko concerning medication, and the triage nurse initialed plaintiff's pain level as 10 out of 10, yet marked the request "routine."  (ECF No. 24 at 91; <u>see also</u> Pl.'s Dep. at 23-24.)

13. There is no evidence that plaintiff presented to the treatment and triage area or requested immediate medical assistance complaining of unbearable or severe pain.

14. After plaintiff's morphine was completely cut off, Dr. Ko declares he saw plaintiff three times: June 16, 2014, June 22, 2014, and July 24, 2014. During the first two visits, Dr. Ko declares that plaintiff did not request any alternative pain medication. (ECF No. 67 at 29.) Plaintiff declares that he requested medication at every appointment with Dr. Ko, including June 16, 2014, yet none was provided. (ECF No. 68 at 39; Pl.'s Dep. at 25.) Plaintiff testified that on June 16, 2014, Dr. Ko "was just really, like mad. He seemed like he was upset with me. . . .he refused me. And he rushed me out of his office." (Pl.'s Dep. at 25.)

15. Plaintiff declares he saw Dr. Ko on July 22, 2014, not June 22, 2014, which is supported by Dr. Ko's medical progress note dated July 22, 2014.[6] (ECF No. 68 at 36.) In his declaration, Dr. Ko does not address his visit with plaintiff on July 22, 2014.

16. On July 24, 2014, during an interview/visit with Dr. Ko in connection with plaintiff's administrative appeal, plaintiff requested alternative pain medication and Dr. Ko prescribed plaintiff Ibuprofen 400 mg and Nortriptyline 25 mg.

17. The only reason Dr. Ko discontinued plaintiff's morphine was because plaintiff had violated the Agreement. Dr. Ko's action to discontinue the morphine was authorized and justified by the terms of the Agreement, especially due to the potential health risk to plaintiff having both morphine and methamphetamine in his system.[7]

18. Dr. Ko declares that all of the medical care and treatment rendered to plaintiff by him was appropriate and consistent with plaintiff's symptoms, medical condition and history, CDCR policies and procedures, and, at all times, was within the community standard of care and

---

[6] It is unclear whether Dr. Ko's reference to June 22, 2014, is a typographical error. Medical records confirm Dr. Ko saw plaintiff on July 22, 2014. (ECF No. 24 at 102.) Defendants do not address the July 22, 2014 medical record or the date discrepancy in their reply. (ECF No. 72.)

[7] Plaintiff initially disputes this fact by denying he used methamphetamine. But plaintiff adduces no competent evidence rebutting the lab results, or supporting his theory that the urine test was contaminated. Moreover, plaintiff later concedes Dr. Ko was required to discontinue the morphine. (ECF No. 68 at 39:17-20.)

consistent with the degree of knowledge and skill ordinarily possessed and exercised by members of Dr. Ko's profession under similar circumstances. Dr. Ko declares he has not refused or denied plaintiff appropriate medical treatment or evaluation. Although plaintiff cannot opine as to the standard of care, plaintiff declares that Dr. Ko denied plaintiff alternative pain medication on June 16, 2014, and July 22, 2014 (ECF No. 73 at 5.) In further support, plaintiff provides his appeal complaining of very severe pain on June 19, 2014. (ECF No. 24 at 93.) Plaintiff also provides Dr. Ko's September 30, 2013 chrono diagnosing plaintiff as a chronic pain patient for whom morphine was the appropriate pain medication given plaintiff's neuropathic pain. (ECF No. 24 at 65.)

*Undisputed Facts as to Defendant Zink*

19. <u>See</u> UDF No. 1.

20. At all relevant times, Teresa Zink, R.N., was employed by the CDCR as a registered nurse at CMF in Vacaville, California.

21. In his First Amended Complaint, plaintiff alleges that in April 2014, Nurse Zink collected a urine sample from plaintiff in violation of the Department Operations Manual, Section 52010.17 (ECF No. 24 at 6), which requires that staff observing the collection of a urine sample be of the same gender as the inmate being tested.

22. Title 15, Section 52010.17 applies only to "custody" situations, not to medically-related issues.[8] (ECF No. 67 at 36.)

23. There are no CDCR regulations or policies preventing same-gender nursing staff from collecting urine samples from inmates for medical reasons. (ECF No. 67 at 36.)

24. In this case, in April 2014, Dr. Ko issued an order to collect a urine sample from plaintiff because nursing staff suspected that plaintiff was cheeking his morphine tablets.

25. The purpose of Dr. Ko's order was to determine the level of morphine in plaintiff's system to ensure that plaintiff was, in fact, ingesting his morphine.

---

[8] Plaintiff disputes this fact, citing §§ 52010.1 and 52010.18. (ECF No. 24 at 135.) However, plaintiff fails to provide the context for these regulations, and cites no regulation applied in the medical setting.

26. The result of the urine collection showed levels of both morphine and methamphetamine.

27. [Intentionally left blank.][9]

28. Levels of methamphetamine can only be found in a urine sample when someone has used methamphetamine within a few days prior to the test.

29. Other than collecting a urine sample from plaintiff, it is undisputed that Nurse Zink did not have any other personal interaction with plaintiff.

*Undisputed Facts as to Defendant DiTomas, M.D.*

30. See UDF No. 1.

31. At all relevant times, Michele DiTomas, M.D. was the Chief Physician and Surgeon at CMF.

32. Plaintiff's only complaint against Dr. DiTomas is that she was a supervising physician and she had the authority to overturn Dr. Ko's order terminating plaintiff's morphine.[10]

33. Dr. DiTomas' only involvement in this case is that she denied plaintiff's appeal at the first level of review.

34. On April 11, 2014, a urine toxicology test showed that plaintiff had methamphetamine in his body, in violation of the pain management agreement ("Agreement")

---

[9] Plaintiff urges that the failure of Nurse Zink to wear gloves during the urine collection process contaminated the urine sample. But Dr. Ko declares that plaintiff's contamination theory is "an unrealistic scenario" because "[d]etectable levels of methamphetamine can only be found in a urine sample when someone has used methamphetamine within a few days prior to the test." (ECF No. 67 at 28.) Whether or not Nurse Zink wore gloves during the urine collection, plaintiff offers no competent evidence to rebut Dr. Ko's declaration. Thus, whether or not defendant Zink wore gloves during the urine collection is not a material dispute of fact for purposes of summary judgment.

[10] Plaintiff argues that Dr. DiTomas also had the authority to order a repeat urine sample collection based on plaintiff's theory that the urine sample was contaminated by Nurse Zink's failure to wear gloves. However, as set forth above, plaintiff adduced no competent evidence to support such contamination. Moreover, as urged by defendants, Dr. DiTomas used her professional medical judgment to confirm the discontinuation of plaintiff's morphine prescription because of the potential health risk when morphine is combined with methamphetamine.

entered into between plaintiff and the CDCR in 2013.[11]

35.  Federal and state regulations recommend prescribing doctors stop prescribed narcotics where the risks to the patient outweigh the benefits.

36.  Because plaintiff was being prescribed morphine, the finding of methamphetamine in his system was not only a violation of his pain management agreement, but also a serious risk to his health.[12]  That reason is why plaintiff's primary care physician, Dr. Ko, discontinued plaintiff's morphine prescription, and Dr. DiTomas denied plaintiff's appeal.

37.  Dr. DiTomas denied plaintiff's first level of review to ensure that plaintiff's health was not jeopardized.[13]

*Undisputed Facts as to Defendant Jackie Clark*

38.  <u>See</u> UDF No. 1.

39.  At all relevant times, Jackie Clark was the Chief Executive Officer at CMF.

40.  Plaintiff's only complaint against Jackie Clark is that she was a supervisor and she denied his appeal at the second level of review.

41.  Jackie Clark denied plaintiff's appeal at the second level of review because plaintiff violated the terms of his pain management agreement entered into on April 22, 2013.[14]

*Undisputed Facts as to Defendant Wendy Harris*

42.  <u>See</u> UDF No. 1.

---

[11]  Plaintiff disputes this fact, arguing that urine test procedures were violated and his urine sample was contaminated.  But, as explained above, plaintiff adduces no competent evidence the sample was contaminated.

[12]  Plaintiff disputes part of this fact, again based on his unsupported contamination claim.

[13]  Defendant DiTomas also claims she was not deliberately indifferent; however, whether or not Dr. DiTomas was deliberately indifferent is the legal question at issue herein.  Plaintiff disputes this fact on the grounds that he requested a repeat urine test because the urine sample was contaminated and the urine test procedures were not violated.  However, plaintiff's theory that the urine test was contaminated, standing alone, is insufficient to demonstrate the urine test was contaminated.

[14]  Plaintiff's dispute with this fact is also based on his unsupported theory that his urine sample was contaminated.

43. At all relevant times, Wendy Harris was a medical appeals coordinator employed by CDCR at CMF in Vacaville, California.

44. Plaintiff's complaint against Wendy Harris is that she processed his appeal as a "routine" rather than "emergency" appeal, resulting in a delay in plaintiff receiving medical treatment.

45. On June 19, 2014, plaintiff submitted a 602 medical appeal (Number 14039699) and Wendy Harris received it on June 27, 2014. (ECF No. 24 at 93.)

46. Wendy Harris assigned a due date of August 8, 2014 for Appeal No. 14039699.

47. Plaintiff's Appeal No. 14039699 was not designated as an "emergency" appeal by his health care provider, Dr. Ko, or any other health care provider.

48. As a medical appeals coordinator, Wendy Harris did not have the authority to designate an appeal as either "routine" or "emergency."[15]

49. An appeal is designated as "routine" or "emergency" only by a clinician (R.N. or higher licensing level).

50. Wendy Harris is not a clinician.

V. Discussion

    A. Eighth Amendment Claims

        1. Serious Medical Need

On October 4, 2013, defendant Dr. Ko issued plaintiff a chrono documenting that plaintiff suffered a gunshot wound in 1995 resulting in chronic low back pain, sciatica, and left foot drop, and is status post cervical fusion C5-6 which had complications resulting in chronic neck pain and chronic incontinence. (ECF No. 24 at 106.) After his cervical fusion, plaintiff suffered a fall on August 11, 2008, and was then worked up for increased neck and low back pain. (ECF No. 24 at 45.) "He was felt to have a bilateral radiculopathy, left greater than right, secondary to the acute trauma." (Id.) Plaintiff's September 10, 2008 EMG reflected "markedly severe sciatic nerve

---

[15] Plaintiff disputes this fact and UDF 49, citing § 3084.9 Exceptions to the Regular Appeal Process. (ECF No. 24 at 133.) However, he fails to adduce evidence that § 3084.9 applies to health care appeals.

compromise at the left hip affecting both myelin and axons as well as an L4 through S2 nerve root radiculopathy on the right side." (ECF No. 24 at 45.) Plaintiff has been prescribed morphine for chronic pain for many years.[16] The parties do not dispute, and the undersigned finds, that based upon the evidence presented, a reasonable juror could conclude that plaintiff's chronic pain constitutes an objective, serious medical need. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.")

### 2. Deliberate Indifference

The undersigned finds that defendants have borne their initial responsibility of presenting evidence that demonstrates the absence of a genuine issue of material fact concerning whether or not plaintiff's morphine was improperly discontinued. Defendants adduced evidence that on April 11, 2014, plaintiff's urine test results showed a significant level of methamphetamine, and that detectable levels of methamphetamine can only be found in a urine sample when someone has used methamphetamine within a few days prior to the urine test. Defendant Dr. Ko discontinued plaintiff's morphine prescription because plaintiff violated the terms of the Agreement, and the combination of morphine and methamphetamine could cause a serious medical risk to plaintiff's health. Dr. Ko issued an order that plaintiff's morphine be reduced 25% each week until completely discontinued. Finally, Dr. Ko declared that he did not initially substitute the morphine with another pain medication in order to obtain a baseline pain level after the morphine washed out of plaintiff's system, and declares that plaintiff requested alternative pain medication on July 24, 2014, and Dr. Ko prescribed them immediately.

Defendants adduced evidence that Dr. DiTomas and Jackie Clark denied plaintiff's appeals concerning the discontinuation of morphine based on plaintiff's failure to comply with

---

[16] Plaintiff declares he has been taking morphine since 2008. Medical records confirm that plaintiff was prescribed morphine at least by July 17, 2009. (ECF No. 24 at 45-46.) On April 22, 2013, plaintiff and Dr. Ko signed the pain management agreement, and on September 6, 2013, Dr. Ko increased plaintiff's morphine from twice a day to three times a day. (ECF No. 24 at 65.)

the Agreement. Defendants submitted evidence that it is Nurse Zink's practice to always wear gloves when collecting urine, and that in the medical setting, the person collecting urine is not required to be of the same gender as the patient. Finally, defendants adduced evidence that Wendy Harris is not a clinician and therefore did not have the authority to process plaintiff's June 19, 2014 health care appeal as an emergency appeal.

In the absence of any competent evidence that the lab test was erroneous or that the urine sample was contaminated in such a way that it would reflect such a significant level of methamphetamine, as well as evidence showing that each defendant was aware thereof, defendants have demonstrated entitlement to judgment in their favor on plaintiff's Eighth Amendment claim challenging the discontinuation of his morphine prescription, as well as the failure to immediately prescribe alternative pain medication.

a. Discontinuation of Morphine Prescription

It appears that plaintiff now concedes that Dr. Ko had to discontinue plaintiff's morphine prescription "due to the alleged violation of the pain contract." (ECF No. 68 at 39:17-20.)

As evidence that his urine sample was contaminated, plaintiff declares the urine sample was contaminated. But plaintiff's declaration, standing alone, is insufficient. Without competent evidence showing the urine sample was contaminated, plaintiff's declaration to that effect is a theory, nothing more.

Plaintiff submits various regulations in support of his declaration that defendant Zink violated policy by failing to have the urine collected by someone of the same gender as plaintiff. As noted above, defendant Zink declares that in the medical setting, there is no same-gender requirement, and plaintiff adduced no competent evidence in rebuttal. In his opposition, plaintiff argues that his urine was tested not only to determine whether plaintiff had ingested morphine, but also to test for a controlled substance such as cocaine or methamphetamine, such that the controlled substances policy under DOM Section 52010.1, et seq. applies. (ECF No. 68 at 45; referring to ECF No. 24 at 135.)

However, the section 52010 policy is articulated as "The California Code of Regulations (CCR) includes a disciplinary process and evidence control system for controlled substance-

14

related offenses by inmates." DOM Section 52010.1. Here, the drug test was not ordered in connection with a disciplinary process, as contemplated under section 52010.1. Rather, the evidence shows that defendant Dr. Ko ordered the drug test in a medical setting to determine whether plaintiff had ingested the morphine as prescribed. (UDF 8, 25.) Plaintiff points to no evidence demonstrating that defendant Dr. Ko ordered the drug test for the purpose of testing for cocaine or methamphetamine. Because morphine is an opioid, a controlled substance, the urine test revealed not only the morphine but also methamphetamine in plaintiff's system. (ECF No. 67 at 32.) Moreover, defendant Zink declared that the section 52010 relied upon by plaintiff only applies to custody settings, not medical settings. (UDF 22.) Indeed, Chapter 5 of the 2015 DOM is entitled "Adult Custody and Security Operations." Id. In addition, the DOM also has a separate chapter governing Health Care Services, Chapter 9, which includes 10 separate articles. Id. at 790-820. Plaintiff points to no evidence in rebuttal.

For all of the above reasons, the undersigned finds that plaintiff fails to demonstrate that the termination of plaintiff's morphine prescription was deliberate indifference on the part of any defendant based on the lab results showing methamphetamine in plaintiff's system. In addition to violating the terms of the Agreement signed by plaintiff, the presence of methamphetamine and morphine in plaintiff's system posed a serious medical health risk, both of which supported Dr. Ko's decision to discontinue the morphine prescription, and also supported the decisions of defendants DiTomaso and Clark. Defendants are entitled to summary judgment on this claim.

b. Failure to Immediately Prescribe Alternative Pain Medication

To the extent plaintiff contends that defendant Dr. Ko failed to immediately prescribe alternative pain medication following the order to taper off and discontinue plaintiff's morphine prescription, such claim fails based on Dr. Ko's declaration that he was waiting for the morphine to wash out of plaintiff's system in order to establish plaintiff's pain baseline. Plaintiff offers no expert medical opinion to rebut Dr. Ko's declaration. Dr. Ko is entitled to summary judgment on this claim.

c. Further Delay in Providing Alternative Pain Medication

Plaintiff also alleges that the delay in providing plaintiff alternative pain medication

15

following the discontinuation of the morphine prescription constitutes deliberate indifference on the part of Dr. Ko, and, even assuming Dr. Ko was waiting for the morphine to wash out of plaintiff's system, Dr. Ko failed to call plaintiff back to the clinic to establish plaintiff's baseline pain level or to timely provide alternative pain medications. Plaintiff also contends that defendant Harris further delayed plaintiff's receipt of alternative pain medications by failing to process plaintiff's 602 appeal dated June 19, 2014, as an emergency appeal.

*Defendant Harris*

Plaintiff contends that defendant Harris should have processed plaintiff's June 19, 2014 appeal as an emergency appeal. Plaintiff relies on § 3084.9(a)(1) which states, in relevant part:

Exceptions to the Regular Appeal Process

(a) Emergency appeals. Emergency appeals should not be used by inmates . . . as a substitute for verbally or otherwise informing staff of an emergency situation requiring immediate response.

(1) When circumstances are such that the regular appeal time limits would subject the inmate or parolee to a substantial risk of personal injury or cause other serious and irreparable harm, the appeal shall be processed as an emergency appeal. Emergency circumstances include, but are not limited to:

(A) Threat of death or injury due to enemies or other placement concerns.

(B) Serious and imminent threat to health or safety.

(2) An emergency appeal shall be submitted directly to the appeals coordinator and shall include a clear description of the circumstances warranting emergency processing. A request for emergency processing of an appeal that clearly does not meet the criteria for emergency processing or is made for the purpose of circumventing normal procedures or obtaining an expedited response may be considered misuse or abuse of the appeals process.

(3) If the appeals coordinator determines emergency processing is unwarranted, the inmate . . . shall be notified and the appeal shall be processed pursuant to subsection 3084.5(b)(2).

(4) If emergency processing is warranted, the first level shall be waived and the second level review shall be completed within five working days.

Cal. Code Regs. Tit. 15, § 3084.9(a)(1); (ECF No. 24 at 133).

Here, however, it is undisputed that defendant Harris is not a clinician, and Harris declares that as a medical appeals coordinator, she does not have the authority to assign a designation of

either "routine" or "emergency" to an appeal. (UDF 48, 50.) Indeed, § 3084.9 is entitled "Exceptions to the <u>Regular</u> Appeal Process," not <u>Health Care</u> Appeals Process. The undersigned observes that Title 15 of the California Code of Regulations contains Article 8.6 Health Care Grievances, which addresses health care appeals in §§ 3087 -3087.12. Plaintiff adduces no competent evidence to rebut Harris' declaration. Moreover, involvement in reviewing an inmate's administrative appeal does not necessarily demonstrate awareness of a violation, or contribute to the underlying violation. <u>Peralta</u>, 744 F.3d at 1086-87 (Chief Medical Officer's role was "largely administrative.") Defendant Harris' role as medical appeals coordinator was administrative in nature. Plaintiff offers no additional factual allegations or evidence demonstrating defendant Harris was deliberately indifferent.

In any event, even if § 3084.9 applies, it expressly states that administrative appeals should not be used as a substitute for verbally or otherwise informing staff of an emergency situation requiring immediate response. If plaintiff was suffering severe or unbearable pain, he could have submitted an urgent health care request form stating he was in such pain and requesting emergency medical care, or, as Dr. Ko declared, plaintiff could have presented to CMF's Treatment and Triage Area for immediate medical assistance. Plaintiff did not do either.

For all of these reasons, defendant Harris is entitled to summary judgment.

*Defendant Dr. Ko*

The issue of whether Dr. Ko was deliberately indifferent to plaintiff's serious medical needs by delaying the prescription of alternative pain medications cannot be determined on summary judgment due to material disputes of fact, as discussed below.

*When did the morphine wash out from plaintiff's system?*

Dr. Ko declares plaintiff's morphine was completely stopped on May 24, 2014. Plaintiff declares that his morphine was completely stopped on May 14, 2014, the same date plaintiff wrote in his administrative appeal. (ECF Nos. 68 at 38; 24 at 94, 98.) Neither party provided plaintiff's pharmacy records. Dr. Ko did not explain how he arrived at the May 24, 2014 date, provide a copy of his order changing the morphine prescription, or provide a copy of medical records confirming the provision of the tapered morphine and each specific dose. Dr. Ko did not

17

offer his opinion on when the morphine would have washed out from plaintiff's system.

Dr. Ko's April 24, 2014 medical record states that the order would taper plaintiff's dose "25% each week until off completely (three week taper)." (ECF No. 24 at 73.) Presuming Dr. Ko's order was written on April 24, 2014, the tapering process might occur as follows:

Week One: April 24 - 30, 2014

Week Two: May 1 - 7, 2014

Week Three: May 8 - 14, 2014

Week Four: May 15 - 21, 2014

The record does not reflect when the first tapered dose was administered. Plaintiff claims he received his last dose on May 14, 2014. Given the above time frames, and absent evidence in support, it is unclear how Dr. Ko arrived at the discontinuation date of May 24, 2014. In any event, absent more specifics, a trier of fact would have difficulty determining when the morphine washed out of plaintiff's system.

Thus, there is a material dispute of fact as to when plaintiff received the last morphine dose. This fact is relevant because it would assist the trier of fact in determining when the morphine washed out of plaintiff's system, as well as how long plaintiff was without any pain medication for his long-term chronic pain.

*When Were Alternative Pain Medications Required?*

Dr. Ko declares that plaintiff did not request alternative pain medications on either June 16, 2014, or June 22, 2014. Plaintiff declares that, in addition to submitting his June 4, 2014 health care request form asking to see Dr. Ko concerning medication, plaintiff requested alternative pain medications on both June 16, 2014, and July 22, 2014. Neither party provided a medical record from June 16, 2014, or June 22, 2014, and plaintiff insists he did not see Dr. Ko on June 22, 2014.

On June 19, 2014, plaintiff filed an administrative appeal stating that he suffered from very severe pain and that despite consult with Dr. Ko, the doctor refused to prescribe plaintiff alternative pain medication. (ECF No. 24 at 93.) Such appeal supports plaintiff's contention that he asked Dr. Ko for alternative pain medication on June 16, 2014.

The medical record for July 22, 2014 reflects that no medical care was provided, which is curious given plaintiff's June 19, 2014 appeal seeking emergency pain medication for his severe pain. Dr. Ko does not address the July 22, 2014 medical record. (ECF No. 67.) On July 22, 2014, the chief complaint portion of the record states: "Dispo states today's appnt is for 'Needs F/O.' Not clear what this means. Pt did not request appnt." (ECF No. 24 at 102.) Dr. Ko's name is printed at the bottom; the doctor assessed "No reason for appnt today," and the plan was "no tx [treatment] needed today." (Id.) There is no notation that plaintiff was in pain, or that plaintiff asked for pain medications. (Id.) However, in his verified amended complaint, plaintiff explained that "F/O" means "full observation," and contends that Dr. Ko was aware of plaintiff's serious medical needs and condition. (ECF No. 24 at 13, citing ECF No. 24 at 65, 106-07.) Plaintiff argues that Dr. Ko's notation that plaintiff ambulates with a slight limp, no cane used today, supports plaintiff's claim that he asked for alternative pain medication. Id. In any event, plaintiff declares he requested pain medication, but none was provided. (ECF Nos. 24 at 13; 68 at 39.)

Moreover, the record reflects that Dr. Ko was aware of plaintiff's need for pain medication based on Dr. Ko's own medical findings and prescription of morphine. Plaintiff and Dr. Ko signed the Pain Management Agreement on April 22, 2013. (ECF No. 67 at 32.) In addition, plaintiff points to Dr. Ko's September 30, 2013 primary care update which reads:

> A senior physician at CMF is aware I increased [plaintiff's] MSER from 30 BID to 30 TID on 9/6/13. She pointed out a truth: [Plaintiff's] pain is purely neuropathic in nature (as opposed to nociceptive pain). Thus [plaintiff] would benefit more from TCA, gabapentin, venlafaxine, oxcarbazepine or methadone.

(ECF No. 24 at 65.) (emphasis added) (BID is two times per day; TID is three times per day; MSER is morphine sulfate extended release.) Dr. Ko's medical record demonstrates that plaintiff was in need of stronger pain medication for his type of chronic pain. (Id.) It appears that plaintiff was taking 30 mg BID of morphine on April 24, 2014, because Dr. Ko wrote and crossed out: "MS ER 30 BID." (ECF No. 24 at 73.) Plaintiff also points to Dr. Ko's October 4, 2013 chrono explaining the etiology of plaintiff's chronic pain and other medical issues. (ECF No. 24 at 106.) The record confirms that plaintiff has been taking morphine since at least July 17, 2009. (ECF

19

No. 24 at 45.)  These medical records demonstrate that Dr. Ko was aware of plaintiff's neuropathic chronic pain which warranted the prescription of morphine for many years.  Such records raise an inference that Dr. Ko was aware of plaintiff's need for chronic pain medication at the time Dr. Ko discontinued the morphine prescription.

The undersigned further observes that morphine is a narcotic used for the treatment of severe pain.  https://medlineplus.gov/druginfo/meds/a682133.html.  The fact that plaintiff was prescribed morphine potentially indicates that plaintiff suffered from more than mild or moderate pain.

Based on plaintiff's medical history and Dr. Ko's awareness thereof, as well as plaintiff's assertion that he sought alternative pain medications from Dr. Ko, a trier of fact could reasonably conclude that Dr. Ko was deliberately indifferent to plaintiff's chronic pain when Dr. Ko completely discontinued pain medication for plaintiff's chronic pain, yet failed to prescribe an alternative pain medication once the morphine washed out of plaintiff's system or when plaintiff sought alternative pain medications.[17]

*Conclusion*

As discussed above, it is unclear on what date the morphine washed out of plaintiff's system, and there are material disputes of fact as to the date the morphine stopped, and when plaintiff told Dr. Ko that plaintiff was in pain and needed alternative pain medications.  Because material disputes of fact remain at issue, defendant Dr. Ko is not entitled to summary judgment on this claim.

B.  Qualified Immunity

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015), quoting Reichle v. Howards, 566 U.S. 658, 664 (2012).  Qualified immunity analysis requires two prongs of inquiry:

---

[17]  The undersigned acknowledges that there is a lack of documented complaints of unbearable or severe pain in plaintiff's medical file.  But plaintiff can testify as to when and what he told Dr. Ko, whether or not Dr. Ko documented plaintiff's pain complaints in plaintiff's medical file.

"(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009). These prongs need not be addressed in any particular order. Pearson v. Callahan, 555 U.S. 223 (2009).

Here, the court finds that there are material disputes of fact that preclude summary judgment for Dr. Ko. Taking the facts in the light most favorable to plaintiff, the undersigned finds that defendant Dr. Ko potentially violated plaintiff's constitutional rights when Dr. Ko failed to prescribe plaintiff alternative pain medication for plaintiff's chronic pain, once the morphine washed out of plaintiff's system, or plaintiff requested alternative pain medication. Taking the facts in the light most favorable to plaintiff, the record demonstrates that plaintiff suffered chronic pain and Dr. Ko was aware of such chronic pain. There are material disputes of fact as to when the morphine washed out of plaintiff's system, such that a new pain prescription could be written, and as to when plaintiff told Dr. Ko that he needed alternative pain medication. The undersigned finds that a reasonable doctor would have known that failing to prescribe plaintiff alternative pain medication that adequately managed his chronic pain would violate plaintiff's Eighth Amendment rights, particularly where Dr. Ko was the doctor who identified plaintiff as a chronic pain patient in 2013, identified plaintiff's pain as neuropathic, and prescribed morphine for such pain for over a year. For these reasons, defendant Dr. Ko is not entitled to qualified immunity on plaintiff's claim that his alternative pain medication was delayed.

As to plaintiff's other claims, because the undersigned finds that Dr. Ko and the remaining defendants did not violate plaintiff's constitutional rights with regard to plaintiff's other claims, the undersigned does not address the qualified immunity analysis any further with respect to such claims.

VI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 67) be granted in part, and denied in part, as follows:

21

1    1. Dr. Ko's motion for summary judgment be denied on plaintiff's claim that the

2 prescription of alternative pain medication was delayed once the morphine washed out of his

3 system or plaintiff informed Dr. Ko of plaintiff's need for alternative medications;

4    2. Dr. Ko's motion for summary judgment be granted on all other grounds;

5    3. The remaining defendants' motion for summary judgment be granted; and

6    4. This action be remanded to the undersigned for further scheduling.

7    These findings and recommendations are submitted to the United States District Judge

8 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

9 after being served with these findings and recommendations, any party may file written

10 objections with the court and serve a copy on all parties.  Such a document should be captioned

11 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12 objections shall be filed and served within fourteen days after service of the objections.  The

13 parties are advised that failure to file objections within the specified time may waive the right to

14 appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

15 Dated:  August 27, 2018

16

17    KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

18

19 /owen0982.msj.med

20

21

22

23

24

25

26

27

28

                                    22